Samuel B. Mayer (SM6479)
Scott H. Casher (SC7903)
Edwards Angell Palmer & Dodge LLP
Attorneys for Plaintiff
750 Lexington Avenue
New York, NY 10022
(212) 308-4411

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK



LINCOLN GENERAL INSURANCE COMPANY,

Plaintiff,

- against –

THE ROBERT PLAN CORPORATION, THE ROBERT
PLAN OF NEW YORK CORPORATION, THE
ROBERT PLAN OF CALIFORNIA CORPORATION,
and FREEDOM GENERAL AGENCY, INC.

Defendant.

**ECF CASE**

Case No.: 08-cv-01251-GEL

**AMENDED COMPLAINT**

Plaintiff Lincoln General Insurance Company, by its attorneys Edwards Angell Palmer &

Dodge LLP, for its first amended complaint alleges as follows:

## PARTIES

1. Plaintiff Lincoln General Insurance Company is incorporated in and has its principal

place of business in the Commonwealth of Pennsylvania.

2. Defendant The Robert Plan Corporation ("TRPC") is incorporated in the State of

Delaware and has its principal place of business in the State of New York.

3. Defendant The Robert Plan of New York Corporation is incorporated in and has its

principal place of business in the State of New York.

NYC 308536.2

4. Defendant The Robert Plan of California Corporation is incorporated in the State of California and has its principal place of business in the State of New York.

5. Defendant Freedom General Agency, Inc. is incorporated in the State of Texas and has its principal place of business in the State of New York.

## JURISDICTION

6. The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 because it involves a matter in dispute between citizens of different States, as defined in 28 U.S.C. §1332, and because the matter in controversy exceeds the sum of $75,000, exclusive of interest and costs.

## FIRST CLAIM

7. On or about November 22, 2005, plaintiff and defendants entered into a Program Manager Agreement ("PMA") relating to the management and administration of certain automobile insurance programs insured by plaintiff. A copy of the PMA is attached hereto as Exhibit A. On or about June 14, 2006, the parties to the PMA entered into Amendment No. 1 to the PMA, a copy of which is attached hereto as Exhibit B. The PMA refers to plaintiff as "Company" and defendants collectively as "Manager."

8. On or about January 5, 2007, the parties to the PMA terminated the PMA, but certain provisions of the PMA by the terms of the PMA survived such termination.

9. Defendants have breached certain of the provisions of the PMA which are hereinafter described and which survived termination of the PMA, causing damages to plaintiff for which plaintiff seeks judgment in this action.

10. Article IV.A of Endorsement C of the PMA provides as follows:

> For all claims services to be rendered by the Manager during the term of this Agreement the Company shall pay the Manager a fee

- 2 -

> of 12% of the Earned Net Premium and buy out fees relating to that premium. This fee shall be deemed to cover all of Manager's allocated and unallocated loss adjustment expenses, including legal and investigative expenses, and no additional or supplementary fee shall be payable to Manager for claims services.

11. Article V.C of Endorsement C of the PMA provides: "To the extent Company directly handles administration of the claims attributable to the Business, Manager's fee shall be proportionately reduced or eliminated as determined in Company's sole discretion."

12. Defendants owe plaintiff $2,175,842 by reason of defendants' failure to pay to plaintiff allocated and unallocated loss adjustment expenses incurred by plaintiff in 2007.

## SECOND CLAIM

13. Article III.A of Endorsement D of the PMA provides: "Manager shall refund on a prorated basis to Company, on all insurance issued under this Agreement, Commissions or Provisional Commissions on coverage which has been canceled by Company or the insured, and on premiums which have been reduced or refunded, in each case at the Provisional Commission Rate or Commission Rate, as applicable, at which such Provisional Commissions or Commissions were originally payable and within the period of time required by the rules or regulations of Company."

14. Defendants owe plaintiff $3,145,904 for Commissions or Provisional Commissions on coverage which has been canceled by plaintiff or the insured, and on premiums which have been reduced or refunded.

## THIRD CLAIM

15. On or about December 31, 2006, plaintiff and defendants entered into a series of transactions described in a Closing Memorandum, a copy of which is attached hereto as Exhibit

- 3 -

NYC 308536.2

C, which makes reference to the PMA and modified the terms and conditions of the parties' business relationship with respect to then existing automobile insurance programs.

16. The Closing Memorandum at Section 5 provided for a Sublease from TRCP to RPC Insurance Agency, L.L.C., a Delaware limited liability company of which plaintiff was the sole member, for premises leased by TRPC in Bethpage, New York (the "Sublease"), and authorized plaintiff to suspend the payment of fees otherwise owed to TRCP, in the event of material breach by TRPC of its obligations with respect to the Sublease.

17. TRPC has breached its obligations under the Sublease by, among other things, failing to keep and maintain its lease with the landlord of said premises, and such breaches are material.

18. By reason of TRPC's breaches of the Sublease, plaintiff has sustained damages in an amount to be ascertained at the trial of this action.

## FOURTH CLAIM

19. On or about July 9, 2008, plaintiff sent approximately $958,000 to TRPC in payment of presumed obligations under the surviving provisions of the PMA (the "Payment").

20. By reason of the amounts owed by defendants to plaintiff as alleged in the preceding paragraphs of this Amended Complaint, as well as the failure of TRPC to meet its obligations with respect to the Sublease, plaintiff is entitled to set off the Payment against amounts which would otherwise be payable to TRPC under the surviving provisions of the PMA.

WHEREFORE, plaintiff demands:

1. On the First Claim, money damages in the amount of $2,175,842.00;

2. On the Second Claim, money damages in the amount of $3,145,904.00;

3. On the Third Claim, money damages in an amount to be ascertained;

4. On the Fourth Claim, money damages in the amount of approximately $958,000.00;

- 4 -

5. interest, costs and disbursements as provided by law; and

6. such other and further relief as is just and proper.

Dated: New York, New York
August 27, 2008

EDWARDS ANGELL PALMER & DODGE LLP

By: _Samuel B. Mayer_

Samuel B. Mayer (SM 6479)
Scott H. Casher (SC 7903)
750 Lexington Avenue
New York, New York 10022
(212) 308-4411

Attorneys for Plaintiff

- 5 -

**EXHIBIT A**

ʻʧ

**LINCOLN GENERAL INSURANCE COMPANY**

**PROGRAM MANAGER AGREEMENT**

**THE ROBERT PLAN CORPORATION**

## PROGRAM MANAGER AGREEMENT – TABLE OF CONTENTS

ARTICLE I.   Term of Agreement and Definitions ............................................................................ 1

ARTICLE II.   Appointment of Manager ........................................................................................ 1

   A.   Lines of Business ........................................................................................................... 1
   B.   Territory. ........................................................................................................................ 2
   C.   Authority. ....................................................................................................................... 2
   D.   Restrictions .................................................................................................................... 3
   E.   Reinsurance Availability ............................................................................................... 3

ARTICLE III.   Managers Duties and Responsibilities .................................................................. 3

   A.   Servicing Business ......................................................................................................... 3
   B.   Competent Staff ............................................................................................................. 5
   C.   Premium Rates ............................................................................................................... 5
   D.   Compliance with Manuals ............................................................................................. 5
   E.   Binding of Risks ............................................................................................................ 5
   F.   Policy Issuance .............................................................................................................. 5
   G.   Policy Cancellation ........................................................................................................ 5
   H.   Sub-producers ................................................................................................................ 6
   I.   Premiums ....................................................................................................................... 6
   J.   Bad Debt ........................................................................................................................ 6
   K.   Accounting .................................................................................................................... 6
   L.   Fiduciary Capacity – Premium Trust Funds .................................................................. 7
   M.   Company Property; Confidentiality ............................................................................... 9
   N.   Manager Expenses ........................................................................................................ 9
   O.   Licenses ......................................................................................................................... 9
   P.   Legal Compliance .......................................................................................................... 9
   Q.   Governmental Contacts ............................................................................................... 10
   R.   Premium Financing ..................................................................................................... 10
   S.   Company Interface ...................................................................................................... 10
   T.   Copies of Policies ....................................................................................................... 10
   U.   Records ........................................................................................................................ 10
   V.   Audit ........................................................................................................................... 11
   W.   Statements and Reports ............................................................................................... 11
   X.   Insurance Coverages .................................................................................................... 12
   Y.   Supplies ....................................................................................................................... 12
   Z.   Prohibited Actions ....................................................................................................... 12
   AA.  Ethical Conduct ........................................................................................................... 13
   BB.  Notice of Change in Ownership ................................................................................... 13

ARTICLE IV.   Claims Settlement ............................................................................................... 13

ARTICLE V.   General Duties of Company .................................................................................. 13

**ARTICLE VI.    Representations and Warranties** ................................................................... 14

**ARTICLE VII.    Manager's Compensation** ....................................................................... 16

**ARTICLE VIII.    Advertising** ......................................................................................... 16

**ARTICLE IX.    Representation With Respect to Policies** ................................................ 16

**ARTICLE X.    Annual Standards for Volume** ................................................................. 17

**ARTICLE XI.    Insurance and Guaranty of Manager** ..................................................... 17

A.    Errors and Omissions .......................................................................................... 17
B.    General Liability .................................................................................................. 17
C.    Fidelity Bond ....................................................................................................... 17
D.    Manager's Personal Guaranty .............................................................................. 17

**ARTICLE XII.    Indemnification** .................................................................................... 18

A.    Manager ................................................................................................................ 18
B.    Company ............................................................................................................... 18
C.    Procedures ............................................................................................................ 18

**ARTICLE XIII.    Flat Cancellations** ................................................................................ 18

A.    Less than thirty (30) days .................................................................................... 19
B.    More than thirty (30) days ................................................................................... 19

**ARTICLE XIV.    Suspension of Production Authority** ....................................................... 19

A.    Notice of Suspension ........................................................................................... 19
B.    Legal Prohibition .................................................................................................. 19
C.    Loss of Reinsurance ............................................................................................. 19
D.    Loss of License .................................................................................................... 20
E.    Indictment ............................................................................................................ 20
F.    Grounds for Immediate Termination .................................................................... 20
G.    Default and Delinquency ...................................................................................... 21
H.    Termination by Manager ...................................................................................... 21
I.    Dispute Over Termination .................................................................................... 21
J.    Termination of Key Employees ........................................................................... 21

**ARTICLE XV.    Commencement and Termination** ............................................................ 21

A.    Basis for Termination .......................................................................................... 21
B.    Business After Termination .................................................................................. 24
C.    Records Ownership Upon Termination ................................................................ 25

**ARTICLE XVI.    Ownership of Expirations** ..................................................................... 27

NYC_NYC_222453_5/NPEARSON

| | | |
|---|---|---|
| A. | Use and control | 27 |
| B. | Failure to pay | 27 |
| C. | Security Interest | 27 |
| D. | Solicitation | 27 |

**ARTICLE XVII.   Waiver of Statutory Termination Rights of Manager** ......... 27

**ARTICLE XVIII.   Offset** .................................................................................... 28

**ARTICLE XIX.   Miscellaneous Terms** ............................................................... 28

| | | |
|---|---|---|
| A. | Applicable Law | 28 |
| B. | Waiver | 28 |
| C. | No Assignment | 28 |
| D. | Notices and Service of Process | 28 |
| E. | Jurisdiction | 29 |
| F. | Severability | 29 |
| G. | Entire Agreement; Modifications | 29 |
| H. | Negotiated Agreement | 29 |
| I. | General Conditions | 29 |
| J. | Confidentiality | 30 |
| K. | Independent Contractor | 31 |
| L. | Promptly | 31 |
| M. | Headings | 31 |
| N. | Honorable Undertaking | 31 |
| O. | Counterparts | 31 |
| P. | Survival | 31 |
| Q. | Delivery of Insurance and Guaranty of Manager | 31 |
| R. | Force Majeure | 31 |

**ENDORSEMENT A – Entities and Lines of Business Governed By This Agreement To Program Manager Agreement** ................................................................................ 34

**ENDORSEMENT B – Classes of Business and Authority to Program Manager Agreements** ........... 35

**ENDORSEMENT C – Claims Service Agreement to Program Manager Agreement** ...................... 39

**ENDORSEMENT D – Program Manager Agreement Compensation** .................................................. 46

**ENDORSEMENT E – Manager's Personal Guaranty Program Manager Agreement** ...................... 51

**EXHIBIT A** ............................................................................................................... 55

**EXHIBIT B** ............................................................................................................... 61

NYC_NYC_222453_5/NPEARSON

## PROGRAM MANAGER AGREEMENT

This Program Manager Agreement and any applicable Endorsements (hereinafter "Agreement.") is between Lincoln General Insurance Company, 3350 Whiteford Road, York, PA 17402 ("Company"), and The Robert Plan Corporation (d/b/a; acting through its licensed subsidiaries, The Robert Plan of New York Corporation, The Robert Plan of California Corporation and Freedom General Agency, Inc.), (collectively, "**Manager**").

WHEREAS, Manager has expertise in its business of transferring "assigned risk" obligations to approved LAD/CLAD servicing carriers and pricing, obtaining and administering the related buyout agreements and individual policies as well as related claims handling and other specialized services;

WHEREAS, Company is a licensed insurance company authorized to write private passenger and commercial automobile insurance in various states;

WHEREAS, Company seeks to enter into buyout agreements with other insurance companies in order to participate as a servicing carrier in the assigned risk market; and

WHEREAS, Company and Manager desire to enter into this Agreement pursuant to which Manager will serve as the Company's manager, administrator and agent with respect to the assigned risk and certain voluntary business and to provide certain administrative services (including, but not limited to policy administration and claims administration services) for it with respect to the business contemplated by this Agreement.

NOW, THEREFORE, the parties hereto agree as follows:

### ARTICLE I.    Term of Agreement and Definitions

A. Term. This Agreement is effective on the date of execution hereof and will continue until terminated under the provisions of Article XV.

B. Definitions. The terms "Excused Carrier", "Buy Out Agreement", "Take Out Policies", "Take Out Credits", "Mandatory Take Out Policies" when used herein shall have the definitions, if any, given to them in the applicable state Automobile Insurance Plan. The term "Buy Out Fees" shall mean fees charged to the Excused Carrier(s) by the Company, acting in the capacity of a LAD, CLAD, PAPCLAD, & LCA servicing carrier, for the purposes of handling the State's Auto Insurance Plan (AIP) business. The term "Take Out Fees" shall mean fees generated through the sale and transfer of "take out credits" by the Company to voluntary market client(s) for the purposes of reducing the voluntary client's "assigned" proportionate share of the personal auto premiums (policies) in the New York Automobile Insurance Plan (NYAIP).

### ARTICLE II.    Appointment as Manager

Company appoints Manager as follows:

A. Lines of Business.

Subject to the terms and conditions of this Agreement including the attached Endorsements, Manager hereby agrees to serve as Company's manager, administrator and agent with respect to all Limited Assignment Distribution Program ("LAD") and the Commercial Limited Assignment

NYC_NYC_222453_S/NPEARSON

Distribution Program ("CLAD"), and the California Low Cost Auto Program ("LCA"), the New York Public Automobile Limited Assignment Distribution Program ("PAPCLAD"), and the New York Private Passenger Auto (Voluntary Take Out), and Physical Damage Only programs as set forth in Endorsement A attached hereto.   LAD, CLAD, LCA, Mandatory Take Out and PAPCLAD are collectively referred to as "Assigned Risk Programs". The New York Private Passenger Auto (Voluntary Take Out) and Physical Damage Only programs are together referred to as "Voluntary Programs."

B. Territory.

Manager's appointment and authority extends to insureds and prospective insureds with their principal place of business or a portion of the risks located in the following jurisdictions to the extent it holds appropriate licenses and for which it is properly appointed by Company:

Those States set forth in the Endorsement B attached hereto and made part of this Agreement ("Territories").

C. Authority.

  1. Manager's appointment and authority extends to the Assigned Risk Programs and Voluntary Programs, and policies of insurance and renewals thereof, including all endorsements, written in connection therewith (the "Policies"); and limits of insurance and Territories described in Endorsement B attached hereto, for which Manager holds all appropriate licenses (the "Business").

  2. Manager shall have authority to supervise, solicit, market, arrange, negotiate, service and administer the Business on behalf of Company with respect to Buyout Agreements. Manager shall have authority to negotiate Buyout Agreements only at such terms and conditions that have been approved in advance in writing by the Company. The Company and the Manager shall each designate a representative to meet prior to September 1st of each year to review trends and other relevant factors. Thereafter, no later than October 1st of each year, the Company shall exclusively determine the aforementioned terms and conditions, which shall include a buyout price for each Buyout Agreement, or an average buyout price for all Buyout Agreements under any Plan. Nothing herein shall require the Company to enter into any Buyout Agreement. Manager shall be Company's sole and exclusive agent for all Buyout Agreements and related Policies in connection with the Business administered by Manager under this Agreement, all sale of credits agreements, and all Assigned Risk Programs and related Policies.

  3. Manager shall have authority to supervise, solicit, market, arrange, service and administer the Business on behalf of the Company with respect to Take Out policies and related credits and fees and fee agreements. Manager shall have authority to underwrite and administer Take Out policies and negotiate Take Out fee agreements only pursuant to terms and conditions that have been approved in advance in writing by the Company within its sole discretion. Nothing herein shall require the Company to enter into any such Take Out fee agreements. Manager shall be Company's sole and exclusive agent for all Voluntary Programs, Take Out policies and Take Out fee agreements and related Policies in connection with the Business administered by Manager under this Agreement. Notwithstanding the foregoing, Company is not precluded from providing authority to any of its other program managers, agents and producers to use the rate filings and form systems approved for the Voluntary Programs for any purpose so long as the authority so provided [other program managers to use the rating

- 2 -

and form systems approved for the Voluntary Programs] does not permit the Company or other program managers agents and producers to compete with Manager in the Voluntary Programs."

D. Restrictions. Manager's appointment and authority is subject to any restrictions set forth in this Agreement including any Endorsement attached hereto and made part of this Agreement.

E. Reinsurance Availability. Manager's appointment and authority for Business written under this Agreement is subject to the following:

   1. Company is able to obtain and maintain in force at all times reinsurance satisfactory to Company for the Business. The Company's efforts in this regard will at all times be diligent and undertaken in good faith with the intent to maintain reinsurance during the term of this Agreement, however Company cannot guarantee that its efforts will be successful.

   2. Obtaining reinsurance is the sole responsibility of Company. When Company obtains satisfactory reinsurance for all or some of the Business, Company will give Manager written notice that Manager may write and bind those classes of business, policies, and lines and limits of insurance for which reinsurance has been obtained.

   3.    If reinsurance is terminated or no longer in full force and effect for all or any part of the Business, Manager's authority for the Business affected shall be suspended, or limited immediately upon written notice to Manager from Company, until further notice, said suspension or limitation not affecting in-force policies of insurance. However Company may cause a duly licensed and qualified affiliate to write the Business in lieu of Company, in which case Manager shall use such affiliate as its exclusive insurer pursuant to the terms of this Agreement as if such affiliate were Company.  Should Company not cause a duly licensed affiliate to write the Business, Manager shall be allowed to utilize any other insurer to write the Business until Company shall notify Manager that its Production Authority has been reinstated at which time Company shall be Manager's exclusive insurer for the Business. Notwithstanding the foregoing provisions of this subsection E, Company may not suspend Manager's production authority with respect to Assigned Risk Programs (i.e., Buy Out Agreements) for the period after May 1 of any calendar year, and, in the event that Company suspends Manager's production authority with respect to Assigned Risk Programs prior to May 1 of any calendar year and such production authority is not reinstated by May 1 of that calendar year, this Agreement will be deemed terminated as of December 31 of that calendar year. In the event that Company provides notice to Manager of the suspension of Manager's production authority with respect to Assigned Risk Program Business subsequent to May 1 of any calendar year, this Agreement will remain in effect as to the Assigned Risk Programs, subject to termination pursuant to Article XV, until December 31 of the calendar year immediately following the year in which notice of suspension is given.

**ARTICLE III.   Managers Duties and Responsibilities**

Manager will faithfully perform all of its duties to the best of its professional knowledge, skill and judgment. The Manager's duties include the following:

A. Servicing Business.

   1.  Subject to any and all restrictions set forth in this Agreement or any Endorsement, Manager is hereby given authority and is obligated to do as Manager on behalf of Company all things

NYC_NYC_222453_5/NPEARSON

necessary in the usual and proper conduct of business under the Business to carry out the following functions:

(a) Obtain and process applications for Policies and renewals thereof,

(b) Collect all premium balances, Buy Out Fees and revenue generated by Take Out Fees, plus all related installment and policy service fees,

(c) Allow deductions from premiums for commissions to the producer of record,

(d) Return premiums on the Policies,

(e) Rate, quote, bind and issue the Policies of insurance, endorsements thereto, certificates of insurance and notices of cancellation, consistent with the Business, as well as provide policy information services for insureds, and

(f) Pay commissions to sub-producers.

2. Manager shall be responsible as a fiduciary of the Company for the safe-keeping of all premiums received by Manager on behalf of Company under this Agreement and shall promptly remit to Company premiums due in the manner set forth in Article III, Section L — **Fiduciary Capacity.**

3. Commencing with Policies assigned to Company on and after January 1, 2006 under the buy out agreements and renewals effective on or about January 1, 2006 and continuing until termination of this Agreement (by non-renewal or otherwise), Company shall be the exclusive insurance carrier for all Business produced or owned by Manager except as specifically provided in Article II.E, XIV.B. or C., and XV. A., B. or C.

4. In order to fully and effectively satisfy all reporting obligations hereunder, including but not limited to the transition of data or records from other carriers, Manager must provide detailed policy and claim transactional data required by Company. Further, Manager shall cooperate with Company to obtain all required third party approvals, if any, to utilize any licensed or copyrighted software or programs upon request of Company. Manager shall bear the sole cost and expense of the transition of any and all data or records, whether electronic or otherwise, from previous carriers to Company. Thereafter, Company shall bear the cost and expense of any changes to Manager's format that Company may request in advance in writing that are not required as a result of changes in Assigned Risk or Voluntary programs or other governmental or regulatory requirements.

5. Manager shall use commercially reasonable efforts to cooperate with Company to provide all data provided by the Manager to the Company pursuant to this Agreement in a format that is understandable, utilizable and reasonably acceptable to Company, with a frequency, timeframe and quality reasonably acceptable to Company. The data shall be in an electronically transmittable form reasonably determined by the Company at no extra charge to the Company, except that reports on collected premium, net balances due, deposits by policy and aging reports of premiums receivable are not available in electronic form; and all electronic data must agree in every respect to the premium and coverage on issued policies; and Manager is responsible for correcting errors identified by Company in a timely manner and entering transactions directly to Company systems if they are unable to provide the transactions electronically, at no extra charge to the Company.

6. Manager shall, at its own cost and expense, modify its systems by the second anniversary of this Agreement so that it can electronically transmit to the Company all data required by this Agreement.

NYC_NYC_222453_SNPEARSON

B. <u>Competent Staff</u>.  To maintain sufficient supplies and equipment and a staff of competent and trained personnel, to produce, develop, underwrite, handle claims and loss control if allowed by endorsement, to supervise the Business covered by this Agreement, and to otherwise do all things required by Manager to perform its duties and responsibilities under this Agreement.

C. <u>Premium Rates</u>.

    1.  To quote accurate premiums and rates for Policies bound or written under this Agreement under Business as described in, and in compliance with, the approved and applicable Assigned Risk Plans.

    2.  Upon instruction from the Company or with Company's prior written approval develop, formulate and file policy forms, rates and rules and all other reports and filings, as may be required by the regulatory authorities in the authorized states.  The Manager must receive written approval from the Company before making any such filing.

D. <u>Compliance with Manuals</u>.  To comply fully, timely and promptly with all manuals, rules, regulations, guidelines, instructions and directions issued by Company relating to the Business covered by this Agreement.  Notwithstanding any other provision of this Agreement or any action taken by Company pursuant to this Agreement, Manager shall not be required to act (or fail to act) in violation of the written requirements of any applicable Assigned Risk Program.

E. <u>Binding of Risks</u>.

    1.  To bind risks only in accordance with this Agreement and any Endorsements attached hereto and made part of this Agreement and any other underwriting and pricing standards from time to time established by Company in writing and provided to Manager, and to report all risks bound in accordance with this Agreement and the Endorsements attached hereto and made part of this Agreement, and subject to Company's final underwriting approval.

    2.  Nothing herein shall require Company to provide insurance coverage other than in accordance with the provisions, rules, and/or regulations of the Assigned Risk Business.

    3.  Manager shall have authority pursuant to this Article to administer buy out, sale of credit and other agreements entered into by Company under the Business, subject to requirements of Company.

F. <u>Policy Issuance</u>.  To timely and properly issue, deliver and execute or countersign Policies, certificates, endorsements, binders and related documents on forms approved by Company and appropriate regulatory authorities, as required by law, for the Business described in the Endorsements attached hereto and made part of this Agreement.  Manager shall insure all Policies bear any notice required by applicable law.

G. <u>Policy Cancellation</u>.  To cancel or non-renew policies and/or certificates for cause as set forth in such policies, or at the direction of the Company, subject to the requirements imposed by law and in compliance with the applicable provisions contained in this Agreement and the policies, and file the required reports with the appropriate Insurance Department with regard thereto.  However, this does not preclude the Company from taking such action on its own.  At the sole discretion of the Company, the Company has the right to cancel or non-renew any policy of insurance issued by the Manager under this Agreement subject to the relevant state laws, rules, regulations or bulletins and the rules governing applicable Assigned Risk Programs.

- 5 -

H. Sub-producers. To accept Business on behalf of Company written by properly licensed and qualified, professional insurance agents, solicitors and brokers ("sub-producers"). Manager shall be solely responsible for payment of all commissions earned by sub-producers pursuant to Article II.B of Endorsement D, Compensation, and return of sub-producers commissions on cancelled policies. The Manager shall be responsible to Company for ensuring that it only accepts business from sub-producers who: (1) are properly licensed and appointed, (2) forward all premium funds owed in a manner consistent with the terms of this agreement, and (3) otherwise comply with all applicable laws and regulations involving business generated or serviced under this agreement. **Manager is not authorized to appoint agents for Company. Sub-producers shall have no authority to bind risks with the Company unless approved by Company in writing at Company's sole discretion..**

I. Premiums. To charge, collect, receive and receipt for all premiums, including but not limited to buy out fees, revenues generated from take out credits, policy and related service fees, premium surcharges, fire district and other taxes or assessments levied by any jurisdiction and required to be collected in addition to stated premiums, due on all Policies bound or written under this Agreement, and deposit such amounts in the premium trust account (as hereinafter defined) in accordance with Article III. Section L

J. Bad Debt. The Manager shall make a good faith effort to collect any bad debt.

K. Accounting. To timely account for the Business as follows:

1. Establish and maintain true, accurate and complete books, and records in accordance with Generally Accepted Accounting Principles consistently applied (GAAP).

2. Manager shall immediately upon request provide Company all such records and accounts of transactions or other information requested by Company so that Company can comply with all statutory reporting requirements, accounting principles and insurance practices, and the insurance laws and regulations of all applicable jurisdictions. The Company shall have access to and the right to copy all such books, records and accounts at any time and all such books, records and accounts shall be property of the Company and Manager. Denial of this right by Manager shall constitute a material breach of this Agreement. Upon an order of liquidation of the insurer, the Manager shall have reasonable access to and the right to copy the files on a timely basis.

3. Collect, compile and timely transmit to Company, for the timely transmission to the appropriate reporting agencies, any and all requested statistical, underwriting and claims data and information, including but not limited to, premium and loss information, so that it can meet all reporting requirements in a format or formats and at such frequency as may be determined by the respective reporting agency and the Company.

4. Furnish, render and provide the Company with an accounting detailing all transactions and insurance written pursuant to this Agreement, including but not limited to all Policies and/or certificates issued (by policy/certificate), changes and cancellations and premium statements on not less than a monthly basis and not later than ten (10) working days after the end of the month in which the transaction occurs and/or the premium is written. This information shall be furnished to the Company beginning at the end of the month in which this Agreement becomes effective.

- 6 -

Such accounting shall include for each authorized line of insurance, the following, and such additional information as Company may request in writing:

(a) Gross written premium;
(b) Net written premium;
(c) Collected premium;
(d) Fees as defined in Endorsement D;
(e) Policies issued or bound by insured including location, limits, and effective date;
(f) Policies canceled;
(g) Premium adjustments due to endorsements, audits or otherwise;
(h) Commissions payable to or retained by Manager;
(i) Net balance due;
(j) Premium surcharges, fire district and other taxes or assessments levied by any jurisdiction;
(k) Deposits by policy;
(l) Agency fees;
(m) Gross buy out fees;
(n) Fees collected from take out credits; and
(o) Uncollected premium/bad debt.

5.  Manager shall provide the Company with monthly aging reports of premiums receivable, at policy level, in a format reasonably acceptable to the Company.

6.  Manager shall provide the Company separate monthly report that includes a reconciliation of checks issued through the accounts referenced in Article III, Section L herein, to the paid amounts included in the monthly reporting template.

7.  All accounts, records and remittances shall be in U.S. dollars.

8.  Manager shall make all payments directly to the Company and not through an intermediary or other party.

9.  The omission from any statement or bordereau of any item due the Company shall in no way modify or otherwise affect the responsibility of Manager to account for and pay the Company any and all premiums, or any other monies due Company, nor shall the omissions prejudice the right of the Company to collect any and all sums to which it is entitled.

10. Manager shall initially develop, for the Company's use with its reinsurers, each year's LAD, CLAD, LCA, and PAPCLAD buy out fee and sale of credit pricing strategy.

L.  Fiduciary Capacity – Premium Trust Funds.

1.  All premiums, policy fees, buy out fees, revenues generated by take out credits, and servicing fees received relating to the Business written under this Agreement are the property of the Company and are received by Manager on behalf of the Company and shall be deposited as they are received by the Manager into a premium trust account established and maintained by the Company as set forth in subsection 2 below.

2.  The premium trust account established by Company shall be entitled "Lincoln General – Premium Trust Account (Assigned Risk) (hereinafter "LGPTA") at:

- 7 -

Bank Name: LaSalle Bank
City/State: Chicago, Illinois

The above bank and any successor bank shall always be a member of the Federal Reserve System and whose deposits the Federal Deposit Insurance Corporation insures.

3. The Manager shall not commingle any premium or other funds relating to the Business written under this Agreement with any other account, including but not limited to any corporate operating accounts, or with other funds held in any other capacity.

4. The Company shall maintain exclusive signature authority on said LGPTA.

5. The Manager shall deposit all funds owed to Company into the LGPTA on a daily basis.

6. The Company shall grant the Manager authority to issue checks through a premium refund zero balance account ("hereinafter PR–ZBA), which shall be established by the Company, for the following approved purposes;

   (a) To return unearned premiums arising from cancellations or endorsements of Company's policies,
   (b) To issue checks for monies deposited in error,
   (c) To pay commission owed to Sub-Producers subject to Article II.B of Endorsement D, Compensation;
   (d) To refund Buy Out fees pursuant to the terms of the applicable Buy Out Agreement.

   The PR-ZBA shall be established so that the Manager may not, without Company's prior written approval, which can be withheld or granted at Company's sole discretion, issue checks for more than five thousand dollars ($5,000) in any one transaction or a maximum of one million dollars ($1,000,000) for any calendar month covered under this Agreement. Manager will not issue checks totaling more than the funds then available in the PR-ZBA. Manager shall send the bank a 'positive pay file' of checks issued and voided from the PR-ZBA as checks are issued. Manager shall not withdraw any funds from the PR-ZBA that are not expressly authorized in this subsection.

7. The Company shall grant the Manager authority to issue checks through a claims zero balance account (hereinafter "C-ZBA") strictly for the purpose of making claims payments in accordance with the provisions outlined under Endorsement C. Manager shall send the bank a 'positive pay file' of checks issued and voided from the C-ZBA as checks are issued or made. Manager will not issue checks totaling more than the funds then available in the C-ZBA.

8. Manager shall provide the Company a monthly reconciliation of check items processed through the C-ZBA to the loss reporting template and a monthly reconciliation of collected premium to the amount deposited in the LGPTA.

9. Except as otherwise set forth in Endorsement D, Article II.A. with respect to calendar year 2006 the Company shall pay Manager compensation due Manager, as defined in Endorsement D, by the 5th business day after receipt of monthly reconciliations provided by Manager on items deposited in the LGPTA.

10. The Manager shall refund commissions owed to Company, including those paid to its Manager and to its Sub-producers, on policy cancellations, reductions in premiums or any other return premiums at the same rate at which such commissions were originally retained.

11. Neither the Company nor the Manager shall offset any balances due under this Agreement with any amount due under any other agreement between the Company and the Manager.

12. The Manager's duties and obligations pursuant to this Agreement shall be fully and unconditionally guaranteed pursuant to guarantees by Manager as covered under Endorsement E of this Agreement.

13. If Manager fails to deposit funds when and as it is required under Article III, Section L.1 herein, or pay Company any premiums or any other monies, or fails to comply with applicable premium fund trust laws and regulations such failure shall constitute a material breach under this Agreement.

14. All monies or funds received by Manager on behalf of Company under this Agreement are deemed received by Manager in a fiduciary capacity inclusive of any amount withdrawn by Manager from the C-ZBA or PF-ZBA. Manager shall not withhold any monies or property of Company that is not expressly authorized.

M. **Company Property; Confidentiality.** To promote and safeguard at all times as a fiduciary the best interests and good name of Company and to safeguard, maintain and account for all Policies, forms, manuals, equipment, supplies or anything else furnished by Company or Manager, all of which shall remain the property of Company. Manager will return all such property to Company promptly upon demand. The materials or information furnished to Manager may contain proprietary or confidential information of Company. Manager agrees to treat any such proprietary or confidential information in accordance with the provisions of Article XIX.

N. **Manager Expenses.** To pay, to assume the obligation for and to be fully responsible for all costs and expenses associated with the Manager's performance under this Agreement including: processing of assigned risk policies, sub-producer commissions, loss control reports, premium audits, regulatory exams and related fees, fines and settlement costs, policy and policy jacket printing, motor vehicle reports ("MVR's") and OFAC costs, travel expense, employee salaries, benefits, fees, postage, advertising, exchanges, and license fees. Company shall be responsible only for its own costs and expenses unless otherwise agreed by Company. In the event Company is required to pay any costs or expenses that are the responsibility of the Manager, the Manager shall promptly reimburse Company for its payments and shall after 30 days from invoice pay to Company interest accruing at a rate of 10% per year on such payments.

O. **Licenses.** To obtain all licenses and permits required by Manager for the proper conduct of its duties under this Agreement and to immediately provide copies of such licenses and permits upon request of the Company. Manager agrees that it will not transact any business in any jurisdiction covered under this Agreement until Manager has obtained all required licenses and permits, and is properly appointed to represent the Company in such jurisdiction.

P. **Legal Compliance.** To keep fully informed of and comply fully with all applicable laws and regulations. This includes, but is not limited to compliance with all laws and regulations applicable to insurance producers in the state(s) where the Business is located. Manager shall not solicit or bind any risks in any state until all applicable laws, regulations and ISO, AIPSO or other bureau rules have been complied with.

Q. <u>Governmental Contacts.</u>  To promptly notify Company of all contacts and correspondence received from insurance regulatory or other governmental authorities relating to the insurance and activities which are the subject of this Agreement, to forward promptly upon receipt all summonses, copies of complaints, subpoenas or other court documents relating to actions taken by insurance regulatory or other governmental authorities in connection with the insurance and activities which are the subject of this Agreement, and to cooperate fully with Company in making any responses. Manager has no authority to represent Company in regulatory matters and shall not respond to any governmental communication or action except by written permission of the Company or as required by law. All complaints from regulatory agencies shall be sent directly from the regulatory agency to Company. Manager shall cooperate with Company to ensure Company can provide a timely and complete response and shall forward a written response to Company by the date and time required by Company. Company, which shall have sole discretion to determine the final response, shall forward same to the appropriate regulatory agency.

R. <u>Premium Financing.</u>  Manager is not and shall not hold itself out as Manager of Company for the purpose of obtaining premium financing. Manager shall refund applicable premiums to the premium finance company in the event of a cancellation of a Policy.

S. <u>Company Interface.</u>  To interface at all times with Company through electronic data processing hardware and software, networks and communication lines and other means as specified in writing and in advance by Company.

T. <u>Copies of Policies.</u>  To maintain in each insured's file all Policies, endorsements, rating worksheets and related documents and correspondence, Policy cancellations and other terminations processed by the Manager.

U. <u>Records.</u>

    1. Manager shall provide to Company any and all records and/or reports relating to the Business covered under this Agreement including but not limited to policy information and claims information, if any, as may be reasonably requested by Company, within seven (7) business days following such request, or such other period of time as the Manager and Company may agree.

    2. In addition to the specific reports requested under this Agreement, Manager shall furnish such reports related to the Business covered by this Agreement as required by applicable laws or regulations, orders or directives or as may be reasonably requested by Company, within seven (7) business days following such request, or such other period of time as the Manager and Company may agree.

    3. Unless a longer period is required by law, to keep and maintain for a period of seven (7) years from the termination of this Agreement, separate, identifiable, orderly, accurate, complete and timely records and accounts of all business and transactions pertaining to Policies bound or written under this Agreement including complete underwriting and rate files. Subject to Article XV.C. Such records and files shall be the property of Company, however, a copy of said records and files may at all times be maintained by Manager. Upon request by Company or the insurance regulator or Commissioner of any state having jurisdiction over Company ("Commissioner"), all records and reports maintained pursuant to this Article III., shall be provided as hard copies or in an electronic/computer format usable by Company and the

NYC_NYC_222453_5/N/PEARSON

Commissioner, within seven (7) business days following such request, or such other period of time as the Manager and Company may agree.

4. Manager shall maintain paid, closed, and outstanding claims files for all claims handled by Manager on behalf of Company, which files shall be the joint property of Company and Manager. However upon an order of liquidation of Company such files shall become the sole property of the insurer or its estate. These files shall remain in the physical possession of Manager for the period of time that Manager continues to administer such claims and for a period of seven (7) years after each claim closed. If Company desires Manager to retain such records beyond that period, Manager shall do so at Company's request and expense. Company shall have the right, but not the obligation, to direct the Manager in the administration of, or assume administration of any claim or all claims at any time. In such case, Manager shall fully cooperate with Company and Company shall have access to all claim files, electronic data, systems and Manager's facilities for purposes of administering the claims, and Manager shall deliver any or all original and electronic claims files to Company promptly upon request. Manager shall have the right to copy all original files requested by Company and Company and Manager shall share, on a 50-50 basis, the costs of making such copies.

5. Notwithstanding any other provision of this subsection, Manager must receive approval from Company prior to the destruction of any documents or records, electronic or otherwise, generated by Manager under this Agreement.

V. Audit. To permit Company or designated representatives, during the term of this Agreement and for a period of seven (7) years from the termination of this Agreement, to visit, inspect, examine, audit and verify, at Manager's offices or elsewhere, during Manager's normal business hours and as often as Company may deem appropriate but in no event less than twice annually, with ten (10) business days prior notice, any of the properties, accounts, premium trust funds, files, documents, books, reports, work papers, internal controls and other records belonging to or in the possession or control of Manager or of any other person relating to the Business covered by this Agreement. The Manager shall also be required to submit to an independent financial examination when and as required under any applicable laws or regulations at Manager's expense. The form of the financial examination will be specified by the Company and may include, but is not limited to, an audit opinion of the external financial statements, specific accounts and/or internal controls at the expense of the Manager, which shall be at least annually. The results and all related materials will at all times be maintained by Company in the strictest confidence and only used by Company as it relates to the writing of Business under this Agreement. Company may make copies and extracts as may be reasonably necessary. Company may conduct any audit through any person or persons it may designate. The Insurance Department of any state having jurisdiction over this Agreement shall have access to all books, bank accounts and records of the Manager in a form usable to the Insurance Department and the Manager agrees it may be examined as if it were the Company.

W. Statements and Reports

1. To furnish the Company with an audited financial statement for the year ended December 31, 2004, no later than ninety (90) days after the execution hereof, or the Company may, at its option, render this Agreement void ab initio or such failure shall be deemed a material breach of this Agreement. Thereafter, the Manager shall furnish the Company, on an annual basis, an audited financial statement prepared by an independent certified public accountant, as of December 31 of each calendar year, prepared in accordance with Generally Accepted Accounting Principles consistently applied (GAAP) and shall include consolidated

NYC_NYC_222453_5/NPEARSON

worksheets, no later than June 1 of each year. The Company shall rely on all financial statements provided by Manager in commencing and continuing the relationship established by this agreement.

2. To furnish the Company annually with an actuarial report by an outside, nationally recognized, independent actuarial firm agreeable to the Company of accident year results by state and line of business for all business written under this Agreement no later than forty-five (45) days after the end of the calendar year. And additionally furnish quarterly actuarial reports no later than forty-five days after the end of the quarter, completed by Manager's internal actuary. If requested by Company, at Company's expense, such quarterly actuarial reports shall be completed by an independent actuary, who is independent from those professionals conducting the audit and acceptable to the Company.

3. To furnish the Company with an annual SAS 70 Type 2 report at Manager's expense, no later than December 31st of each year, prepared by independent auditors acceptable to the Company. Each report shall encompass the period of time required by the Company.

X. Insurance Coverages. To maintain in force the insurance coverages specified under Article XI and to immediately notify Company in the event of cancellation, non-renewal or if fifty percent (50%) of the indicated limits have been exhausted, in which case the Company may, at its option, deem the Manager in material breach of and in default of this Agreement.

Y. Supplies. To return all such property and supplies furnished it by the Company to the Company or its representative promptly upon demand. The materials or information furnished to Manager may contain proprietary or confidential information of Company. Manager agrees not to disclose such proprietary or confidential information to any other parties without the express written permission of Company.

Z. Prohibited Actions.

1. In addition to any other prohibitions required under this Agreement or any Endorsements, the Manager shall have no authority to:

  (a) Bind any reinsurance or retro-cessions, including, but not limited to, facultative or treaty, on behalf of Company, or commit Company to participate in insurance or reinsurance syndicates. This responsibility shall remain with the Company.
  (b) Appoint any producer or sub-producer that is not lawfully licensed to transact the insurance business for which it has been appointed.
  (c) Collect any payment from a reinsurer or commit the Company to any claim settlement with a reinsurer.
  (d) Jointly employ an individual who is employed with Company.
  (e) Appoint a sub-Manager or Program Administrator.
  (f) Without the prior written approval of Company, which can be withheld or granted at Company's sole discretion, extend any binding authority to sub-producers nor provide to sub-producers any evidence or indicia of such authority.
  (g) Engage in any activity that is not in compliance with all laws, regulations or other written instructions of the Company.

2. In addition to any other limitations contained in this Agreement or any Endorsements, any exhibits or addenda hereto or any applicable underwriting or procedural guideline issued by

NYC_NYC_222453_SNPEARSON

Company to Manager, Manager has no authority, to take any of the following actions on behalf of Company, without the prior written consent of Company:

(a) Make, accept or endorse notes or otherwise incur any liability other than as may be incurred in the ordinary course of business of Manager pursuant to the terms and conditions of this Agreement,

(b) Waive a forfeiture or issue a guaranty, other than as expressly permitted in writing by Company in each instance,

(c) Extend the time for the payment of premiums or other monies due Company,

(d) Institute, prosecute, settle or compromise any suits, claims or legal proceedings in connection with any matter pertaining to Company's business, except as part of the claims administrative functions as authorized in Article IV hereof,

(e) Directly or indirectly solicit, sell, offer, bind, issue, or deliver any insurance at any reduction or deviation from the rates, terms or conditions specified therefore by Company, it being understood and agreed that Manager shall in all circumstances adhere strictly to the rates and forms promulgated and filed by Company,

(f) Waive premium payment,

(g) Offer or pay any rebate of premium,

(h) Bind coverage subsequent to the effective date of a Policy without prior written approval of Company, or

(i) Effect or authorize a flat cancellation of a Policy more than thirty (30) days after the effective date without prior written approval of Company and without documenting the existence of substituted coverage or other reasons why Company has no liability for payment of loss while coverage was in force.

AA. Ethical Conduct.

1. Manager shall not exploit its relationship with Company or use Company's name in connection with any fraudulent, unethical or dishonest transactions.

2. Manager shall not knowingly use producers, consultants, independent contractors or other representatives that Company could not deal with directly under its Code of Conduct as attached hereto and incorporated by reference as Exhibit as Exhibit A, and as it may be changed from time to time, or applicable laws or regulations.

3. Manager may use assets of Company for legitimate business purposes only.

4. Manager shall avoid any knowing conflict of interest with the Company relating to the Business.

5. Manager shall abide by the Company's Privacy Policy as attached hereto and incorporated by reference as Exhibit B, and as it may be changed from time to time, when handling customer information.

BB. Notice of Change in Ownership. Manager must promptly provide Company with written notice of a material change in ownership of Manager as that term is defined in Article XV.A.3(e).

### ARTICLE IV.   Claims Settlement

Manager's authority, to adjust, compromise, settle or pay any claim made on the Policies written or bound under this Agreement is set forth in the Endorsement C attached hereto and made part of this Agreement.

### ARTICLE V.   General Duties of Company

The Company shall:

- 13 -

A. Ensure continued satisfaction of all eligibility requirements to qualify as an authorized servicing carrier as those requirements are specified, and as amended from time to time, under the Plan Rules for the Business listed in Endorsement B, but only to the extent any such requirements are directly within Company's control.

B. Promptly apply for approval as a servicing carrier in any state which proposes to enact a buy out mechanism of the kind administered by Manager.

C. Commencing on or after January 1, 2006, and continuing until termination of this Agreement (by non-renewal or otherwise), and subject to all applicable regulatory approvals and negotiation of terms of the Buy Out Agreements, write new and renewal assigned risk policies as may be required under applicable Plan rules and/or state laws of the Business listed in Endorsement B. Nothing set forth herein shall constitute a waiver of any rights that Company has under the terms of the Buy Out Agreements.

D. Commencing on or about January 1, 2007, and continuing until termination of this Agreement (by non-renewal or otherwise), and subject to all applicable regulatory approvals and negotiation of terms of the Take Out Agreement, write new and renewal Mandatory Take Out policies as may be required under applicable Plan rules and/or state laws of the Business listed in Endorsement B. Nothing set forth herein shall constitute a waiver of any rights that Company has under the terms of the Take Out Agreements.

E. Make all statistical filings and receive all statistical and underwriting data applying to the Program written pursuant to this Agreement, provided that the Manager furnishes all required information and data in a timely manner so as to enable the Company to meet all time requirements.

F. Develop, formulate and file policy forms, rates and rules and all other reports and filings, as may be required by the regulatory authorities in the various states where Business under this agreement is to be conducted.

G. Conduct, as often as Company deems prudent, solely at Company's discretion, but in no event less than semiannually, upon reasonable notice and during normal working hours, an on-site audit of the books, records and accounts of the Manager, including but not limited to those in the underwriting, claims, accounting, IT, marketing, finance and policyholder operations, using either its own employees or independent outside auditors.

H. If Manager qualifies as a "managing general agent" of Company under any applicable state statute, Company shall not permit any of Manager's sub-producers to serve on Company's Board of Directors; nor shall the Company appoint to its board of directors an officer, director, employee, sub-producer or controlling shareholder of Manager unless otherwise permitted by law.

## ARTICLE VI.  Representations and Warranties

A. Company warrants and represents that the transactions contemplated hereby:

1. are within the corporate powers of the Company;

2. have been duly authorized by all necessary corporate action of the Company;

NYC_NYC_222453_SNPEARSON

3. constitute the legal, valid and binding obligations of the Company, enforceable against it in accordance with their terms; and

4. do not and will not conflict with, result in a breach in any of the provisions of, or constitute a default under the provisions of any law, regulation, licensing requirement, charter provision, by-law or other instrument applicable to the Company or its employees or to which the Company is a party or may be bound, except to the extent that various state regulatory approvals to act as a servicing carrier for the Business hereunder that are pending or not received.

B. Manager warrants and represents that the transactions contemplated hereby:

1. are within the corporate powers of the Manager;

2. have been duly authorized by all necessary corporate action of the Manager;

3. constitute the legal, valid and binding obligations of the Manager, enforceable against it in accordance with their terms; and

4. do not and will not conflict with, result in a breach in any of the provisions of, or constitute a default under the provisions of any law, regulation, licensing requirement, charter provision, by-law or contract, agreement or other instrument applicable to the Manager or its property or employees or to which the Manager is a party or may be bound.

C. Manager warrants and represents that it currently holds all necessary licenses as an agent or producer, and if necessary, a managing general agent, in all states in which this Agreement will apply to lawfully carry out its duties and obligations under this Agreement. Manager further warrants and represents that neither Manager, its principals, nor any of its employees has been convicted of a crime, a criminal felony involving dishonesty or a breach of trust, or a violation of 18 U.S. Code Section 1033 and gives Company the authority to verify same. Manager hereby gives Company the right to verify information about Manager, its officers, directors or other principals by obtaining and using consumer reports, investigative reports, credit reports, D&B reports, criminal background checks or any other similar type of report or check. Company warrants that such reports or checks will be obtained strictly for business purposes to verify Manager's eligibility or continued eligibility, financially and otherwise, to be a party hereto.

D. Manager warrants and represents that:

1. it has the proper right and interest in the business contemplated herein in order to place the business under this Agreement;

2. the business being placed under this Agreement is not subject to another entity's claim of interest, including but not limited to a claim by contract or common law right; and

3. in placing business under this Agreement, it is not in violation of any duty or obligation owed to another entity.

E. Manager warrants and represents that it presently has in effect all insurance policies as required under the provisions of Article XI.

NYC_NYC_222453_S/NPEARSON

F. Manager warrants and represents that it possesses all requisite resources to fulfill all of its obligations, including but not limited to all system/electronic data processing capability, under this Agreement.

G. Manager warrants and represents that the underwriting guidelines to be used by it with regard to the Program are now and will, as amended by Company from time to time, continue for the life of this Agreement to be in conformity with the applicable statutes, regulations, rules, bulletins and opinions in the various states where business under this agreement is to be conducted.

H. If Company terminates this Agreement other than as set forth in Article XV, Section A. 4 (a), (b) or (c), Company warrants and represents that, except as required by law or under any applicable Assigned Risk Program for a period of three (3) years after the termination of this Agreement Company shall not solicit, directly, indirectly, or through any third party intermediary, any Business for which the Manager is Company's exclusive agent under this Agreement, including without limitation any buyout agreement with any insurance company in any of the states listed on Endorsement B or any other state in which buyout agreements are entered into pursuant to this Agreement. This provision survives termination of this Agreement.

I. Company warrants and represents that until the termination of this Agreement and for three (3) years thereafter, Company, shall not solicit for retention or employment nor accept any solicitation for retention or employment by or on behalf of, any then present employee of Manager or Manager's parent company or any person who, to the best of the Company's knowledge is then a present employee of Manager, or to the best of Company's knowledge has been employed by any Manager or Manager's parent company at any time during the previous 12 months. This provision survives termination of this Agreement.

J. Manager represents and warrants that, effective January 1, 2006, all new and renewal Business within its use and control shall be placed exclusively with Company.

### ARTICLE VII.  Manager's Compensation

For its services as Managing General Agent and its policy administration and claims administration services under this Agreement, Manager will be entitled to the compensation set forth in Endorsement C, Claims Service, and Endorsement D, Compensation.

### ARTICLE VIII.  Advertising

Manager will not refer to Company (or any division or affiliate of Company) or use the Company's logo, or that of its parent company, in any advertisement, letter, circular, pamphlet or other publication or statement without the prior written consent of Company.  Company will not be responsible, under any circumstances, for any advertising expense.  Manager will insure that any reference to Company pursuant to this Article shall comply with the laws and regulations of the jurisdiction in which such advertising occurs or to which it is directed.

### ARTICLE IX.  Representation With Respect to Policies

Manager will not make or permit Voluntary Program independent sub-producers or any other person to make any representation to applicants, insureds, policyholders or claimants as to the existence or extent of coverage either available from Company or under a Policy that is not consistent with the terms and conditions of coverages available from Company or of a Policy. Manager shall establish procedures designed to ensure that Manager and Manager's employees will make known to any

- 16 -

applicant, insured or policyholder the full scope and effect of all exclusions and limitations upon or under coverage provided under the Policy and advise independent sub-producers of their existing statutory obligations and Manager's and Company's expectations in this regard.

### ARTICLE X.  Annual Standards for Volume

Manager will comply with any annual maximum and minimum standards of production for premium volume that are made a part of the Endorsement B attached hereto and made part of this Agreement.

### ARTICLE XI.  Insurance and Guaranty of Manager

Manager will maintain from the inception of this Agreement until all run off business resulting from this Agreement terminates with unaffiliated insurers and on forms acceptable to the Company:

A.    Errors and Omissions:  Upon execution of this Agreement, Manager will continue its existing professional errors and omissions policy which specifically covers all activities and entities contemplated herein, and specifically includes coverage for violations of Unfair Trade Practices Acts and Bad Faith, with limits not less than $5,000,000 and a deductible not greater than $750,000.  Upon expiration or termination of said policy, but in no case later than February 20, 2006, Manager shall secure a professional errors and omissions policy that meets the foregoing criteria except that the limits shall be in an amount not less than $10,000,000, with a deductible not greater than $1,000,000.  With respect to both policies referenced above, Company shall receive a Certificate of Insurance in its name containing the following provision: "(Company) shall receive thirty (30) days written notice of any change, cancellation or other termination of this Policy". In the event of termination or nonrenewal of such coverage, if written on a claims made basis, tail coverage or coverage for prior acts shall be required for all periods of time which this Agreement is in force.

B.    General Liability:  Comprehensive general liability or umbrella liability insurance policy in an amount of $1,000,000 per occurrence, $5,000,000 aggregate.  The General Liability policy shall list Company as an additional insured.  In the event of termination or nonrenewal of such coverage, if written on a claims made basis, tail coverage or coverage for prior acts shall be required for all periods of time which this Agreement is in force.

C.    Fidelity Bond.  Manager shall maintain a Fidelity Bond covering all operations, employees and subcontractors servicing the business of this Agreement, in an amount of at least $1,000,000 and on a form and with a deductible reasonably satisfactory to Company.  Manager shall provide a certificate for the Fidelity Bond with the same provision as provided for in the Errors & Omissions coverage.  The bond shall provide for a discovery period and prior notification of cancellation in accordance with state-specific regulations.

D.    Manager's Personal Guaranty:  Robert Wallach and William Wallach shall be required to sign and execute, concurrently with the execution of this Agreement, a Personal Guaranty, in the form of the Personal Guaranty attached hereto as Endorsement E to this Agreement, to encourage the Manager's prompt and faithful compliance with any and all obligations under this Agreement, to include the Manager's responsibility to comply with Premium Finance statutes in making refunds to insureds or to policyholders.  The Company may also require a form of security acceptable to the Company, in an amount to be determined at the sole discretion of the Company up to the maximum aggregate amount set forth in Endorsement E attached hereto, in order to collateralize the Personal Guaranty.

Company shall require certificates of insurance or other evidence that the insurance and other forms of security required by this Article is and remains in force. Manager shall provide such certificates of insurance or other proof on at least an annual basis, or as otherwise directed by the Company.

### ARTICLE XII.  Indemnification

A. <u>Manager</u>: Manager shall be responsible to Company and shall indemnify, save, defend and hold Company, (or its rehabilitator or liquidator) including its affiliates, and all officers, directors and employees harmless against any and all claims, suits, hearings, actions, damages of any kind, liability, fines, penalties, loss or expense, including attorneys' fees caused by or resulting from any allegation of any misconduct, error, omission or other act or breach of this Agreement or material misrepresentation hereunder by Manager, Manager's employees, Third Party Administrator, Adjuster, or any other type of independent contractor employed by Manager or Manager's affiliates unless the conduct giving rise to the allegation was performed at the specific direction of Company.

B. <u>Company</u>: Company shall be responsible to Manager and shall indemnify, save, defend and hold Manager, including its affiliates, and all shareholders, officers, directors and employees harmless against any and all claims, suits, hearings, actions, damages of any kind, liability, fines, penalties, loss or expense, including attorneys' fees caused by or resulting from any allegation of any misconduct, error, omission, or other material breach of this Agreement or material misrepresentation hereunder by Company, provided Manager has not contributed to or compounded the act alleged.

C. <u>Procedures</u>: If any third party notifies any party (the "Indemnified Party") with respect to any matter (a "Third Party Claim") which may give rise to a claim for indemnification against the other Party (the "Indemnifying Party") under this Article XII, then the Indemnified Party will promptly notify the Indemnifying Party thereof in writing, but failure to so give such notice shall not relieve the Indemnifying party of its obligations hereunder except to the extent it is prejudiced thereby. The Indemnifying Party will have the right at any time to assume and thereafter conduct the defense of the Third Party Claim with counsel of its choice; *provided, however,* that the Indemnifying Party will not consent to the entry of any judgment or enter into any settlement with respect to the Third Party Claim without the prior written consent of the Indemnified Party (not to be withheld unreasonably) unless the judgment or proposed settlement involves only the payment of money damages and does not impose an injunction or other equitable relief upon the Indemnified Party. Any Indemnified Party will have the right to employ separate counsel in any Third Party Action and participate in the defense thereof, but the fees and expenses of such counsel will be at the expense of the Indemnified Party unless (i) the employment of such counsel will have been specifically authorized in writing by the Indemnifying Party, (ii) the Indemnifying Party will have failed to assume the defense of such action or employ counsel reasonably satisfactory to the Indemnified Party, (iii) the Indemnified Party shall have reasonably concluded that there may be defenses available to the Indemnified Party that are different from or additional to those available to the Indemnifying Party, or (iv) the Indemnified Party's counsel shall have advised the Indemnified Party in writing, with a copy delivered to the Indemnifying Party, that there is a conflict of interest that could make it inappropriate under applicable standards of professional conduct to have common counsel, in any which event the Indemnifying Party shall pay the cost of the Indemnified Party's counsel. In no event will the Indemnified Party consent to the entry of any judgment or enter into any settlement with respect to the Third Party Claim without the prior written consent of the Indemnifying Party (not to be withheld unreasonably).

### ARTICLE XIII.  Flat Cancellations

A. Less than thirty (30) days. If a Policy is canceled flat, the originals of the canceled Policy or a lost policy release shall be retained by Manager in the insured's file. Manager will cancel flat a Policy only if it has been in effect for less than thirty (30) days, or if no coverage has attached, and then only if the following conditions are confirmed by the Company:

1. no regulatory filings have been made;

2. no facultative reinsurance commitments or expenses have been incurred by the Company; and

3. no other miscellaneous expenditures have been incurred by the Company (i.e., loss control reports, etc.).

4. No claims paid.

B. More than thirty (30) days. An appropriate premium charge established by Company and provided in writing to Manager shall be made for any Policy in force for a period in excess of thirty (30) days or if no coverage has attached.

## ARTICLE XIV.    Suspension of Production Authority

A. Notice of Suspension. The Company may suspend the authority of the Manager to solicit, market, arrange, negotiate, underwrite, bind or otherwise hold itself out to third parties as authorized to produce Assigned Risk Programs or Voluntary Programs on behalf of Company (hereinafter "Production Authority") only for the reasons and in accordance with the procedures described below. The Company shall give immediate written notice of the suspension of Production Authority and the Manager shall then immediately cease to exercise its Production Authority until the reason for the suspension is resolved. Once resolved to the Company's satisfaction, the Company shall immediately reinstate the Production Authority of the Manager. Notwithstanding any action taken pursuant to this Section, the parties may exercise whatever rights they may have to terminate this Agreement.

B. Legal Prohibition. The Company may suspend Production Authority for Assigned Risk Programs or Voluntary Programs if the Company is legally prohibited from writing insurance for Assigned Risk Programs or Voluntary Programs. In such event, the suspension shall remain in effect until the prohibition has been lifted. The suspension shall only apply to the jurisdiction in which the Company is unable to continue writing Business. Company may cause a duly licensed affiliate to write the Business in any such jurisdiction, in which case Manager shall use such affiliate as its exclusive insurer pursuant to the terms of this Agreement as if such affiliate were Company. Should Company not cause a duly licensed affiliate to write the Business in any such jurisdiction, Manager shall be allowed to utilize any other insurer to write the Business in such jurisdiction until the prohibition has been lifted.

C. Loss of Reinsurance. The Company may suspend Production Authority, if in its sole discretion there has occurred any of the following:

1. impairment of the reinsurance coverage with respect to the Program business;

2. reduction in A.M. Best's rating of any reinsurer;

3. cancellation of the reinsurance with respect to all or any material portion of the Program business;

4. the failure of a reinsurer to discharge obligations under all or any portion of any reinsurance contract relating to business subject to this Agreement;

5. the ceasing of any reinsurer to carry on the particular classes of business subject to this Agreement or having the performance of such reinsurance rendered illegal by any subsequent law or regulation;

6. insolvency of a reinsurer reinsuring all or a material part of the Business; or

7. any instance where a reinsurer suspends payment of debts, convenes a meeting of creditors, has a receiver appointed or petition presented for its compulsory liquidation, or has a resolution passed for its voluntary liquidation.

The Manager agrees that upon notification from the Company, it shall immediately cease the binding of any Policies under this Agreement. However Company may cause a duly licensed affiliate to write the Business in lieu of Company, in which case Manager shall use such affiliate as its exclusive insurer pursuant to the terms of this Agreement as if such affiliate were Company. Should Company not cause a duly licensed affiliate to write the Business, Manager shall be allowed to utilize any other insurer to write the Business until Company shall notify Manager that its Production Authority has been reinstated at which time Company shall be Manager's exclusive insurer for the Business. Notwithstanding the foregoing provisions of this Subsection C, Company may not suspend·Manager's production authority with respect to Assigned Risk Programs (i.e. Buy Out Agreements) for the period after May 1 of any calendar year, and, in the event that Company suspends Manager's production authority with respect to Assigned Risk Programs prior to May 1 of any calendar year and such production authority is not reinstated by May 1 of that calendar year, this Agreement will be deemed terminated as of December 31 of that calendar year. In the event that Company provides notice to Manager of the suspension of Manager's production authority with respect to Assigned Risk Program Business subsequent to May 1 of any calendar year, this Agreement shall remain in effect as to the Assigned Risk Programs, subject to termination pursuant to Article XV, until December 31 of the calendar year immediately following the year in which notice of suspension is given.

D. Loss of License. The Company may suspend Production Authority if a regulatory authority cancels, restricts, suspends or declines to renew either the Company's or the Manager's license or certificate of authority, provided said license or certificate of authority is required to solicit and bind Business pursuant to the terms of this Agreement. In such event, the suspension shall remain in effect until such license or certificate of authority has been granted or reinstated by the regulatory authority and satisfactory evidence of such action has been provided to all parties.

E. Indictment. The Company may suspend Production Authority if the Manager or any of the Manager's executive officers is indicted for a criminal offense, the conviction of which would permit termination of the Manager under this Agreement.

F. Grounds for Immediate Termination. In addition to any other grounds for suspension of Manager's Production Authority, Company may suspend Production Authority for any reason that would permit termination of the Manager under this Agreement under Article XV.A.

NYC_NYC_722453_S/NPEARSON

G. Default and Delinquency The Company may suspend Production Authority for failure of the Manager to perform its duties and responsibilities under this Agreement including the timely remitting of accounts and monies to Company, insureds or policyholders and timely and full compliance with Company directives, rules, regulations or manuals.

H. Termination by Manager. The Company may suspend Production Authority if the Manager gives notice of termination under Article XV.

I. Dispute Over Termination. The Company may suspend Production Authority in the event of a dispute over the reason for termination of the Agreement.

J. Termination of Key Employees. The Company may suspend Production Authority if the employment of the individuals identified in Endorsement B is terminated.

**ARTICLE XV.   Commencement and Termination**

This Agreement shall commence as of the date of execution by both parties and shall remain in full force until terminated in accordance with the provisions outlined below, each of which provisions shall be independent of one another. Neither party shall be precluded from challenging the other party's right to terminate this Agreement in a court of law in a manner otherwise consistent with all terms and conditions of this Agreement.

A. Basis for Termination

1. This Agreement may be terminated at any time upon the mutual written agreement of the Company and the Manager.

2. This Agreement may be terminated by either party, for any reason, with two hundred and forty (240) days advance written notice.

3. This Agreement may be terminated by the Company upon five (5) days written notice to Manager with respect to paragraphs (a), (b), (e), (g), (h) and (i) and immediately upon written notice to Manager with respect to paragraphs (c), (d), (f), (j) and (k) of this subsection in the following circumstances:

   (a) Adverse Legislation. Enactment of legislation which could reasonably be expected to materially adversely affect the Company's rights under this Agreement or increase its liabilities or obligations under the Policies and any buy-out or take-out agreements;

   (b) Conflict of Law. If any provision of this Agreement should be declared invalid by a court of general jurisdiction or superseded by specific law or regulation, and the resultant voiding of any provision hereof could reasonably be expected to materially adversely affect this Agreement or the relationship of the parties under this Agreement;

   (c) Default. The failure of the Manager to perform its duties and responsibilities under the provisions of this Agreement, other than those listed in Article XV.4.d, including timely and full compliance with the Company's directives, rules, regulations or manuals; however, Company shall allow Manager an appropriate cure period of sixty (60) days;

- 21 -

(d) Insufficient or Inaccurate Data Reports. The failure of the Manager to properly compute and report all required data or generate reports as required by Article III.; however, Company shall allow Manager an appropriate cure period of thirty (30) days.

(e) Ownership Change. A material change in ownership of Manager that Company does not consent to in writing, which consent may be granted or withheld by the Company in its sole discretion. In the event Company so consents, Manager agrees that the Company shall have the exclusive right to continue all Business set forth under this Agreement for a minimum of two (2) years from the effective date of change in ownership. For purposes of this Agreement, a "material change in ownership" of Manager shall be defined as (i) a change in the ownership of a majority in interest of voting stock of Manager or, (ii) a change in the effective control of the management of Manager pursuant to the power to direct the affairs of or the right to designate a majority of the Board of Directors of Manager by contract, agreement, or otherwise, provided that a transfer of ownership and control within the Wallach family shall not be a material change in ownership of Manager. Notwithstanding anything stated in this subparagraph (e), and Company's right to terminate this Agreement as a result thereof, Manager may effectuate a material change in ownership of Manager at any time without the consent of Company.

(f) Adverse Judgment, etc. Any judgment, writ, attachment, execution or similar process for more than $250,000 is issued or levied against Manager or any of its property and any such writ, attachment, execution or similar process is not paid, released, vacated or fully bonded within thirty (30) days after its issue or levy;

(g) Constructive termination. If the Manager (1) ceases to use Company as its exclusive carrier for the Business without Company's written consent, which consent may be granted or withheld in the sole discretion of the Company, or (2) cancels or non-renews fifty percent (50%) or more of the Business in order to, directly or indirectly, place the Business with a carrier other than the Company, other than as a result of being instructed to take such action by the Company and except if such action is taken following either party's issuance of a notice of intent to terminate this Agreement or if such action is taken during any period during which the Manager's exclusivity obligations under this Agreement are suspended pursuant to Article II.E. or Article XIV.

(h) Legal. If any law or regulation of a federal, state or local government has rendered performance of any material terms of this Agreement illegal, but only insofar as this Agreement applies to such jurisdiction.

(i) Loss ratio. If the claims incurred (i.e., paid claims plus loss adjustment expenses plus outstanding loss reserves plus IBNR) during a twelve month period exceed 90% of the total of earned premium plus collected buy out fees.

(j) Loss of insurance. If Manager loses or does not renew any of their insurance coverages cited in Article XI; however, Company shall allow Manager an appropriate period of no more than sixty (60) days in order to secure coverage which satisfies all requirements set forth in Article XI.

(k) Excessive Complaints. If the number of complaints received by the Company relating to the Manager's performance and service to insureds, policyholders, sub-producers or members of the public is excessive, so as to indicate a pattern of conduct triggering a finding of unfair claim practices or result in the commencement of litigation against the

Company or the Manager by an insured for damages resulting from the failure of the Manager to perform its obligations hereunder, which shall not have been dismissed within sixty (60) days of its commencement, or in the event of regulatory notice to or other communication with the Company or the Manager or regulatory proceeding or investigation regarding the number of or substance of such complaints or the failure of the Manager to perform its obligations hereunder, which shall not have been completed or closed within sixty (60) days of its commencement;

4.  This Agreement may be terminated immediately at any time by either party by written notice, in the event any of the following shall occur:

    (a)  Act of Bankruptcy.  The other party shall be dissolved or be placed under supervision or in rehabilitation or liquidation; or such party shall commence a voluntary case or other proceeding seeking rehabilitation, liquidation, reorganization or other relief with respect to itself or its debts and obligations under any bankruptcy, insolvency, rehabilitation, liquidation or other similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, custodian or other similar official of it or any substantial part of its property, or shall consent to any such relief or to the appointment of or taking possession by any such official in an involuntary case or other proceeding commenced against it, or shall fail generally to pay its debts and obligations as they become due, or shall make a general assignment for the benefit of creditors, or shall take any action to authorize any of the foregoing.

    (b)  Insolvency.  An involuntary case or other proceeding shall be commenced against the other party seeking liquidation, reorganization or other relief with respect to it or its debts and obligations under any bankruptcy, insolvency, rehabilitation, liquidation or other similar law now or hereafter in effect or seeking the appointment of a trustee, receiver, liquidator, rehabilitator, custodian or other similar official of it or any substantial part of its property and such involuntary case or other proceeding shall remain undismissed and unstayed for a period of forty-five (45) days; or an order for relief shall be entered against such party under such laws as now or hereafter in effect;

    (c)  Misconduct, etc.  Fraud, abandonment of its obligations hereunder, gross or willful misconduct relating to the Business, or lack of legal capacity to act hereunder, including cancellation, suspension or non-renewal of any required license or certificate of authority, on the part of the other party that materially affects the Business.  In the event that termination is because of cancellation, suspension or non-renewal of any required license or certificate of authority under Article XV.A.4(c), the Manager will have sixty (60) days to cure such cancellation, suspension or non-renewal, provided however that no payments will be made to Manager during such cure period that are in violation of any applicable law.

    (d)  Failure to Provide Personal Guaranty or Collateral.  Robert Wallach's and William Wallach's failure to (i) sign and execute the Personal Guaranty required pursuant to Article XI.D. concurrently with the execution of this Agreement or (ii) provide Company, by December 16, 2005 at 5:00 P.M., E.S.T with the $5,000,000 LOC required by the Personal Guaranty (or other collateral as allowable therein at the Company's sole discretion).

NYC_NYC_222453_S/NPEARSON

(e) Material Breach.  In the event of the following material breaches of this Agreement by the other party, but subject to a cure period of fifteen (15) business days (except as set forth in subsections (i) and (iii) below):

(i) failure of such party to pay any funds owing to the terminating party or to any insured for any reason within ten (10) days after the time set forth in this Agreement or after notice of such failure from the terminating party, whichever shall first occur, and not cured within two (2) business days thereafter following receipt of such notice of failure;

(ii) in the case of a termination by the Company pursuant to this clause, the delegation of any of Manager's obligations and/or assignment of any rights hereunder without the written consent of the Company, which consent may be granted or withheld in the sole discretion of the Company;

(iii) such party being delinquent two (2) times in any consecutive twelve (12) month period in the accounting for any and all monies due by it to the terminating party or any insured pursuant to this Agreement, which delinquency is not cured within two (2) business days thereof;

(iv) in the case of a termination by the Company pursuant to this clause, failure by the Manager to provide the Company access to books and records related to the Business in accordance with the terms and provisions of this Agreement; or

(v) Any other act or omission expressly deemed a material breach under any of the other terms and conditions of this Agreement.

B. Business After Termination.  In the event of termination of this Agreement, at the election of Company, and as required by law, the Company shall continue Policies and binders in force until their stated expiration dates, subject to the following provisions:

1. Subject to all terms and conditions of this Agreement, including without limitation Article XVI, and the Endorsements, the Manager owns rights to the continuation of Business written under this Agreement except in the case of termination of this Agreement by Company pursuant to Article XV.A.4(a), (b), (c) or (d). Company agrees that it and its affiliates will not, except in the case of termination of this Agreement by Company pursuant to Article XV.A.4(a), (b), (c) or (d) compete with the Manager for the Business written under this Agreement for a period of three (3) years following termination of this Agreement.

2. The Company reserves all its rights to cancel Policies and binders for nonpayment of premium and to cancel Policies and binders issued in violation of the Program's underwriting guidelines then applicable, provided said cancellation comports with applicable state law.

3. Upon termination, the Manager shall cease to have any Production Authority as defined in Article XIV, Section A herein and shall not bind or issue Business to be insured by the Company. The Manager shall continue to be the agent of the Company for all other purposes under this Agreement including the servicing of Policies and binders in force on or before the date of termination of this Agreement in accordance with the terms and provisions hereof. The Manager shall not, without prior written approval of the Company, or as required by any applicable Assigned Risk Program, increase or extend the Company's liability or extend the term or change any conditions of any such Policies under the Program.  If the Agreement is

- 24 -

~~terminated pursuant to subsections A.2. or A.3.(a), (b) or (h) of this Article XV, after May 1~~
of any calendar year, to the extent permitted by applicable law the Production Authority (i.e
Buy Out Agreements) under this Agreement shall remain in effect as to the Assigned Risk
Business until December 31 of the calendar year immediately following the year in which
notice of termination is given.

4.  Upon termination of the Agreement, and provided that Manager continues to service the
    Business, the Company shall have no obligation to pay the Manager any additional fees other
    than those specified in this Agreement for services in settlement of accounts or concluding of
    affairs between the Company and the Manager.

5.  If this Agreement is terminated as provided for herein, neither party shall have any claim
    against the other for loss of prospective profits or fees or damage to business arising solely as
    a result of said termination; provided that each party shall be entitled to damages resulting
    from any breach by the other party of this Agreement, whether or not such breach was the
    basis for the termination hereof.

6.  In the event of termination of the Agreement, any business written hereunder and remaining
    with the Company shall be permitted to continue to normal expiration, provided, however,
    that if the renewal date of any annual policy shall occur within a period of thirty (30) days
    after the date of termination of the Agreement, and such renewal shall have had renewal
    terms already committed, such policy shall be renewed and permitted to continue in force
    until its next annual renewal date. Manager and Company will comply with applicable State
    Statutes and Regulations and Assigned Risk Program rules regarding renewals.

7.  Should any Policy be extended, continued or renewed due to regulatory or other legal
    restrictions, the terms of this Agreement shall continue to apply to and the parties obligations
    hereunder shall continue with respect to such Policy until such Policy is terminated or
    expires.

8.  In the event of any termination of this Agreement other than as set forth in Article XV,
    Section A.4(a), (b), (c) or (d) Company will cooperate in good faith with Manager with
    respect to Manager's replacement of Company with a new insurance carrier for the Business,
    and Company shall, at Manager's expense, take all actions reasonably requested by Manager
    to assure a smooth transition.

9.  In the event of any termination of this Agreement, Manager shall agree to cooperate with
    Company in the administration of the run off of any outstanding business and, in the event
    such termination is by the Company pursuant to Article XV.A4(a), (b), (c) or (d), Manager
    will cooperate in good faith with Company with respect to Company's replacement of
    Manager with a program manager for the Business, and Manager shall, at Company's
    expense, take all actions reasonably requested by Company to assure a smooth transition to
    such new program manager; provided however that so long as Company does not require any
    changes to the Manager's format, there will be no extra formatting charge by Manager for the
    transition of any or all data or records, whether electronic or otherwise, to Company or the
    new program manager.

C.  Records Ownership Upon Termination.
1.  In the event of termination of this Agreement, all records, including electronic records, for the
    Business written under this Agreement (which shall not include work processes, work
    applications, work flows and actuarial pricing models of Manager, which shall remain the

~~confidential and proprietary information of Manager) except claim records which shall be co~~ owned by Company and Manager as provided for in this Agreement, together with the use and control of such records, shall be the sole property of the Company. Notwithstanding Manager's rights to any proprietary intellectual property parenthetically described in the preceding sentence, the Company and/or any new program manager to which the Business is transitioned following termination shall be entitled to use such proprietary intellectual property for the sole purpose of effecting such transition and, upon reasonable request of Manager, Company shall cause such new program manager to enter into a confidentiality and intellectual property protection agreement reasonably acceptable to Manager. The Manager shall be entitled, at its own expense, to maintain copies of all such records, which shall include but not be limited to:

    a.  policy records to the extent that such information is recorded in Manager's general ledger and used for financial statements and tax returns.

    b.  policy records to the extent that such information was reported by Manager to the Internal Revenue Service for 1099 reporting of commissions and other vendor reportable payments.

    c.  premium information which is used in the actuarial valuations for LAD, CLAD, PAPCLAD, and LCA pricing.

  2.  Upon termination of this Agreement, the Manager agrees:

    a  to promptly return to the Company, or destroy with the Company's consent, any and all materials belonging to the Company,

    b  to immediately discontinue the dissemination or use of any materials, marketing or otherwise, bearing the Company's name or logo; and

    c.  promptly return to Company all original records and all electronic records relating to the Business.

3.  Upon termination of this Agreement, the Company agrees, for a period of seven (7) years from the date of termination, that:

  a. following reasonable advance written notice to Company, Manager shall have the right to access and review all records related to the Business generated by Manager.

  b. Company will provide:

        i) Quarterly reports of written and earned premium by state and program.

        ii) Quarterly reports of claim activity by coverage including paid losses, reserve transactions, salvage/subrogation recoveries, claim counts (pending, opened, closed).

        iii) Quarterly reports on Buy Out Fee transactions including reconciliation of Buy Out Agreements.

**ARTICLE XVI.   Ownership of Expirations**

A. Use and control.  Subject to Article XVI.B. below, the business relationships with all customers, use and control of, and all right, title and interest in, all expirations and business written under this Agreement, pertaining to Business written pursuant to this Agreement shall remain Manager's property and remain in Manager's undisputed possession, provided that the Agreement is not terminated pursuant to Article XV.A.4(a), (b) (c) or (d).

B. Failure to pay.  In the event the Manager fails to pay to Company amounts due Company under this Agreement which exceed two million dollars ($2,000,000) the use and control of, and all right, title and interest in all expirations, applicable to the Business written pursuant to this Agreement, shall be vested in Company.  Manager shall have twelve (12) months from the date expirations vest with the Company under this sub-section B to cure such failure. In the event that such breach is cured to Company's reasonable satisfaction, then Manager shall have the right to use and control of such expirations. In the event that Manager fails to so cure, or in the event of termination by Company pursuant to Article XV.A.4.(a), (b), (c) or (d), Company may, in its discretion, sell at private or public sale such expirations , provided that Company shall use its commercially reasonable efforts to sell only such portion of the expirations necessary to realize an amount that approximates the amount due Company under this Agreement to which this Section XVI.B. relates (it being understood that Manager shall have the right to use and control any remaining expirations), and if Company does not realize sufficient money from such sale to discharge Manager's indebtedness for amounts due Company under this Agreement, Manager shall remain liable for the balance of the amount owed to Company.  Any amount realized by Company in excess of the aggregate amount of Manager's indebtedness for amounts due Company under this Agreement, after deduction of all costs and expenses of selling such expirations and records, shall be paid to Manager or Manager's statutory successor in interest.

C. Security Interest.  To secure all indebtedness or liabilities for which Manager and/or its affiliated entities as set forth in Endorsement A are now, or may become liable to the Company in any manner pursuant to this Agreement, the Manager and its affiliated entities specified in Endorsement A grant to the Company, and its present and future affiliates, a security interest in all inventory, chattel paper, accounts, equipment, general intangibles and fixtures, including, but not limited to, all expirations and all records, commissions, and after acquired collateral relating to insurance policies written by Manager and/or its affiliated entities (per Endorsement A), and all products and proceeds from the foregoing. The Manager, and/or its affiliated entities listed in Endorsement A will execute any document, including but not limited to a document giving Company Power of Attorney, the Company considers necessary to obtain, maintain, and perfect this security interest or to comply with applicable law.  Notwithstanding the prior provisions of this Article XVI.C, Company and its affiliated entities shall have no right to enforce or foreclose upon such security interest except in compliance with Article VXI.B.

D. Solicitation.  Except as otherwise provided for in this Article, unless authorized by Manager in writing, Company shall not identify policyholders whose expirations Manager owns and for whom Company writes insurance, in order to solicit said policyholders for any lines of insurance, products or services.  This provision survives termination of this Agreement, but not to exceed two (2) years following termination of this Agreement.

**ARTICLE XVII.   Waiver of Statutory Termination Rights of Manager**

Both Manager and Company are aware that there are or may be laws or regulations that may be interpreted to provide Manager or Company with certain rights of notice, "run-off", continuation of

business written through Manager, prevention of termination and regulatory review and possible disapproval of the termination of this Agreement. Because this Agreement has been mutually entered into for a special purpose, and places responsibilities, duties and obligations upon Manager both beyond those and different from those of a normal soliciting agent, Manager acknowledges that this necessitates a different relationship. Manager and Company therefore specifically waives any and all rights with respect to termination of this Agreement that may now or hereafter be provided Manager or Company by statute or regulation in recognition of that different relationship, and shall not impose upon or require compliance by Company or Manager of any obligations relating to termination of this Agreement other than those provided for specifically in this Agreement.

**ARTICLE XVIII.    Offset**

All amounts due Manager or Company under this Agreement between the parties shall be subject to the right of offset. For the protection of the Company, the Company shall have the right of offset with respect to any premium not timely refunded to premium finance companies or to insureds in the time allotted by the appropriate state law, or within 30 days after policy cancellation, whichever is greater so long as the premium in question arises from Business generated pursuant to this Agreement. For the purposes of this Article, Manager shall include all subsidiaries and affiliates. The Manager may not use the right of offset to remove funds the Manager believes it is owed from the LGPTA or any other account without the prior written consent of the Company.

**ARTICLE XIX.    Miscellaneous Terms**

A. Applicable Law. The rights of the parties to this Agreement shall be governed by and construed in accordance with the law(s) of the State of New York without regard to New York rules on conflict of laws.

B. Waiver. The failure of the Company or Manager to insist on strict compliance with this Agreement, or to exercise any right or remedy shall not constitute a waiver of any rights provided under this Agreement, or stop the parties from thereafter demanding full and complete compliance or prevent the parties from exercising such a remedy in the future.

C. No Assignment. Neither this Agreement nor any rights or obligations under this Agreement may be assigned or delegated, in whole or in part, by either Party without the prior written consent of the other party.

D. Notices and Service of Process. Any notices given with regard to this Agreement (other than the Company's notices or invoices with respect to amounts due hereunder) shall be sent to the following addresses by U.S. mail or any other means calculated to provide notice:

1. To Company:

Lincoln General Insurance Company
150 Northwest Point Boulevard
Sixth Floor
Elk Grove Village,
IL 60007
Attn: John T. Clark

2. To Manager:

NYC_NYC_222453_S/NPEARSON

The Robert Plan Corporation
999 Stewart Avenue
Bethpage, NY 11714
Attn: President

With copy to:
Office of the General Counsel
The Robert Plan Corporation
999 Stewart Ave.
Bethpage, NY 11714

E. <u>Jurisdiction.</u> Any lawsuit, action or legal proceeding of any nature commenced under this Agreement by either party must be brought either in the United States District Court for (a) the Middle District of Pennsylvania, (sitting at Harrisburg) or (b) the Southern District of New York (sitting in Manhattan). In the event (a) the federal district court in which such lawsuit, action or legal proceeding is commenced determines that it does not have legal jurisdiction over the matter and (b) such jurisdiction would not be available in the other federal court designated under this Agreement, such lawsuit, action or legal proceeding must then be brought in the Court of Common Pleas of York County, Pennsylvania. For purposes of service of process related to disputes governed by this Agreement only, the parties agree to accept service of process by personal delivery, registered or certified U.S. mail or overnight courier/delivery service to the addresses specified above.

F. <u>Severability.</u> If any provision hereof is or shall at any time be deemed invalid and unenforceable then, to the fullest extent permitted by law, the other provisions hereof shall remain in full force and effect.

G. <u>Entire Agreement; Modifications.</u> This Agreement constitutes the entire agreement of the parties with respect to the subject matter herein and supersedes any other previous agreements or quotations, whether written or oral, between the Company and the Manager, unless specifically referred to within this Agreement. Except where otherwise provided by the terms of this Agreement, this Agreement may not be released, discharged, amended or modified except in writing signed by officers or authorized representatives of both parties. Notwithstanding the foregoing, manuals, rules, regulations, guidelines, instructions and directions issued in writing by the Company from time to time as provided in this Agreement, shall bind the Manager as though a part of this Agreement.

H. <u>Negotiated Agreement.</u> This Agreement has been negotiated by the parties and the prior drafts and the final version have been reviewed by counsel for the parties. The fact that the initial and final draft shall have been prepared by one or the other of the parties shall not be used in any forum in the construction or interpretation of this Agreement or any of its provisions.

I. <u>General Conditions.</u> In addition to any other limitations contained in this Agreement, any exhibits or addenda hereto or any applicable underwriting guideline, bulletin or instruction which may be issued from time to time by Company to Manager, Manager has no authority to act as outlined below, except as otherwise required by the Business:

    1. Transact business in contravention of any of the following:
        (a) the rules and regulations of any Insurance Department and/or other governmental authority having jurisdiction of the subject matters embraced by this Agreement,

- 29 -

      (b) any written instructions issued by Company to Manager, or

      (c) the applicable laws of any jurisdiction concerned.

2. Hold itself out as an agent of Company in any manner, or for any purpose, other than as specifically prescribed in this Agreement.

J. Confidentiality.　Manager and Company (each a "Receiving Party") agree, on behalf of themselves and their respective Affiliates, employees and agents, that during the term of this Agreement and for a period of five (5) years after the termination hereof, they shall not, without the prior written consent of the other party, disclose to any third person, corporation, firm or other party or use for any purpose other than as specifically permitted by this Agreement, any Confidential Information disclosed by the other party (the "Disclosing Party"), except where an order of court of competent jurisdiction, a governmental agency, state or federal law, the Company's Privacy Policy, or a third party's rights or interest in such Confidential Information otherwise requires such disclosure.

For purposes of this section, "Confidential Information" means all information relating to a Disclosing Party, its Affiliates or third parties to whom a Disclosing Party owes an obligation of confidentiality that is furnished to a Receiving Party now or in the future by or on behalf of a Disclosing Party or to which a Receiving Party obtains access, in either case whether such information is furnished or made accessible in writing, orally, visually, electronically or by any other means.

For purposes of this section, an "Affiliate" of a person or entity means any person or entity (including any entity acquired or created after the date of this Agreement) that directly or indirectly controls, is controlled by or is under common control with such company.

Notwithstanding the foregoing, the following will not constitute Confidential Information for purposes of this Agreement:

1. information which is or becomes generally available to the public, other than as a result of a disclosure or other act by the Receiving Party or its Affiliates, employees or agents;

2. information which can be shown by the Receiving Party to have been already known to it on a non-confidential basis prior to being furnished to it by or on behalf of the Disclosing Party; and

3. information which becomes available to a Receiving Party on a non-confidential basis from a third party that is not subject to any prohibition against disclosing the information to the Receiving Party.

4. Notwithstanding anything to the contrary set forth herein, upon any notice of non-renewal or termination under Article XV, the parties may share such information as may be necessary to secure a replacement insurance carrier or replacement agent, provided that no information will be shared with any party that has not executed a confidentiality agreement no less stringent than the provisions of this Article.

5. A Receiving Party will not be in breach of its obligations under this Paragraph if it discloses Confidential Information as required by an order of court of competent jurisdiction, a governmental agency, state or federal law; provided, however, that the Receiving Party:

(a) notifies the Disclosing Party sufficiently prior to disclosure to enable the Disclosing Party to seek to oppose or restrict the disclosure;

(b) cooperates with any attempt by the Disclosing Party to oppose or restrict the disclosure;

(c) uses its best efforts, at the expense of the Disclosing Party, to obtain any protective order reasonably requested by the Disclosing Party; and

(d) only discloses such Confidential Information that is required to be disclosed.

K. <u>Independent Contractor.</u> This Agreement is not a contract of employment and nothing contained in this Agreement shall be construed to create the relationship of joint venture, partnership, or employer and employee between Company and Manager or between Manager and any independent producers. Manager is an independent contractor and shall be free, subject to the terms and conditions of this Agreement, to exercise judgment and discretion with regard to the conduct of business.

L. <u>Promptly.</u> Unless the context and circumstances require action sooner, the term "promptly" in this Agreement shall be defined to mean "within five (5) business days".

M. <u>Headings.</u> The headings preceding the text of the articles and paragraphs of this Agreement are intended and inserted solely for the convenience of reference and shall not affect the meaning, construction or effect of this Agreement.

N. <u>Honorable Undertaking.</u> This Agreement shall be considered an honorable undertaking made in good faith and shall be subject to a liberal construction for the purpose of giving effect to the good faith and honorable intentions of Manager and Company.

O. <u>Counterparts.</u> This Agreement may be executed in duplicate counterparts and via facsimile with an original signature to follow promptly via U.S. Mail, each of which shall be deemed an original but both of which when taken together shall be deemed one and the same document.

P. <u>Survival.</u> Articles III. M, O, U, V & W; VI. H & I; VII; XI; XII; XIV; XV. B. and C.; XVI, XIX and Article V of Endorsement C, and any other provisions of this Agreement not herein specified which address the conduct of the parties post-termination shall survive the termination of this Agreement.

Q. <u>Delivery of Insurance and Guaranty of Manager.</u>

**The failure of (i) Robert Wallach and/or William Wallach to (a) execute the Personal Guaranty required in Article XI.D. concurrently with the execution of this Agreement or (b) provide Company by December 16, 2005 at 5:00 P.M., E.S.T. with the $5,000,000 LOC required by the Personal Guaranty (or other collateral as allowable therein at the Company's sole discretion); or (ii) Manager to provide by December 16, 2005 at 5:00 P.M., E.S.T Manager to provide by December 16, 2005 at 5:00 P.M., E.S.T certificates of insurance or other evidence satisfactory to the Company that Manager has continued its existing professional errors and omissions policy and has in force the general liability insurance and fidelity bond, all as required by Article XI A., B. and C., shall entitle the Company, at its sole discretion and in addition to any other remedies provided under this Agreement or at law, to treat this Agreement as <u>void ab initio.</u>**

R. <u>Force Majeure.</u> Performance by either party under this Agreement shall be excused to the event and for so long as such performance is impaired, prevented or delayed by Act of God, such as war, riot, insurrection, terrorism, civil commotion, sabotage, strike or other labor disturbances, accidents, fire, flood, earthquake, explosions that damage facilities, measure of governmental

NYC_NYC_222453_SYNPEARSON

authorities or any other cause unavoidable by the exercise of due care, and beyond the reasonable control of either party, provided that the party availing itself of such excuse shall resume or complete its required performance promptly after such cause has ceased.

*Remainder of Page Intentionally Left Blank*

NYC_NYC_222453_5/NPEARSON

IN WITNESS WHEREOF, the parties, intending to be legally bound, have caused their authorized representatives to execute this Agreement below.

Manager:                                        Company:

THE ROBERT PLAN CORPORATION          LINCOLN GENERAL INSURANCE
                                                COMPANY

By: _____          By: _____

Title: _Chairman & CEO_               Title: _____

Date: _11-22-05_                      Date: _____

WITNESS: _____     WITNESS: _____

By: _____          By: _____

Title: _____       Title: _____

Date: _11/22/05_                      Date: _____

WITNESS: _____     WITNESS: _____

- 33 -

NYC_222453_5/NPEARSON

IN WITNESS WHEREOF, the parties, intending to be legally bound, have caused their authorized representatives to execute this Agreement below.

Manager:

THE ROBERT PLAN CORPORATION

By:_____

Title:_____

Date:_____

WITNESS:_____

By:_____

Title:_____

Date:_____

WITNESS:_____

Company:

LINCOLN GENERAL INSURANCE COMPANY

By: _John T. Clark_

Title: _Pres. & CEO_

Date: _11/22/05_

WITNESS: _Wanda Kell_

By: _W.S_

Title: _DIRECTOR_

Date: _NOVEMBER 22, 2005_

WITNESS:_____

- 32 -

NYC 25545_1/RRKARBON

**ENDORSEMENT A**
**ENTITIES AND ASSIGNED RISK AND VOLUNTARY PROGRAM BUSINESS GOVERNED**
**BY THIS AGREEMENT**
**TO**
**PROGRAM MANAGER AGREEMENT**

**ARTICLE I.    Entities and Assigned Risk and Voluntary Program Business.** This Endorsement identifies those entities under common ownership or control that are authorized to conduct business under this Agreement. Company may apply termination and other relevant provisions of this Agreement to one entity, line of business, or territory without necessarily affecting other subject entities, lines of business or territories. If there are multiple contingent commission endorsements applicable to the various entities or lines of business operating under this agreement, the amounts calculated hereunder shall be combined across all entities and lines to produce a single amount payable for each year that nets all losses and loss-carry-forwards from any entity or line against profit from other entities or lines.

| Entity (name, address, etc.) | Lines of Assigned Risk and Voluntary Program Business (Business) | Effective Date | Governing Endorsements |
|---|---|---|---|
| The Robert Plan Corporation The Robert Plan of New York Corporation The Robert Plan of California Corporation and Freedom General Agency, Inc. 999 Stewart Avenue Bethpage, New York 11714 | Limited Assignment Distribution Program ("LAD") and the Commercial Limited Assignment Distribution Program ("CLAD") specifically listed in Endorsement B and such additional states as may be added with the prior written consent of Company. and the California Low Cost Auto Program ("LCA"), the New York Public Automobile Limited Assignment Distribution Program ("PAPCLAD"), the New York Private Passenger Auto and the New York Physical Damage Only | January 1, 2006 | A,B,C,D,E |

- 34 -

**ENDORSEMENT B**
**CLASSES OF BUSINESS AND AUTHORITY**
**TO**
**PROGRAM MANAGER AGREEMENT**

**ARTICLE I.**     **Classes of business.**  Manager's authority and responsibility extends to the following classes of business, policies of insurance (including endorsements), lines of business and limits of insurance.

    A.  Allowed classes of business

        1.  Private Passenger Automobile
        2.  Commercial Automobile

    B.  Allowed Policy Coverages / Limits

        1.  Assigned Risk Business – all limits as prescribed by the applicable state assigned risk plan rules.

        2.  Voluntary Business

        (a) Automobile Liability:  Statutory limit as required by law
        (b) Personal Injury Protection:  Statutory limit as required by law
        (c) Uninsured/Underinsured Motorist:  Statutory limit as required by law
        (d) Medical Payments:  $5,000
        (e) Automobile Physical Damage:  ACV not to exceed $40,000
        (f) Rental and Towing

    C.  Maximum Annual Premium Volume shall be $400,000,000 Aggregate

**ARTICLE II.**     **Authority to Bind Risks.**  Manager's authority to bind qualifying accounts is governed as below.

Assigned Risk Business – per the applicable assigned risk plan rules

Voluntary Business - Accept, bind, and issue, on forms approved by the Company, applications, binders, and/or policies written for the Voluntary Programs described in the Program Managers Agreement with the Company's approved underwriting procedure manuals and guidelines and subject to Company's final underwriting approval.

**ARTICLE III.**  **Territory.**

    A.  Manager's authority and responsibility extends to the following territories, including any Mandatory Take Out accounts written in these Territories.  Additional territories may be added below from time to time as required by the Company.

        1.  State of Arizona

NYC_NYC_222453_S/NPEARSON

(a.) Arizona Automobile Insurance Assigned Risk Plan – private passenger non-fleet motor vehicle risks
2. State of California
   (a.) Low Cost Auto Program
   (b.) California Automobile Assigned Risk Plan – private passenger non-fleet motor vehicles
3. State of Connecticut
   (a.) Connecticut Automobile Insurance Assigned Risk Plan – private passenger non-fleet motor vehicle risks
4. State of Delaware
   (a.) Delaware Automobile Insurance Assigned Risk Plan – private passenger non-fleet motor vehicle risks
5. District of Columbia
   (a.) DC Automobile Insurance Assigned Risk Plan -- private passenger non-fleet motor vehicle risks
6. State of Colorado
   (a.) Colorado Automobile Insurance Assigned Risk Plan -- private passenger non-fleet motor vehicle risks
7. State of Idaho
   (a.) Idaho Automobile Insurance Assigned Risk Plan -- private passenger non-fleet motor vehicle risks
8. State of Maine
   (a.) Maine Automobile Insurance Assigned Risk Plan – private passenger non-fleet motor vehicle risks
9. State of Montana
   (a.) Montana Automobile Insurance Assigned Risk Plan – private passenger non-fleet motor vehicle risks
10. State of Oregon
    (a.) Oregon Automobile Insurance Assigned Risk Plan – private passenger non-fleet motor vehicle risks
11. State of Nevada
    (a.) Nevada Automobile Insurance Assigned Risk Plan – private passenger non-fleet motor vehicle risks
12. State of New Jersey
    (a.) New Jersey Automobile Insurance Assigned Risk Plan -- private passenger non-fleet motor vehicle risks
13. State of New Mexico
    (a.) New Mexico Automobile Insurance Assigned Risk Plan -- private passenger non-fleet motor vehicle risks
14. State of New York
    (a.) New York Automobile Insurance Assigned Risk Plan – private passenger non-fleet motor vehicle risks
    (b.) New York Automobile Insurance Assigned Risk Plan – commercial automobile risks, including PAPCLAD
    (c.) New York Private Passenger Auto (Voluntary Take Out)
    (d.) New York Physical Damage Only (Voluntary)
15. State of Pennsylvania
    (a.) Pennsylvania Assigned Risk Plan -- commercial automobile risks
    (b.) Pennsylvania Assigned Risk Plan – private passenger automobile risks
16. State of South Carolina
    (a) South Carolina Automobile Insurance Assigned Risk Plan – private passenger non-fleet motor vehicle risks

(b) South Carolina Automobile Insurance Assigned Risk Plan – commercial automobile risks
17. State of Texas
    (a.) Texas Automobile Insurance Assigned Risk Plan – private passenger non-fleet motor vehicle risks
    (b.) Texas Automobile Insurance Assigned Risk Plan – other than private passenger
18. State of Utah
    (a) Utah Assigned Risk Plan – private passenger automobile risks
19. State of Vermont
    (a) Vermont Automobile Insurance Assigned Risk Plan – private passenger non-fleet motor vehicle insurance
20. State of Washington
    (a) Washington Automobile Insurance Assigned Risk Plan – private passenger non-fleet motor vehicle risks
21. State of West Virginia
    (a) West Virginia Automobile Insurance Assigned Risk Plan – private passenger non-fleet motor vehicle risks
22. State of Wyoming
    (a.) Wyoming Automobile Insurance Assigned Risk Plan – private passenger non-fleet motor vehicle risks

B.  Additional states to be added at the written consent of Company.

C.  All other Risks outside these territories require prior written Company approval.

D.  Company reserves the right to modify the list of approved territories at its sole discretion.

E.      The bases for the rates to be charged for Assigned Risk Business generated pursuant to this Agreement are per the Assigned Risk Plan filings. The bases for the rates to be charged for the Voluntary Program Business shall be in accordance with the Company's filing with the appropriate state regulatory agency. Prior to filing, such rates must be approved by the Company, such approval being withheld or granted at Company's sole discretion.

F.  The applicable exclusions that apply to the authorized line(s) of business are per the Assigned Risk Plan approved filings or the Voluntary Program filings, as applicable.

G.  The maximum policy period for any policy issued pursuant to this Agreement is per the Assigned Risk Plan approved filings or the Voluntary Program filings, as applicable..

## ARTICLE IV.   Additional Responsibilities of Manager

Manager is knowledgeable of and agrees to be fully responsible for compliance with all applicable national security and privacy laws and regulations. This includes, if applicable, but is not limited to, the Office of Foreign Assets Control requirements, the Gramm-Leach-Bliley Act, the Fair Credit Reporting Act, Fair and Accurate Credit Transactions Act, the Insurance Information and Privacy Protection Act and those regulations promulgated to support implementation thereof. The Manager shall make all compliance measures and documents available to the Company.

## ARTICLE V.   Key Employees.

    1.  Robert Wallach
    2.  Robert Palm

- 37 -

3. Jasper Jackson
4. Philbert Nezamoodeen
5. Designated Producer for Licensing Purposes
6. Steve Paparo
7. John Lusardi
8. Marie Barbieri
9. Mike DiVittorio

NYC_NYC_222453_S/NPEARSON

**ENDORSEMENT C**
**CLAIMS SERVICE AGREEMENT**
**TO**
**PROGRAM MANAGER AGREEMENT**

**ARTICLE I.    Duties of the Manager.**  The Manager shall provide the following claim management services to the Company:

    A.  Investigate liability, damages and coverages, evaluate, negotiate claims through settlement or final disposition, and issue all claim payments with funds provided by the Company.  All payments will be documented and supported, with frequent reconciliation by traditional accounting methods.

    B.  Prepare and file all reports and handle all claims in accordance with established claims procedures and state guidelines, assuring compliance with *Fair Claims Practice Acts,* and all other applicable statutes and regulations.

    C.  Maintain a separate file on each claim with appropriate physical documentation and within an electronic information management system, to track activities, file notes and to manage all reserve and payment activity, which file shall be the joint property of Company and Manager.  However upon an order of liquidation of Company such files shall become the sole property of the insurer or its estate.  Monthly management reports shall be provided per terms agreed to by both parties.  Furthermore, the Administrator will provide the Company access to their electronic claims information management system via a computer located in the Company's Home Office.

    D.  Coordinate, direct and manage litigation activity, assigning defense to house counsel and to outside legal counsel selected from an outside counsel list with any changes to the list subject to Company's review and approval.  Notwithstanding any other provision of this Agreement, Company will have ultimate control of all legal decisions and retains right to handle and direct any litigation at any time.

    E.  Establish initial reserves and adjust them according to the instructions provided in Article III of this Endorsement.

    F.  Coordinate all outside field assignments, investigations, appraisals and experts, based on need, cost-effectiveness and return on expense/cost.  Company must give prior approval before the Manager hires any independent adjusters, experts or consultants.

    G.  Manage, direct and coordinate claim file and operational audits, reinspections of direct repair facilities, and regular evaluation of cost containment and other cost control measures.

    H.  Coordinate and handle all subrogation and salvage disposal activities based on applicable state title statutes and regulations, applying recoveries and tracking transactions.

    I.  Conduct four (4) management random audits per year, with results submitted to the Company in writing.

J.  Other than those that are to be handled pursuant to Article III, Q of this Agreement, address all complaints from regulatory or other governmental entities, maintaining a log recording them, including whether such is justified, the resolution and steps taken to address the issues.

K.  Allow Company to perform periodic audits of claim files being handled by Manager on behalf of Company. Manager will cooperate fully with Company and allow complete access to Company's claim files and to Manager's claim system. Audits will be on-site at any of Manager's claim offices and will be at sole discretion of Company.

L.  Directly handle and manage all claim and legal activity and not subcontract any services covered under this Agreement without the express written approval of Company.

M.  Upon the execution of this Agreement, Manager will become a signatory member of Arbitration Forums, Inc. for purposes of resolving applicable industry disputes.

N.  Handle Company's claims consistent with the Manager's established practices and procedures. In the event of any conflict between the Manager's established practices and procedures and this Agreement, the terms, conditions and provisions of this Agreement shall govern.

O.  If and when applicable, evaluate all members of its direct repair facility network for quality and compliance with any applicable state or industry guidelines, regulations or statutes which Manager warrants and represents that it has done. Manager further warrants and represents that it has contracts with all members of any direct repair facility network insuring that the facility has adequate liability insurance and are independent contractors exercising independent judgment in the repair of damaged motor vehicles.

P.  Company shall be liable for any extra-contractual obligations, including, but not limited to punitive, exemplary or compensatory damages arising out of the handling of any claims on business covered hereunder, such liabilities arising because of, but limited to, the following: failure by the Manager to settle within the policy limit or by reason of alleged negligence in (i) rejecting an offer of settlement, or (ii) in the preparation of the defense, or (ii) in the trial of any action against its insured or reinsured, or (iv) in the preparation or prosecution of an appeal consequent upon such action, except for those extra-contractual obligations which arise due to Manager's gross or willful misconduct, negligence or failure to exercise professional claims business practices, including but not limited to acts or omissions of Manager giving rise to allegations against Company for bad faith.

Q.  In the event that Company decides to handle a claim(s), cooperate fully with Company to facilitate the investigation, adjustment, settlement and payment of each and all claims, and assign such claim or loss for handling as may be directed in writing by Company.

R.  Give immediate notice to Company of any claim (other than PIP claims) or suit brought against Company where Company or any of its affiliated companies is named as defendant, and Company reserves the right to assume sole and full control of the defense of that claim or suit.

S.  The Manager will not be reimbursed by Company for the salaries, office expenses or any other expenses incurred in the handling of claims unless otherwise expressly agreed to in writing by Company.

T.  The Manager shall send the Company a copy of the claims file anytime at the Company's request and as soon as it becomes known that the claim

- 40 -

1. Has the potential to exceed an amount determined by the Insurance Commissioner of the state where the risk is located or exceeds any limit which the Company may from time to time set;

2. May exceed the Manager's claims settlement authority as outlined in this Endorsement, Article II. D herein;

3. Involves a coverage dispute;

4. Is open for more than six months;

5. Is closed by payment of an amount set by the Insurance Commissioner of the state where the risk is located or by an amount which the Company may from time to time set, whichever is less.

**ARTICLE II.    Duties of the Company.** The Company agrees to the following as respects Manager's claim management services.

A. Honor the payment of all covered loss payments, claim service fees and reasonable allocated loss adjustment expenses issued by the Manager. The Company is solely responsible for funding and maintaining adequate funds in the C-ZBA. Manager may not retain more than three months estimated claims payments and allocated loss adjustment expense in the C-ZBA, which amount shall be agreed to by the Company and Manager.

B. The Manager must supply positive pay file to Company for the C-ZBA as the checks are issued.

C. Provide up-to-date information on any changes in excess insurance, limits of coverage, self-insured retention, or any changes that may affect its capacity to fulfill financial obligations to the Manager or as required to the public. (This includes up-to-date status of any regulatory actions, formal or informal, pending against Company.)

D. Cooperate fully in the disposition of the claims, including but not limited to, providing Manager with $25,000.00 settlement authority per liability claim $50,000 per accident and actual cash value for comprehensive, collision and property damage claims up to the limit of coverage.

E. Provide Manager with 30 days advance written notice for any potential changes which might impact Manager's financial capacity to deliver proper service, handle claims promptly and to honor agreed settlements with any party to a loss, vendors or providers within the limits of the policy.

**ARTICLE III.    Reserving Procedures.** Evaluation of the exposure is critical and ongoing. Each claim must be evaluated on the basis of the most current and credible information beginning at the time of the initial report of loss and continuing through all phases of handling until the file is closed. Delays mean understated losses and improper rates as well as missed settlement opportunities. The following discussion outlines Lincoln General's evaluation and reserving policy. Of course, no written policy can cover every situation that might arise, it is expected that your claim professionals will use common sense and good claim judgment.

NYC_NYC_222453_S/N/PEARSON

A. <u>Initial Factor reserves.</u>  A prompt and appropriate value is necessary on every claim file to properly reserve our liabilities. The Manager shall use the following initial factor reserves on all open claims:

1. BI: Per agreement with Company;
2. PD: $ Per agreement with Company;
3. COLL: $ Per agreement with Company;
4. COMP: $ Per agreement with Company;
5. UMBI: $ Per agreement with Company; and
6. PIP: $ Per agreement with Company.

B. <u>Evaluation.</u>  Lincoln General's policy is to evaluate claims and suits based on probability rather than possibility.  Predicting what a court or jury may award to a claimant is very difficult. Exceptional verdicts are highly publicized, yet less than 5% of our liability claims and suits result in verdicts. Claimants' attorneys normally recognize that verdicts vary significantly, even on cases that are quite similar, so the risks inherent at trial encourage compromise settlements. Although verdicts may, over time, influence the usual or average compromise settlement on a given type of claim in a given area, we owe it to the policyholders, who pay premiums, not to let a few high verdicts unduly influence our evaluations and payments on the overwhelming majority of claims and suits that are settled. This means that, while anything is possible in court, our starting point in evaluating a liability claim or suit is to determine the probable or estimated settlement value of the injury or property damage; i.e.. the usual or average settlement on like cases. The methodology to be used in evaluating and reserving liability claims and suits is a three-stage process of:

1. DETERMINE THE DAMAGE VALUE (DV).  This is the probable settlement value of the claimant's injury or property damage, without regard to liability or comparative fault on the part of the claimant; or other parties; the usual settlement value. It is not representative of a high verdict, nor does it represent the highest or lowest settlement experienced on similar claims. When establishing or adjusting the *Damage Value* on bodily injury claims, consider the following components at a minimum:

   (a.) Extent of injury/damages;
   (b.) Medical expenses (diagnostic and therapeutic)
   (c.) Loss of income/other expenses
   (d.) Total amount of expenses (gross and out-of-pocket)
   (e.) Verified future expenses (medical and wage)
   (f.) Permanent or disfiguring injury
   (g.) Pain and suffering
   (h.) Other intangible factors and influences which may increase or decrease the valued of a claim
   (i.) Prejudgment interest, if applicable.

   The claim handler should always estimate the *DV* through individual thought process, and/or round tabling. The amount of policy limits should not be considered at this point.

2. DETERMINE THE PERCENT OF LIABILITY ON THE PART OF THE INSURED (PL). This is our assessment of the insured's probable responsibility for the claimant's injury or property damage, our insured's responsibility compared to that of the claimant and all other culpable parties.  It is the percentage of legal liability that we believe will be assessed against our insured after weighing the facts, considering the applicable laws, assessing the

NYC_NYC_222453_SNPEARSON

responsibility of others, and determining whether viable codefendants are financially capable of making a contribution or satisfying a potential judgment. You must consider whether joint and several liabilities apply.

3. ESTABLISH THE ESTIMATED SETTLEMENT VALUE (ESV). This is simply the *Damage Value* multiplied by the percent Liability on the insured's part. For example:

        $20,500     Damage Value
        X   .40     %Liability on Insured's Part
        $ 8,200     Estimated Settlement Value

The ESV should not exceed the policy limits. If so, it should be reduced. The ESV represents our most likely payment, our settlement objective in the final stages of negotiations. However, since no two cases are exactly alike and, in most cases, there is an adversary relationship, give and take will occur. Thus, our settlement objective, in the early stages of negotiation, is often something less than the reserve on any given case. Each and every claim has a certain lifespan. Early in the life of some claims, reserves are often based on incomplete information and represent only a best "guess". As the claim ages and as better information is developed, our evaluation must change and our reserves must therefore change. Once the evidence is known, and the claim has been fully evaluated based on that evidence, we should be willing to negotiate a compromise settlement up to the established *Estimated Settlement Value*, which generally should be the top figure of our range of settlement goals. Some exceptions arise; e.g. a claimant's contributory negligence in some jurisdictions may be such as to bar recovery; the facts and the law may be so heavily in the insured's favor that we would refuse to make a compromise settlement even though we carry a reserve. Any exception to our normal willingness to negotiate a compromise settlement up to the *ESV* requires an appropriate rationale and explanation in the claim file.

C. <u>Reserving.</u> Based on the foregoing process to evaluate a claim, a reserve should normally represent the probable cost of what we expect to pay on any claim. It is not the best-case or worst-case scenario figure. Our goal is to establish a firm reserve as soon as possible dependent on the type of claim and ability to obtain adequate facts, for example:

1. Simple claims: First or third party physical damage claims should take 30 days or less as a reasonable time period.
2. Complex or serious claims and first notice suits: may take 30-90 days.
3. Liability issues in most nonsuit claims can be resolved within 30-45 days.
4. Coverage issues should be finalized or a position established within 30 days.

In any case, from the time of receipt of a claim or suit until conclusion the reserve must be based on all available information, even if it represents our best "guess". The reserve should be updated as new information or developments occur. Intentional "stair stepping" should be avoided in most instances.

D. <u>Minimum Reserving Factors:</u> We are obligated to maintain overall reserving integrity on our entire book of claims. This means that we must recognize the fact that some "no liability" or "no coverage" cases are ultimately lost. Even when the law and/or the evidence are heavily in favor of our insured, we can still expect plaintiff verdicts infrequently in "no liability" or "no coverage" cases. To maintain reserving integrity on our entire book of claims, we expect to reserve a minimum of 10% of the *Damage Value* on all claims, even on cases where our investigation

determines our insured has no liability. Adopting this approach should result in adequate aggregate reserves on our book of "no liability" and "no coverage" claims so that we can accommodate every claim. For example: Our insured is T-boned by the claimant driver. Liability is 100% versus the claimant. The claimant car is a total loss with a DV of $20,000 (acv + rental). The claimant's injury is worth $50,000 DV. The reserves in this case would be $2000 APD and $5000 ABI. All First party losses should be reserved initially at the agreed upon factor reserve unless initial information received reveals a reason for an immediate increase or decrease. UMBI claims would be handled the same as third party liability claims.

E. First Notice Suits. Frequently, service of suit papers is our first notice of a claim. Therefore, it is difficult to establish a representative reserve when transmitting the claim. If the information is lacking, make a best "guess". Avoid setting an arbitrary reserve of $1.00 or some other preset amount. Consider the limited information and utilize good claim judgment to make the best "guess". This reserve should be reexamined within 45 days and adjusted to an appropriate level. Manager shall notify Company of first notice suits by means of a monthly active suit report.

F. Changes in Reserves. A reserve change should be made within 10 days whenever new information or a change in a prior evaluation will result in an adjustment of $1,000 or more. In instances where receipt of closing papers will be delayed (awaiting court approval, the finalization of a Structured Settlement, or final billing from defense counsel), adjust the reserves to the amount of settlement within 10 days unless the difference is less than $1,000.

## ARTICLE IV.    Claims Service Fees.

A. For all claims services to be rendered by the Manager during the term of this Agreement the Company shall pay the Manager a fee of 12% of the Earned Net Premium and buy out fees relating to that premium. This fee shall be deemed to cover all of Manager's allocated and unallocated loss adjustment expenses, including legal and investigative expenses, and no additional or supplementary fee shall be payable to Manager for claims services.

B. The Company shall pay Manager 90% of the claim fee due following Company's receipt of an invoice and the monthly bordereau supporting such fee. Such claims fee shall be paid within ten (10) days of Company's receipt of the invoice.

C. So long as Manager performs in accordance with all claims handling obligations under this Agreement, ten percent (10%) of the fee shall be deposited in an escrow account ("Claims Escrow") by the Company to handle claims should the Program go into a run off situation. Conditional upon performance by the Manager of all claim services in accordance with the requirements set forth herein and any other written instructions of the Company and delivery of notice to the escrow agent of the completion of such performance by the Company, funds from the Claims Escrow shall be distributed to the Manager on a semiannual basis commencing six months after the end of the date of termination as follows:

| Six months after termination date | First Payment | 50% of total in trust |
|---|---|---|
| Twelve Months | Second Payment | 50% of balance in trust |
| Eighteen Months | Third Payment | 50% of balance in trust |
| Twenty-Four Months | Fourth Payment | 50% of remainder in trust |

| After all claims closed | | remainder in trust | |
|---|---|---|---|

Funds from the Claims Escrow shall be distributed to Company by the escrow agent to the extent Company has damages or expenses due to Manager's failure to perform all or part of its obligations with respect to servicing the run-off Business. Any funds held in the Claims Escrow shall constitute property of Company and shall not constitute property of the Manager unless and until such time as any and all other contingencies have been fully removed and satisfied.

## ARTICLE V.   Termination.

A. The claims settlement authority granted to Manager pursuant to this Endorsement C may be terminated by the Company for cause, or at the Company's sole discretion upon written notice to the Manager or upon the termination of this Agreement. The Company may suspend the Manager's settlement authority during the pendency of any dispute, or arbitration proceeding regarding the cause for termination.

B. Manager shall still be responsible to manage claims attributable to Business written under this Agreement even after the termination of this Agreement. However, Company shall have the right, but not the obligation, to direct the manager in the administration of, or assume administration of any claim or all claims at any time. In such case, Manager shall fully cooperate with Company and Company shall have access to all claim files, electronic data, systems and Manager's facilities for purposes of administering the claims, and Manager shall deliver any or all original and electronic claims files to Company promptly upon request.

C. The payment of fees, except for funds from the Claims Escrow, will cease on the effective day of termination of this Agreement or termination of Manager's claims handling authority hereunder notwithstanding Manager's continued handling of runoff claims. To the extent Company directly handles administration of the claims attributable to the Business, Manager's fee shall be proportionately reduced or eliminated as determined in Company's sole discretion.

- 45 -

**ENDORSEMENT D**
**PROGRAM MANAGER AGREEMENT**
**COMPENSATION**

### ARTICLE I.    Commission.

As compensation for the faithful performance of Manager's duties under this Agreement, Company agrees to pay Manager a commission as set forth in this Endorsement D.

As used in this Endorsement D, the following terms shall have the described meanings:

    A.  "Policies" shall have the meaning ascribed to it in Article II.C.1 of the Agreement.

    B.  "Gross Written Premiums" for any period shall mean the gross premiums (excluding Fees) charged on all original and renewal Policies during such period.

    C.  "Net Written Premium" for any period shall mean the Gross Written Premiums, less return premiums and less uncollectible premiums, in each case for such period.

    D.  "Earned Net Written Premiums" as of the end of any period shall mean unearned Net Written Premium at the beginning of such period plus Net Written Premiums for such period, less unearned Net Written Premium at the end of such period.

    E.  "Yearly Losses Incurred" for any period at the time of any calculation pursuant to Article II, F of this Endorsement shall mean losses outstanding for such period at the time of calculation, plus losses paid for such period on or prior to the time of calculation, less recoveries for losses incurred for such period on or prior to the time of calculation, plus IBNR reserve for such period at the time of calculation, plus all assessments and regulatory required contributions paid by the Company attributable to such period on or prior to the time of calculation.

    E.  "Loss Ratio" as of the end of a period shall be determined by dividing (a) Yearly Losses Incurred for such period by (b) Earned Net Written Premiums for such period plus revenues received by the Company as a result of take out credits during such period.

    F.  "Net Collected Premium" for any period shall mean so much of the Net Written Premium as is actually collected and received by the Company.

    G.  "Fees" shall mean those fees described in Article II.C. of this Endorsement D.

### ARTICLE II.    Commission Payments

    A.  Provisional Commission. Subject to Article III.J of the Agreement, the Company shall allow the Manager a provisional commission (the "Provisional Commission") equal to 10% (subject to adjustment as provided in paragraph H., the "Provisional Commission Rate") on monthly Net Collected Premium, net of required deposits to the Escrow Account (as defined below), as an advance against Commissions (as defined below) payable as provided below. The Manager shall allow the Company return commission on return premiums during each month at the Provisional Commission Rate, which the Company shall deduct on a monthly basis from the Provisional Commission for such month. The Company shall pay the Manager the Provisional Commission,

net of any deduction for deposit into the Escrow Account (as defined below) as set forth below, five (5) days following receipt by Company of the Manager's invoice therefore and monthly reconciliation supporting such Provisional Commission; except that, for the calendar year 2006, the Company agrees to pay Manager an estimated Provisional Commission for each month, net of any deduction for deposit into the Escrow Account (as defined below) as set forth below, within two (2) business days of the first day of the next following month during such year, so long as the Manager shall have provided Company a good faith estimate of such Provisional Commission with such supporting documentation as the Company may reasonably request. On a monthly basis with respect to 2006, the parties shall true up any overpayment or underpayment of the actual monthly 2006 Provisional Commission owed with the estimated 2006 Provisional Commission paid within five (5) business days following receipt by Company of Manager's monthly reconciliation. The Manager agrees to deliver such a monthly reconciliation with respect to each month to the Company not later than the 10th business day following the end of such month.

B. **Subproducer Commissions.** The Manager shall pay subproducer commissions per the Company Underwriting Guidelines or AIPSO Plan Guidelines of the appropriate state, provided that subproducer commissions pursuant to Assigned Risk Programs for any period shall not exceed the amounts required by applicable law and subproducer commissions pursuant to Voluntary Programs for any period shall not exceed amounts that have been approved in writing by the Company as determined by the Company in its sole discretion. Such subproducer commissions shall be considered a pass-through expense over and above the Provisional Commission.

C. **Fee Income.** The Manager will pay the Company monthly an amount equal to 30% of all fees that are payable or assessable under the Company Underwriting Guidelines or AIPSO Plan Guidelines of the appropriate state, that are collected on all Policies, including but not limited to:

1. Policy issuance Fees such as a policy fee, endorsement fee, reinstatement fee, and rewrite fee or any other 'policy issuance' fees.

2. Cancellation and billing fees such as, but not limited to, installment fees, late fees, NSF or cancel fees.

3. Filing fees for financial responsibility forms such as, but not limited to, SR-22's, SR-1P's or SR-26's.

Fees will not be included in any Commission calculations.

D. **Escrow Account.** The Company shall establish an escrow account (the "Escrow Account") with an independent escrow agent designated by the Company (the "Escrow Agent"). Following the date of this Agreement, each month the Company shall deduct an amount equal to the applicable percentage specified below of the monthly Net Collected Premium from the Provisional Commission for such month and deposit such amount in the Escrow Account.

| Months within Period | Percentage |
|---|---|
| 1/1/2006—3/31/2006 | 0.0% |
| 4/1/2006—6/30/2006 | 0.5% |
| 7/1/2006—9/30/2006 | 1.0% |
| 10/1/2006 and thereafter | 2.5% |

NYC_NYC_222453_S/NPEARSON

Any earnings on funds held in the Escrow Account shall be retained in and added to the Escrow Account. The Escrow Agent shall, subject to the terms and conditions hereof and any terms and conditions of an escrow agreement with the Escrow Agent determined by the Company in its reasonable discretion, have sole control over the Escrow Account. The Escrow Agent shall only distribute funds pursuant to written instructions of the Company or on order of a court of competent jurisdiction. If the Manager pledges to the Company collateral in form and substance and on terms and conditions that in each case are in all respects acceptable to the Company in its sole discretion, the Company may elect to waive the requirement that all or some of the amounts be deposited into the Escrow Account with respect to calendar months during 2006.

E.  Commission. The commission payable with respect to any period by the Company to the Manager (the "Commission") shall be a percentage of Net Collected Premiums for such period, not less than one half of the Provisional Commission Rate nor more than 150% of the Provisional Commission Rate (the "Commission Rate") calculated as follows:

1.  If the Loss Ratio for such period is greater than, or equal to, 72.0%, the Commission Rate shall be one half of the Provisional Commission Rate.

2.  If the Loss Ratio for such period is greater than, 67.0%, and less than 72.0% the Commission Rate shall be equal to Provisional Commission Rate, less 100.0% of the difference between the Loss Ratio and 67.0%, but not less than one half of the Provisional Commission Rate.

3.  If the Loss Ratio for such period is greater than 64.0% and less than, or equal to 67.0% the Commission Rate shall be the Provisional Commission Rate.

4.  If the Loss Ratio for such period is greater than, or equal to, 54.0%, but less than, or equal to, 64.0%, the Commission Rate shall be the Provisional Commission Rate plus 50% of percentage by which the Loss Ratio is less than 64.0%, but not greater than 150% of the Provisional Commission Rate.

5.  If the Loss Ratio for such period is less than 54% the Commission Rate shall be 150% of the Provisional Commission Rate.

F.  Subject to applicable law and regulatory approval of this Agreement, the Company shall calculate and report the Commission for 2006 after December 31, 2009 and on or before March 31, 2010, and, thereafter, after each succeeding December 31 and before each following March 31, the Commission for all years ending at least three years prior to the commencement of the then current year, until all losses under the Business written under this Agreement have been fully settled. By way of illustration, the calculation and report delivered after December 31, 2011 and on or before February 28, 2012 shall calculate and report the Commissions for the years 2006, 2007 and 2008.

1.  If the Commission for any period calculated above is less than an amount equal to

(a) the Provisional Commissions previously allowed for such period, plus

(b) any amounts previously paid to Manager from the Escrow Account or otherwise on account of the underpayment of Commissions for such period based on a prior calculation under this subsection F, less

(c) any amounts previously paid to the Company from the Escrow Account or otherwise on account of the overpayment of Commissions for such period based on a prior calculation under this subsection F, then

the Company shall direct the Escrow Agent to distribute the shortfall from the Escrow Account to the Company and to the extent the balance of the Escrow Account is less than such shortfall, the Manager shall remit the difference between such shortfall and the balance of the Escrow Account to the Company within 15 days.

2. If the Commission for any period calculated above is greater than an amount equal to

(a) the Provisional Commissions previously allowed for such period, plus

(b) any amounts previously paid to Manager from the Escrow Account or otherwise on account of the underpayment of Commissions for such period based on a prior calculation under this subsection F, less

(c) any amounts previously paid to the Company from the Escrow Account or otherwise on account of the overpayment of Commissions for such period based on a prior calculation under this subsection F, then

the Company shall direct the Escrow Agent to distribute the excess from the Escrow Account to the Manager and to the extent the balance of the Escrow Account is less than such excess, the Company shall remit the difference between such excess and the balance of the Escrow Account to the Manager within 15 days.

G. It is the intent of the parties that if the Loss Ratio for any period shall exceed 72% for purposes of any calculation then the amount of Yearly Losses Incurred for such period representing such excess shall be carried forward, for purposes of calculations under paragraphs E. or F., to the next succeeding period and treated as Yearly Losses Incurred for such succeeding period.

H. Upon termination of the Agreement, for purposes of this Endorsement, the Manager agrees to reduce the Provisional Commission Rate according to the following schedule:

1. 9% of Net Collected Premium collected 9 to 12 months after such termination.
2. 8% of earned Net Collected Premium collected 12 to 18 months after such termination.
3. 7% of earned Net Collected Premium collected 18 to 24 months after the program is deemed in run-off.
4. 6% of earned Net Collected Premium collected 24 to 36 months after such in run-off.
5. 0% of earned Net Collected Premium collected more than 36 months after the program is deemed in run-off.

## ARTICLE III. Miscellaneous provisions

A. Manager shall refund on a prorated basis to Company, on all insurance issued under this Agreement, Commissions or Provisional Commissions on coverage which has been canceled by Company or the insured, and on premiums which have been reduced or refunded, in each case at the Provisional Commission Rate or Commission Rate, as applicable, at which such Provisional Commissions or Commissions were originally payable and within the period of time required by the rules or regulations of Company.

- 49

B. Manager's fees and commissions and any other monies due Manager shall be subject to offset by Company, or any of its affiliates for any money due from Manager to Company or its affiliates. This provision shall not be affected by the insolvency of the Manager.

C. Upon breach by the Manager of any financial obligation to Company, Company shall have the right to collect any outstanding indebtedness directly from any insured, agent, broker, sub-producer or other party owing any sum to Manager for the Business written under this Agreement. If Company exercises such right by collecting such indebtedness directly, Company shall be accountable to Manager for any sum received that, net of expenses associated with such collection, exceeds the amount owed to Company by Manager.

## ENDORSEMENT E
### MANAGER'S PERSONAL GUARANTY

### PROGRAM MANAGER AGREEMENT

This Guaranty (this "Guaranty") is made as of November ____, 2005 for the benefit of LINCOLN GENERAL INSURANCE COMPANY, a Pennsylvania domiciled property and casualty insurance company ("LGIC") by WILLIAM WALLACH and ROBERT WALLACH (collectively, "Guarantors"), jointly and severally. Reference herein is made to that certain Program Manager Agreement between The Robert Plan Corporation ("RPC") and LGIC dated on or about the date hereof (the "Program Manager Agreement").

The Guarantors have substantial interests in RPC and will benefit from the execution, delivery and performance by LGIC of the Program Manager Agreement. As an inducement to LGIC to execute, deliver and perform the Program Manager Agreement, Guarantors hereby absolutely and irrevocably, jointly and severally, guarantee to LGIC the full and punctual payment and performance of all obligations of RPC (or any of its subsidiaries included in the definition of "Manager") under the Program Manager Agreement. The obligations of Guarantors under this Guaranty are absolute and unconditional, joint and several, and will not be affected by any circumstance (other than full payment and performance of the obligations guaranteed) that constitutes a legal or equitable discharge of a guarantor or surety. With respect to any amounts due from or to be paid by RPC (or any of its subsidiaries included in the definition of "Manager") to LGIC, this Guaranty is a guarantee of payment and not of collection only. This Guaranty, may be enforced by LGIC or a representative on behalf of LGIC and shall remain in full force and effect until satisfaction in full of RPC's (or any of its subsidiaries included in the definition of "Manager") obligations under the Program Manager Agreement. Notwithstanding anything to the contrary contained herein, it is expressly understood and agreed that (a) the obligations and liabilities of the Guarantors hereunder shall not exceed an amount equal to (i) Ten Million Dollars ($10,000,000) less (ii) the aggregate amount of any drawings under the LOC received by LGIC plus (iii) any expenses or costs (including without limitation reasonable attorneys' fees) incurred by LGIC in connection with the enforcement of this Guaranty, (b) the Guarantors shall have no obligation hereunder with respect to a failure of RPC (or any of its subsidiaries included in the definition of "Manager")to make any payment (or portion thereof) under the Program Manager Agreement, unless LGIC shall have provided ninety (90) days prior written notice thereof by personal delivery, certified mail or private overnight courier to the address specified on the signature page hereof, which notice shall describe in reasonable detail the nature of such failure to pay including the amount thereof, and (c) the Guarantors shall have no obligation hereunder with respect to any nonperformance by RPC (or any of its subsidiaries included in the definition of "Manager")of any its obligations under the Program Manager Agreement (other than payment obligations), unless LGIC shall have provided ninety (90) days prior written notice thereof by personal delivery, certified mail or private overnight courier to the address specified on the signature page hereof, which notice shall describe in reasonable detail the nature of such nonperformance and the amount of loss, expense or other damages of LGIC relating to such nonperformance for which Guarantors shall be obligated under this Guaranty and RPC (or any of its subsidiaries included in the definition of "Manager") has failed to indemnify LGIC for such amount within said ninety (90) day period

LGIC may at any time, and from time to time, without the consent of, or notice to Guarantors, without incurring responsibility to Guarantors and without impairing or releasing the obligations of Guarantors hereunder, upon or without any terms or conditions and in whole or in part:

     (a)    exercise or refrain from exercising any rights against RPC, its affiliates or others or otherwise act or refrain from acting, and/or;

     (b)    consent to or waive any breach of, or any act, omission or default under, the Program Manager Agreement, or otherwise amend, modify or supplement the Program Manager Agreement.

Guarantors waive any right to require LGIC to proceed against RPC or pursue any other remedy whatsoever and, to the fullest extent permitted by applicable law, any defenses or benefits that limit the liability of or exonerate guarantors or sureties. This Guaranty is for the benefit of LGIC and its respective successors and assigns, and nothing contained herein shall impair, as between LGIC and RPC, the obligations of RPC under the Program Manager Agreement.

This Guaranty is a continuing guaranty and shall (a) remain in full force and effect until all obligations guaranteed hereunder have been paid, performed or discharged in full; (b) be binding upon Guarantors and their respective heirs, personal representatives, successors and permitted assigns; and (c) inure to the benefit of, and may be enforced by, LGIC and its successors, transferees and assigns. This Guaranty shall not be assignable by any party hereto without the prior written consent of the other party hereto (which consent shall not be unreasonably withheld or delayed).

Neither this Guaranty nor any provision hereof may be changed, waived, discharged or terminated except pursuant to a written agreement executed by Guarantors and consented to by LGIC.

All payments made by Guarantors will be made free and clear of, and without deduction or withholding for, any present or future taxes, levies, imposts, duties, fees assessments or other charges of whatever nature now or hereafter imposed by any jurisdiction or by any political subdivision or taxing authority thereof or therein.

This Agreement shall not be construed to create any right in any person or entity other than LGIC and its successors and assigns or to be a contract in whole or in part for the benefit of any person or entity other than LGIC and its successors and assigns.

This Guaranty shall be secured by an irrevocable, unconditional, evergreen Letter of Credit ("LOC") with a qualified financial institution acceptable to LGIC in a face amount of $5,000,000 on terms and conditions reasonably acceptable to LGIC or, by other collateral acceptable to LGIC as determined in the sole discretion. LGIC shall be entitled to draw upon such Letter of Credit in the event of a breach of this Guaranty or any breach by RPC or any of its affiliates of the Program Manager Agreement or any Endorsement thereto. For purposes of this Endorsement E, qualified financial institution shall mean an institution that:

     (1) is organized or, in the case of a U.S. office of a foreign banking organization, licensed under the laws of the United States or any state thereof;

     (2) is regulated, supervised, and examined by U.S. federal or state authorities having regulatory authority over banks and trust companies; and

     (3) is not affiliated with Manager or Guarantors.

Each Guarantor represents and warrants that after consultation with and advice of counsel he is knowingly and willingly executing and delivering this Guaranty.

NYC_NYC_222453_S/NPEARSON

Until the termination of the Program Manager Agreement and the performance in full by RPC of all of its obligations thereunder, the Guarantors waive any right of subrogation against RPC.

This Agreement shall be construed, governed and enforced in accordance with the laws of the State of New York without regard to principles of conflict of laws.

Any lawsuit, action or legal proceeding of any nature commenced under this Agreement by either party must be brought either in the United States District Court for (a) the Middle District of Pennsylvania, (sitting at Harrisburg) or (b) the Southern District of New York (sitting in Manhattan). In the event (a) the federal district court in which such lawsuit, action or legal proceeding is commenced determines that it does not have legal jurisdiction over the matter and (b) such jurisdiction would not be available in the other federal court designated under this Agreement, such lawsuit, action or legal proceeding must then be brought in the Court of Common Pleas of York County, Pennsylvania. For purposes of service of process related to disputes governed by this Agreement only, the parties agree to accept service of process by personal delivery, registered or certified U.S. mail or overnight courier/delivery service to the addresses specified above.

*[Signature page follows]*

NOV-22-2005 TUE 08:35 PM

P. 002

IN WITNESS WHEREOF, the undersigned have executed this Guaranty as of the date first above written.

_____
Witness

_____
(William Wallach)

_____
Witness

_____
(Robert Wallach)

Notice address for Guarantors:

c/o Robert Wallach
The Robert Plan Corporation
999 Stewart Avenue
Bethpage, NY 11714·

c/o William Wallach
The Robert Plan Corporation
999 Stewart Avenue
Bethpage, NY 11714

NYC_321473_5/NPEARSON

NOV. 22. 2005 11:43PM    ROBERTPLANEXEC/5163934653    NO. 3034    P. 5

IN WITNESS WHEREOF, the undersigned have executed this Guaranty as of the date first above written.

_Yvonne Ferguson_
Witness

_William Wallach_
(William Wallach)

Witness

(Robert Wallach)

Notice address for Guarantors:

c/o Robert Wallach
The Robert Plan Corporation
999 Stewart Avenue
Bethpage, NY 11714

c/o William Wallach
The Robert Plan Corporation
999 Stewart Avenue
Bethpage, NY 11714

NOV. 22. 2005 12:31PM    GENERAL COUNSEL 516 393-4651    NO. 1362    P. 7

IN WITNESS WHEREOF, the undersigned have executed this Guaranty as of the date first above written.

_Yvonne Ferguson_
Witness

_William Wallach_
(William Wallach)
_William Wallach_

_____
Witness

_____
(Robert Wallach)

Notice address for Guarantors:

c/o Robert Wallach
The Robert Plan Corporation
999 Stewart Avenue
Bethpage, NY 11714

Add address for William Wallach

3730 Inverrary D
apt 3P
Lauderhill, Fl
33319

## EXHIBIT A

Kingsway Financial Services Inc. Code of Business Conduct and Ethics

### INTRODUCTION

Our goal at Kingsway Financial Services Inc. and its subsidiaries ("Kingsway", or the "Company") is to achieve the highest business and personal ethical standards as well as to comply with all the laws and regulations that apply to our business. Adherence to the standards contained in this Code will help to ensure decisions that reflect care for all of our stakeholders. This *Code of Business Conduct and Ethics* (the "Code") is intended as an overview of the Company's guiding principles and not as a restatement of Company policies and procedures.

Ethical business behaviour is the responsibility of every member of the Company's team and is reflected not only in our relations with each other but also with our policyholders, other organizations, suppliers, competitors, government and the public. Whatever the area of activity and whatever the degree of responsibility, the Company expects each employee to act in a manner that will enhance its reputation for honesty, integrity and the faithful performance of its undertakings and obligations.

This Code cannot and is not intended to cover every applicable law or provide answers to all questions that might arise; for that we must ultimately rely on each person's good sense of what is right, including a sense of when it is proper to seek guidance from others on the appropriate course of conduct. Because our business depends upon the reputation of the Company and its directors, officers and employees for integrity and principled business conduct, in many instances this Code goes beyond the requirements of the law.

Employees should refer to policies contained in the Employee Manual applicable to the particular Kingsway subsidiary for which you work (hereinafter, the "Employee Manual"), for a description of the policies and required reporting procedures applicable to them. This Code is a statement of goals and expectations for individual and business conduct. It is not intended to and does not in any way constitute an employment contract or assurance of continued employment, and does not create any rights in any employee, client, supplier, competitor, shareholder or any other person or entity.

It is the obligation of each and every director, officer and employee of Kingsway to become familiar with the goals and policies of the Company and integrate them into every aspect of our business. Our ethics are ultimately determined by all of us as we do our daily jobs. Our standard has been, and will continue to be, that of the highest ethical conduct.

### CONFLICTS OF INTEREST

Directors, officers and employees of Kingsway have a duty of loyalty to the Company, and must therefore avoid any actual or apparent conflict of interest with the Company. A conflict situation can arise when an employee, officer or director takes actions or has interests that may make it difficult to perform his or her work objectively and effectively. Conflicts of interest also arise when an employee, officer, or director, or a member of his or her family, receives improper personal benefits as a result of his or her position in the Company.

In exercising our responsibilities, it is vital that we be guided by what is in the best interests of the Company and those clients with whom we have fiduciary relationships. All of our employees are required to conduct their personal and business affairs in such a way so as to avoid

NYC_NYC_222453_5/NPEARSON

~~conflicts — or even the appearance of conflicts — with the interests of the Company, its~~ shareholders, brokers, policyholders and its customers.

It is each employee's responsibility to ensure that his or her personal conduct complies with the following principles and to make appropriate disclosures when actual or potential conflicts may arise. And, although the principles below are discussed in terms of the employees of the Company, each of us must also exercise care to avoid actual or potential conflicts of interest which might arise because of the activities of our close family members or other members of our household.

1.  **Employees may not use their affiliation with the Company for personal benefit.**
    Examples of such prohibited activities include:
    - Employees receiving remuneration, gifts, entertainment or other compensation from any entity performing work or services for the Company or from any entity which is seeking to do business with the Company. However, gifts or favors that are generally considered as common business or social courtesies are acceptable only as long as they are reasonable in type, frequency and value.
    - Employees having a financial interest in an entity that sells goods or services to the Company where the employee is able to influence the Company's business transactions with that entity.
  - Employees using for their own personal gain or for the benefit of others any confidential or "inside" information obtained as a result of their employment with the Company.
    - Employees misappropriating to themselves or to others the benefit of any business venture or opportunity about which the employees learn or develop in the course of their employment and which is related to a current or prospective business of the Company.

2.  **Employees may not be employed by or affiliated with a competitor.**
    Serving as an employee, director, officer, partner, consultant, agent of, or having a significant ownership interest in, an organization, which competes with any member of the Company, violates your duty of loyalty to the Company and is prohibited.

3.  **Employees, officers and directors have a responsibility to disclose actual and potential conflicts.**
    Determining whether you have a conflict and, if so, what to do about it can be difficult and no set of guidelines or statement of principles, however comprehensive and detailed, can hope to cover all situations or address every question of judgment. Every employee is, therefore, required to disclose all possible conflicts or appearances of conflict. If you have any doubt about your disclosure obligations in a particular situation, the best course is to consult with your supervisor or the Executive Vice-President, or the President of the Company.

The Chief Executive Officer and members of the Board of Directors must report any such circumstances to the Audit Committee.

## USE OF INFORMATION

The insurance business, like other service industries, is based on the collection, organization, evaluation and preservation of information about individuals, organizations and the world at large. To provide the highest quality services to our policyholders and customers, we must be efficient in gathering and storing information, be thorough in our analysis of information collected, and be creative in generating new information. Our ability to remain competitive requires both our willingness and alertness to share information within our organization and our awareness that certain types of information need to be protected from disclosure. It is especially

NYC_NYC_722453_5/NPEARSON

~~important to maintain our reputation by safeguarding information entrusted to us by our~~
policyholders, customers and fellow employees; it is also legally required in many cases.

As an employer, the Company maintains personnel records on every employee. This information is collected and maintained only for employee relations or legal reasons. Access to this information is limited within the Company, and is generally released to those outside of the Company only if required by law. Preserving the confidentiality of such information is necessary for creation of a productive and comfortable work environment.

## CONFIDENTIALITY OF PERSONAL INFORMATION

Our policyholders and customers entrust us with confidential information about their personal and business operations. The Company will only collect and maintain information for legal and business reasons. This means that only those employees and outside governmental authorities and regulators with legitimate reasons to know should have access to such information.

Employees must abide by the Company's policies for maintaining, updating, disclosing and verifying such confidential information. Employees are also expected to comply with departmental policies and procedures relating to the retention and orderly destruction of records and documents.

As employees, we must be aware of the consequences of intentionally or inadvertently revealing such information and as importantly recognize that we cannot use confidential information obtained in the course of our employment for any personal benefit. Specific areas in which preventing disclosure or use of confidential information are especially important include personal medical records, financial data for a business entity, and claims investigative, litigation and settlement information.

## CONFIDENTIALITY OF BUSINESS INFORMATION

Confidential business information and practices can be defined as information used in trade or business which gives the owner a competitive advantage and which is not generally known to the public. If the owner fails to adequately protect the information or matter, it may lose its confidential status. Such business information and practices could include software code, customer lists or a new invention that is yet to be patented.

Sometimes you may encounter such business information and/or practices in the course of evaluating a service provided to, or a service or product received from a policyholder, customer or vendor. You may be responsible for the loss of such information and/or practice if you reveal it to others, even fellow Company employees, who do not need to know this proprietary information. Both the Company and the employee may be held liable for financial losses to the owner of the business information or practice.

At times you may develop confidential business information and/or practices in the course of your employment. This information is the property of the Company. Confidential business information and practices of the Company must be identified as such when revealed to outside parties so the recipient is aware he or she should not pass them further. Before the release of proprietary information to a third party the appropriate confidentiality and non-disclosure agreements should be in place.

NYC_NYC_222453_SNPEARSON

~~If confidential business information and practices are revealed to you during the course of~~
your employment with the Company, you must protect the information even after you stop
working for the Company. The Company will take whatever steps it deems appropriate,
including legal action, to protect such business information and practices from unauthorized
disclosure or use by current or former employees.

## CORPORATE OPPORTUNITIES

No director, officer or employee may: (a) take for himself or herself personally
opportunities that are discovered through the use of Company property, information or position;
(b) use Company property, information or position for personal gain; or (c) compete with the
Company. Employees, officers and directors owe a duty to the Company to advance its legitimate
interests when the opportunity to do so arises.

## USE OF INSIDE INFORMATION

It is the Company's goal to protect shareholder investments through strict enforcement of
the prohibition against insider trading set forth in provincial securities laws and regulations. No
director, officer or employee may buy or sell securities of Kingsway at a time when in possession
of "material non-public information." (There is, however, an exception for trades made pursuant
to certain stock plans such as the Kingsway Employee Stock Purchase Plan established in
compliance with applicable law.) Passing such information to someone who may buy or sell
securities is also prohibited. The prohibition on insider trading applies to Kingsway's securities
and to securities of other companies if the director, officer or employee learns of material non-
public information about those other companies in the course of his or her duties for Kingsway.
This prohibition also extends to certain non-employees who may learn about the "material non-
public information" about the Company such as spouses, relatives, and close friends of directors,
officers or employees. Insider trading is both unethical and illegal and will be dealt with firmly. If
you have any questions in connection with whether or not a trade in the company shares is
permitted at any particular time, please contact the Executive Vice-President of Kingsway.

## FAIR DEALING

Each director, officer and employee shall endeavor to deal fairly and in good faith with
Kingsway customers, shareholders, employees, suppliers, regulators, business partners,
competitors and others. No director, officer or employee shall take unfair advantage of anyone
through manipulation, concealment, abuse of privileged or confidential information,
misrepresentation, fraudulent behavior or any other unfair dealing practice.

## PROTECTION AND USE OF COMPANY ASSETS

Company assets, such as information, materials, supplies, time, intellectual property,
software, hardware, and facilities, among other property, are valuable resources owned, licensed,
or otherwise belonging to the Company. Safeguarding Company assets is the responsibility of all
directors, officers and employees. All Company assets should be used for legitimate business
purposes. The personal use of Company assets without permission is prohibited.

- Employees are expected to use Company equipment and materials (e.g. telephones,
  computers, software and photocopiers) for Company business only. All Company equipment
  and materials are dedicated for business use only and the Company reserves the right to
  monitor and investigate usage of Company equipment and materials at its discretion.

- Employees should not use Company resources for personal benefit or to benefit persons or
  entities outside the Company. In certain circumstances, the Company may approve of the use
  of particular corporate resources for charitable or community purposes.

NYC_NYC_222453_5/NPEARSON

- ~~Employees must maintain accurate records and abide by corporate policies concerning~~ reimbursable expenses, and eligibility for all Company benefits, including sick leave, education and disability payments.

- Employees may not make payments or give gifts (other than gifts of nominal vale that are generally considered as common business or social courtesies) to government workers or outside suppliers in order to influence regulatory or business decisions.

- The Company has established internal control procedures to ensure that assets are protected and properly used, and that financial records and reports are accurate and reliable. Employees and supervisors share the responsibility for maintaining and complying with required internal controls.

The Company's success depends upon the integrity of all of its employees. The Company has instituted a comprehensive set of procedures, rules and controls to prevent fraud and dishonesty and it will take all action necessary and appropriate to enforce these policies and procedures.

## ACCOUNTING PRACTICES

It is the policy of Kingsway to fully and fairly disclose the financial condition of the Company in compliance with applicable accounting principles, laws, rules and regulations. All books and records of Kingsway shall be kept in such a way, as to fully and fairly reflect all Company transactions.

## RECORDS RETENTION

Officers and employees are expected to become familiar with the Company's policies regarding records retention applicable to them and to strictly adhere to those procedures. Records may not be destroyed except in accordance with the applicable records retention policy. If you have any questions in this regard, do not hesitate to contact your supervisor.

## COMPLIANCE WITH LAWS, RULES, REGULATIONS

As an insurance provider, the Company is subject to a myriad of laws and regulations on how we conduct our business. Many of these laws are designed to protect consumers in situations where it is perceived that a business because of size, resources or expertise is able to unfairly control or influence customer decisions. It is critically important that both the Company and its employees comply with the letter and spirit of the laws, which regulate the conduct of our business.

All aspects of Company business are impacted by compliance requirements; for example, sales, underwriting, claims, actuarial, accounting and financial reporting, financial services, investments, and governmental relations. Employees must be aware of the applications of the laws that affect the performance of their jobs and must carry out their job responsibilities in a manner that ensures that the Company is in compliance with external statutory, regulatory and industry requirements.

Kingsway takes a proactive stance on compliance with all applicable laws, rules, and regulations, including insider-trading laws and applicable anti-trust laws. In addition, the Company requires that its officers and employees comply with the policies set out from time to time in the Employee Handbook.

## DUTY TO REPORT AND CONSEQUENCES

Every director, officer and employee has a duty to adhere to this *Code of Business Conduct and Ethics* and all existing Company policies and to report to the Company any suspected violations in accordance with applicable procedures.

Employees shall report suspected violations of Company policies contained in the Employee Manual by following the reporting procedures for that specific policy in the Employee Manual. All other suspected violations of the Code must be reported to that party or, if no specific reporting procedures are stated, to the Executive Vice-President at (905-206-2651). The Company will investigate any matter so reported and may take appropriate disciplinary and corrective action, up to and including termination. The Company forbids retaliation against employees who report violations of this *Code of Business Conduct and Ethics* in good faith.

### SCOPE

This Code does not supercede, change or alter the existing Company policies and procedures already in place as stated in the Employee Manual and communicated to Company employees. Certain policies referred to herein are contained in their entirety in the Employee Manual, and Company employees are instructed to refer to this Manual for a copy of those policies and required reporting procedures.

No Company policy can provide definitive answers to all questions. If employees have questions regarding any of the goals, or standards discussed or policies referenced in this Code or are in doubt about the best course of action in a particular situation, the employee should refer to the reporting requirements for that goal or standard as stated in the Code, or the reporting requirements for policies as stated in the Employee Manual and contact the person or party designated.

NYC_NYC_222453_SNPEARSON

EXHIBIT B

**Privacy Notice To Our Customers**

This Privacy Policy is provided to you and other customers of Kingsway America Inc. ("Kingsway" or "we") to explain our policy relating to maintaining the confidentiality of non-public personal information. Kingsway is committed to giving your non-public personal information all the protection required by law. This Privacy Policy outlines the types of non-public personal information that we collect, why we collect it, how we use it, and with whom we share it.

**Categories of Non-public Personal Information We Collect:** Non-public personal information is personally identifiable financial information about you obtained by Kingsway in connection with providing products and services to you. It includes information provided by you, obtained by us, or resulting from your transactions with us or others. It does not include information available to the general public. We collect non-public personal information from the following sources:

- Information we receive from you on applications or other forms. This information may include your name, address, social security number, health and financial information, and may be received in person, by mail, by phone, by facsimile, or via the internet.

- Information about your transactions with us, our affiliates or others. This could include, among other things, information to adjust, investigate or settle your insurance claims, your claims history, billing and payment information and coverage selections.

- Information we receive from consumer reporting agencies. This information is generally used in connection with the application process. It may include motor vehicle reports, claims reports, credit histories and information we receive from a customer report or investigative consumer report.

**Categories of Parties to Whom We May Disclose Non-public Personal Information:** We will disclose your non-public personal information as permitted or required by law. We do not currently disclose non-public personal information about you to our affiliates, except as permitted by law. If we disclose non-public personal information about you to our affiliates, the information will be disclosed to respond to your needs and to provide information about products or services offered by our affiliates. Non-public personal information is treated with the same standards of confidentially among all Kingsway affiliates. We may share information among our affiliates about your accounts or our experiences or transactions with you. This includes identification information, account balance information and payment histories. To underwrite your insurance, we may share your consumer report or investigative consumer report among our affiliated underwriting companies. By applying for insurance with us, you consent to our sharing of this information among our affiliated insurance underwriting companies. We will not otherwise share your consumer report or investigative consumer report among our affiliates.

We do not disclose non-public personal information about you to nonaffiliated third parties, except as permitted or required by law. We may disclose non-public personal information in connection with the servicing or processing of an insurance product or service that you request or authorize. These services may include check processing, data processing and claims handling functions. We may also disclose non-public personal information with nonaffiliated third parties that perform marketing services on our behalf, with other financial institutions with whom we have joint marketing agreements, or as permitted by law.

NYC_NYC_222453_5/NPEARSON

We restrict access to your non-public personal information to those employees and other parties necessary to provide products or services to you. We maintain physical, electronic and procedural safeguards to guard your non-public personal information.

**Further Information:** If you have any additional questions about this privacy policy or concerns regarding your personal information, you may write us at Kingsway America Inc., 1515 Woodfield Road, Suite 820, Schaumburg, Illinois 60173.

NYC_NYC_Z22453_5/NPEARSON

The Robert Plan Corporation
999 Stewart Avenue
Bethpage, New York 11714

Telephone
516 576-3400

## Robert Plan

**R**

December 13, 2005

Mr. Nick Pearson, Esq.
Edwards Angell Palmer & Dodge LLP
750 Lexington Avenue
New York, NY 10022

Dear Nick:

Per our discussion in Court last week, I enclose the original signature pages to the
Program Manager Agreement (p.33) and Guaranty (Endorsement E; pp.53-54).

I understand you will supply me with the original page (bearing the signatures on
behalf of Lincoln) to the Agreement a soon as you obtain same from your client.

Very truly yours,

Robert N. Zausmer
Associate General Counsel

Enclosures

cc:    Robert M. Wallach
       Jasper J. Jackson

IN WITNESS WHEREOF, the parties, intending to be legally bound, have caused their authorized representatives to execute this Agreement below.

Manager:                                  Company:

THE ROBERT PLAN CORPORATION               LINCOLN GENERAL INSURANCE
                                          COMPANY

By: _____            By: _____

Title: _Chairman + CEO_____             Title: _____

Date: __11-22-05_____            Date: _____

WITNESS: _____            WITNESS: _____

By: _Jasper J. Jackson_____            By: _____

Title: _Sr. Exec. V.P. + Gen'l Counsel_  _____

Date: __11/22/05_____            Date: _____

WITNESS: _____            WITNESS: _____

- 33 -

NYC_222453_S/NPEARSON

IN WITNESS WHEREOF, the undersigned have executed this Guaranty as of the date first above written.

_____                    _____
        Witness                                (William Wallach)

_____                    _____
        Witness                                (Robert Wallach)

Notice address for Guarantors:

c/o Robert Wallach                          c/o William Wallach
The Robert Plan Corporation                 The Robert Plan Corporation
999 Stewart Avenue                          999 Stewart Avenue
Bethpage, NY 11714                          Bethpage, NY 11714

NYC_222453_5/NPEARSON

IN WITNESS WHEREOF, the undersigned have executed this Guaranty as of the date first above written.

_Yvonne Ferguson_
Witness

_William Wallach_
(William Wallach)

_William Wallach_
(Robert Wallach)

_____
Witness

Notice address for Guarantors:

Add address for William Wallach

c/o Robert Wallach
The Robert Plan Corporation
999 Stewart Avenue
Bethpage, NY 11714

_3730 Inverrary D_
_apt 3P_
_Lauderhill, Fl_
_33319_

IN WITNESS WHEREOF, the parties, intending to be legally bound, have caused their authorized representatives to execute this Agreement below.

Manager:

THE ROBERT PLAN CORPORATION

Company:

LINCOLN GENERAL INSURANCE COMPANY

By: _____

By: _John T. Clark_

Title: _____

Title: _Pres. & CEO_

Date: _____

Date: _11/22/05_

WITNESS: _____

WITNESS: _Wanda Kill_

By: _____

By: _W.S_

Title: _____

Title: _DIRECTOR_

Date: _____

Date: _NOVEMBER 22, 2005_

WITNESS: _____

WITNESS: _____

- 32 -

NYC_55540_KIMTEAREON

IN WITNESS WHEREOF, the undersigned have executed this Guaranty as of the date first above written.

_____
Witness

(William Wallach)

_____
Witness

(Robert Wallach)

Notice address for Guarantors:

c/o Robert Wallach
The Robert Plan Corporation
999 Stewart Avenue
Bethpage, NY 11714

Add address for William Wallach

3730 Inverrary Dr
apt 3P
Lauderhill, Fl
33319

IN WITNESS WHEREOF, the parties, intending to be legally bound, have caused their authorized representatives to execute this Agreement below.

Manager:                                      Company:

THE ROBERT PLAN CORPORATION        LINCOLN GENERAL INSURANCE
                                              COMPANY

By: _____        By: _____

Title: __Chairman & CEO__           Title: _____

Date: __11/22/05__                  Date: _____

WITNESS: _____          WITNESS: _____

By: _____        By: _____

Title: _____         Title: _____

Date: __11/22/05__                  Date: _____

WITNESS: _____          WITNESS: _____

- 33 -

1/001

IN WITNESS WHEREOF, the parties, intending to be legally bound, have caused their authorized representatives to execute this Agreement below.

Manager:

THE ROBERT PLAN CORPORATION

By:_____

Title:_____

Date:_____

WITNESS:_____

By:_____

Title:_____

Date:_____

WITNESS:_____

Company:

LINCOLN GENERAL INSURANCE COMPANY

By: *John T. Clark*

Title: *Pres. & CEO*

Date: *11/22/05*

WITNESS: *Wanda Keller*

By: *W.S.*

Title: *DIRECTOR*

Date: *NOVEMBER 22, 2005*

WITNESS:_____

-32-

NYC 55545_APPEARSON

1/001

IN WITNESS WHEREOF, the parties, intending to be legally bound, have caused their authorized representatives to execute this Agreement below.

Manager:

THE ROBERT PLAN CORPORATION

By: _____

Title: _____

Date: _____

WITNESS: _____

By: _____

Title: _____

Date: _____

WITNESS: _____

Company:

LINCOLN GENERAL INSURANCE COMPANY

By: _John T. Clark_

Title: _Pres. & CEO_

Date: _11/22/05_

WITNESS: _Wanda Kelly_

By: _W.S J_

Title: _DIRECTOR_

Date: _NOVEMBER 22, 2005_

WITNESS: _____

- 32 -

NYC_32342_APPEARIX

IN WITNESS WHEREOF, the parties, intending to be legally bound, have caused their authorized representatives to execute this Agreement below.

Manager:

THE ROBERT PLAN CORPORATION

By: _Robert M. Wallach_

Title: **Chairman & CEO**

Date: **11/22/05**

WITNESS: _____

By: _____

Title: _____

Date: **11/22/05**

WITNESS: _____

Company:

LINCOLN GENERAL INSURANCE COMPANY

By: _____

Title: _____

Date: _____

WITNESS: _____

By: _____

Title: _____

Date: _____

WITNESS: _____

- 33 -

P. 1

☒ ☒ ☒ Communication Result Report ( Nov. 23. 2005   9:24AM ) ☒ ☒ ☒

1)
2)  EDWARDS & ANGELL LLP

e/Time: Nov. 23. 2005   9:24AM

| File No. | Mode | Destination | Pg(s) | Result | Page Not Sent |
|---|---|---|---|---|---|
| 0054 | Memory TX | 915163934653 | P.  1 | OK | |

---

Reason for error
E. 1) Hang up or line fail                    E. 2) Busy
E. 3) No answer                               E. 4) No facsimile connection
E. 5) Exceeded max. E-mail size

NOV-22-2005 TUE 08:51 PM                                    P. 001

Fax the next
sheet to your father.

954·739-
8090

DAD ① SiGN ; ② Get Witnessed;
AND ③ FAX BACK to EACH OF THE
Following #'s :
    516·393·4653        JASPER
    212·308·4844        Nick PEARSON
    888·325·9166              "

IN WITNESS WHEREOF, the undersigned have executed this Guaranty as of the date first above written.

_Yvonne Ferguson_
Witness

_William Wallach_
(William Wallach)

_____
Witness

_____
(Robert Wallach)

Notice address for Guarantors:

c/o Robert Wallach
The Robert Plan Corporation
999 Stewart Avenue
Bethpage, NY 11714

c/o William Wallach
The Robert Plan Corporation
999 Stewart Avenue
Bethpage, NY 11714

- 54 -

_Nick Pearson_

NOV-22-2005 TUE 08:36 PM                                                    P. 002

IN WITNESS WHEREOF, the undersigned have executed this Guaranty as of the date first above written.

_____                        _____
Witness                                          (William Wallach)

_____                        _____
Witness                                          (Robert Wallach)

Notice address for Guarantors:

c/o Robert Wallach                               c/o William Wallach
The Robert Plan Corporation                      The Robert Plan Corporation
999 Stewart Avenue                               999 Stewart Avenue
Bethpage, NY 11714-                              Bethpage, NY 11714

-54-

NYC_222453_SNOPEARSON

NOV-22-2005 TUE 08:51 PM                                        P. 001

# Fax the next sheet to your father.

954 N. Pearson

DAD. ① SIGN; ② GET WITNESSED;
AND ③ FAX BACK TO EACH OF THE
FOLLOWING #'S:

516 - 393 - 4653        JASPER
212 - 308 - 4844        NICK PEARSON
888 - 325 - 9166            "

ROBERTPLANEXECS16393④653

NO. 3034   P. 6

NOV. 22. 2005 11:43PM

IN WITNESS WHEREOF, the undersigned have executed this Guaranty as of the date first above written.

_Yvonne Ferguson_
Witness

_William Wallach_
(William Wallach)

_____
Witness

_____
(Robert Wallach)

Notice address for Guarantors:

c/o Robert Wallach
The Robert Plan Corporation
999 Stewart Avenue
Bethpage, NY 11714

c/o William Wallach
The Robert Plan Corporation
999 Stewart Avenue
Bethpage, NY 11714

- 54 -

NYC_XINI2_AMPEAREH

NOV. 22, 2005  11:43PM    ROBERTPLANEXEC5163934653    NO. 3034    P. 7

_Nick Pearson_

P. 2    954.739.8090    Robert Plan - FLL    Nov 23 05 09:12a



**KINGSWAY AMERICA INC.**

150 Northwest Point Blvd., 6th Floor, Elk Grove Village, IL 60007-1018 • (847) 871-6400 • Fax (847) 254-2700 • Toll-Free (888) 756-7810

January 18, 2006

Mr. Nick Pearson
Edwards Angell Palmer & Dodge LLP
750 Lexington Avenue
New York, NY 10022-1200

   Re: The Robert Plan MGA Agreement

Dear Nick:

Enclosed is the completed signature page for The Robert Plan document. Your instructions to Amy indicated we could keep the page that had all original signatures. The other is attached for your transmittal to The Robert Plan.

Please advise if I may be of further assistance.

Sincerely,

KINGSWAY AMERICA INC.

Susan Ann King
Executive Assistant

IN WITNESS WHEREOF, the parties, intending to be legally bound, have caused their authorized representatives to execute this Agreement below.

Manager:                                          Company:

THE ROBERT PLAN CORPORATION          LINCOLN GENERAL INSURANCE
                                                    COMPANY

By: _____          By: _____

Title: Chairman & CEO                       Title: President & CEO

Date: 11-22-05                                  Date: November 22, 2005

WITNESS _____     WITNESS: _____

By: _____          By: W. S. J

Title: _____        DIRECTOR

Date: 11/22/05                                  Date: Nov 22, 2005

WITNESS _____     WITNESS: _____

- 33 -                                          NYC_222453_SNPEARSON

**EXHIBIT B**

**AMENDMENT No. 1**
**("Amendment")**

**To The**

**PROGRAM MANAGER AGREEMENT**
**("Agreement")**

**By and Between**

**LINCOLN GENERAL INSURANCE COMPANY**
(Called "Company" in the Agreement)

**And**

**THE ROBERT PLAN CORPORATION**
(Called "Manager" in the Agreement)

**Dated: as of June 14, 2006**

WHEREAS the Manager defaulted under the Agreement by failing to deliver the letter of credit pursuant to Endorsement E of the Agreement (the "L/C Default") and by its failure to deliver to Company on or before June 1, 2006 (the "Statement Default" and together with the L/C Default, the "Defaults") Manager's audited financial statements and consolidated work sheets for the year ended December 31, 2005, as required by Article III.W.1 of the Agreement (collectively, the "Financial Statements");

WHEREAS the Manager has not cured the L/C Default, has advised the Company that it is unlikely to cure the L/C Default, and hereby waives any objection to and consents to the reversion of the ownership of the Expirations (as defined below) to the Company on the terms of this Amendment No. 1 as a result of the L/C Default;

WHEREAS pursuant to Article XVI of the Agreement, "Ownership of the Expirations", Company terminated the Agreement as a result of Manager's default and accepted reversion of the ownership of the Expirations;

WHEREAS Manager has requested that the Company reinstate the Agreement and Manager's Production Authority under the Agreement, and modify it as provided herein;

WHEREAS the Company and the Manager have agreed to reinstate, modify and amend the Agreement as provided herein, in order to address the Manager's default and breach of the Agreement, the termination thereof, the reversion of the ownership of the Expirations to the Company;

WHEREAS the Company has formed a new program manager to be called RPC Insurance Agency, LLC ("RPCA") to which the Company shall transfer, subject to reversion to

the Company, ownership of the Expirations pursuant to the terms of the Limited Liability Company Agreement of RPCA and the Program Manager Agreement between RPCA and the Company, each executed concurrently with the execution of this Amendment; and

WHEREAS pursuant to the terms of an Administration Services Agreement between RPCA and the Manager, the Company has granted to Manager certain rights to acquire 60 Class B Units of RPCA from the Company;

NOW THEREFORE, the Company and the Manager do hereby agree to reinstate and amend the Agreement as follows:

1.    (a)    The "Effective Date" of this Amendment shall be June 9, 2006;

(b)    All capitalized terms given meaning in the Agreement shall have the same meanings herein unless specifically defined herein or the context requires otherwise. The Assigned Risk Programs and the Voluntary Programs, including all policies of insurance and endorsements written in connection therewith (the "Policies"), are hereafter collectively referred to as the "Business." "Expirations" in respect of the Business shall mean (i) the good will and commercial relationships related to and arising out of the negotiation and administration of Buyout Agreements and Take Out Fee agreements, (ii) the good will and commercial relationships with insurance producers of Take Out Policies and (iii) the use and control of, and all right, title and interest in, expirations of the Policies;

(c)    Manager hereby acknowledges and reaffirms that (i) it has failed to cure the L/CDefault, and as a result is in continuing default under the Agreement, (ii) the Agreement was duly terminated by the Company, that it has no ability to cure the same, (iii) the Expirations have reverted to the Company as provided in the Agreement, and (iv) all future Expirations created during the balance of the term of the Agreement shall inure to and belong to the Company, which shall assign same to RPCA;

(d)    Manager waives any requirement in the Agreement or any other document or agreement between the Manager and the Company to provide written notice of Manager's Defaults and the continuation of such Defaults, and Manager acknowledges that the Company has not as of the date of execution of this Amendment expressly or by implication waived any other current default under the Agreement;

(e)    The Manager confirms the grant to the Company of and the Company maintains a valid continuing first lien in and to all of the collateral described in the Agreement that is paramount in interest to all other interests;

(f)    The Agreement and this Amendment constitute legal, valid and binding obligations of the Manager enforceable in accordance with their respective terms by Company against Manager;

(g)    Manager expressly reaffirms each of its obligations under the Agreement as amended hereby, and acknowledges that the Company has a paramount right to protect

- 2 -

its relationship with its policy holders and that the Manager will not interfere with such right or the ability of the Company to communicate with or deal with the policy holders;

(h)    Manager represents that it has no claims against the Company, has not commenced any action or proceeding against the Company and has no present right to do so whether in any judicial, administrative or other proceeding, either as a result of the termination or expiration of the Agreement, or otherwise;

(i)    Manager shall not create any security interests in or suffer to exist any security interest on any of the collateral upon which a security interest is granted under the Agreement or in any of the Expirations or the goodwill associated therewith. The security interest granted to the Company in the Agreement was and is intended to cover the goodwill associated with the Business as well as all books and records relating to the Business including the Policies, claims and other matters relating to the Policies or Policyholders.

(j)    Manager acknowledges that Company has rightfully terminated the Agreement and has the absolute right to enforce all of its rights thereunder, that the Manager's Production Authority ended upon termination, and that the Company has the additional right to enforce its security interests in, and liens on, the collateral and to exercise all other rights, powers and remedies provided to Company under the Agreement or at law or in equity or by statute;

(k)    Manager acknowledges and agrees that Company's decision to allow the Manager to use the collateral and to continue to exercise Production Authority to amend and reinstate the Agreement and upon amendment and reinstatement of the Agreement is of great value to the Manager and that such allowance is, independent of the other consideration received by the Manager under the Agreement or hereunder, sufficient consideration for each and every one of Manager's obligations under this Amendment; and

(l)    Manager represents that neither the Manager nor any of its affiliates intend to file for relief under the United States Bankruptcy Code or any other state or federal insolvency laws or laws providing relief of debtors and that the Company has relied to its detriment on such representation. In the event Manager or its affiliates (i) file any voluntary petition under any Chapter of the Bankruptcy Code (Title 11, U.S.C., hereinafter referred to as the "Bankruptcy Code"), or in any manner seeks any relief under any other state, federal or other insolvency laws or laws providing for relief of debtors, or directly or indirectly causes the other to file any such petition or to seek any such relief, either at the present time, or at any time prior to the termination of the Agreement in accordance with its terms and the expiration of the post termination duties and obligations of the Manager (the "Term"); or (ii) directly or indirectly causes any involuntary petition under any Chapter of the Bankruptcy Code to be filed against Manager or its affiliates, or directly or indirectly causes Manager or its affiliates to become the subject of any proceedings pursuant to any other state, federal or other insolvency laws or laws providing for the relief of debtors, either at the present time, or at

- 3 -

any time prior to the end of the Term; or (iii) directly or indirectly causes the collateral or any interest of Manager or its affiliates in the collateral to become the property of any bankruptcy estate or the subject of any state, federal or other bankruptcy, dissolution, liquidation or insolvency proceedings, either at the present time, or at any time prior to the end of the Term, Manager or its affiliates agree to the lifting of the automatic stay by the appropriate Bankruptcy Court "for cause" pursuant to Section 362(d)(1) of the Bankruptcy Code (11 U.S.C. Section 362(d)(1)) to enable Company, in its sole discretion, to foreclose on and/or protect its interests in the collateral and to otherwise serve and deal with its policy holders. Said Bankruptcy Court shall be authorized to enter an order lifting the automatic stay without the necessity of an evidentiary hearing and without the necessity of Company's establishing the lack of adequate protection of its interest in the collateral and lack of necessity of the collateral for an effective bankruptcy reorganization. The automatic stay shall be lifted within thirty (30) days of filing of the applicable motion, subject to the Court's schedule and orders. Venue of any bankruptcy case or any proceeding or matter concerning collateral shall be in the United States Bankruptcy Court for the Eastern District of New York.

(m)     The reinstatement of the Agreement, with the Company continuing to own the Expirations as a result of the reversion thereof to the Company on the termination of the Agreement on June 9, 2006, does not relieve the Manager of any other liability to the Company, financial or otherwise under the Agreement as amended hereby.

2.     Article II.C.2 is amended as follows:

   2.   Manager shall have authority to supervise, solicit, market, arrange, negotiate, service and administer the Business on behalf of Company with respect to Buyout Agreements. Manager shall have authority to negotiate Buyout Agreements only at such terms and conditions that have been approved in advance in writing by the Company. The Company and the Manager shall each designate a representative to meet prior to September 1st of each year to review trends and other relevant factors. Thereafter, no later than October 1st of each year, the Company shall exclusively determine the aforementioned terms and conditions, which shall include a buyout price for each Buyout Agreement, or an average buyout price for all Buyout Agreements under any Plan. Nothing herein shall require the Company to enter into any Buyout Agreement. Manager shall be Company's sole and exclusive agent, except for RPC Insurance Agency, LLC ("RPCA"), for all Buyout Agreements and related Policies in connection with the Business administered by Manager under this Agreement, all sale of credits agreements, and all Assigned Risk Programs and related Policies.

3.     Article II.C.3 is amended as follows:

   3.   Manager shall have authority to supervise, solicit, market, arrange, service and administer the Business on behalf of the Company with respect to Take Out policies and related credits and fees and fee agreements. Manager shall have authority to underwrite and administer Take Out policies and negotiate Take Out fee agreements only pursuant to terms and conditions that have been approved in

- 4 -

advance in writing by the Company within its sole discretion. Nothing herein shall require the Company to enter into any such Take Out fee agreements. Manager shall be Company's sole and exclusive agent, except for RPCA for all Voluntary Programs, Take Out policies and Take Out fee agreements and related Policies in connection with the Business administered by Manager under this Agreement. Notwithstanding the foregoing, Company is not precluded from providing authority to any of its other program managers, agents and producers to use the rate filings and form systems approved for the Voluntary Programs for any purpose so long as the authority so provided does not permit other program managers agents and producers, except for RPCA, to compete with Manager in the Voluntary Programs so long as this Agreement has not been terminated.

4.    Article II.D is amended as follows:

   D. Restrictions and Ownership of the Business. Manager's appointment and authority is subject to any restrictions set forth in this Agreement, including any Endorsement attached hereto and made part of this Agreement. Ownership of the business relationships with all customers, and use, control of, and all right, title and interest in the Business written under this Agreement, including all expirations and renewals pertaining to the Business written under this Agreement, is vested in the Company.

5.    Article III.A.3 is amended as follows:

      3.    Commencing with Policies assigned to Company on and after January 1, 2006 under the Buy Out Agreements and renewals effective on or about January 1, 2006 and continuing until termination of this Agreement (by non-renewal or otherwise), Company shall be the exclusive insurance carrier for all Business produced by Manager except as specifically provided in Article II.E and XIV.B or C

6.    Article VI.H is omitted in its entirety.

7.    Article XV.A.3(c) is amended as follows:

   (c) Default. The failure of the Manager to perform its duties and responsibilities under the provisions of this Agreement, other than those listed in Article XV.A.4.e, including timely and full compliance with the Company's directives, rules, regulations or manuals; however, Company shall allow Manager an appropriate cure period of sixty (60) days;

8.    Article XI.D is amended as follows:

_235478_11/

D. Manager's Personal Guaranty: Robert Wallach and William Wallach shall be required to sign and execute, concurrently with the execution of this Agreement, a Personal Guaranty, in the form of the Personal Guaranty attached hereto as Endorsement E to this Agreement, to encourage the Manager's prompt and faithful compliance with any and all obligations under this Agreement, to include the Manager's responsibility to comply with Premium Finance statutes in making refunds to insureds or to policyholders.

9.    Article XV.A.4 (d) is amended as follows:

(d)    Failure to Provide Personal Guaranty. Robert Wallach's and William Wallach's failure to sign and execute the Personal Guaranty required pursuant to Article XI.D concurrently with the execution of this Agreement.

10.    Article XV.A is amended by adding a new subsection 5 as follows:

5.    Unless sooner terminated in accordance with the terms and conditions of this Agreement, this Agreement will automatically terminate at such time as RPCA becomes licensed and, where necessary, qualified as an MGA and approved pursuant to the plan governing the Assigned Risk Program and the Voluntary Program to act as LGIC's agent and program manager in all Territories scheduled in Article III(A) of Endorsement B (or any additional Territories added by written consent of the Company per Article III(B) of Endorsement B).

11.    Article XV.B.1 is amended as follows:

1.    The Company owns the rights to the continuation of Business written under this Agreement which concurrently with the execution and delivery of Amendment No. 1 hereto LGIC has transferred to RPCA.

12.    Article XV.B.6 is amended as follows:

6.    In the event of termination of the Agreement, any Business written hereunder shall be permitted to continue to normal expiration. Manager and Company will comply with applicable State statutes and regulations and Assigned Risk Program rules regarding renewals.

13.    Article XV.B.7 is omitted in its entirety.

14.    Article XV.B.8 is omitted in its entirety.

_235478_11/

15.    Article XV.B.9 is amended as follows:

    9. Upon termination of this Agreement, Manager shall agree to cooperate with Company in the administration of the run off of any outstanding business and, Manager will cooperate in good faith with Company with respect to Company's replacement of Manager with a program manager for the Business, and Manager shall, at Company's expense, take all actions reasonably requested by Company to assure a smooth transition to such new program manager; provided however that so long as Company does not require any changes to the Manager's format, there will be no extra formatting charge by Manager for the transition of any or all data or records, whether electronic or otherwise, to Company or the new program manager.

16.    Article XV.C.2 is amended as follows:

    2. Upon termination of this Agreement, the Manager agrees to fully cooperate with the Company and provide all reasonable assistance in a timely fashion to the Company in connection with a transition to a new manager, and in connection therewith, and not in limitation of such duty:

    a    to provide, in a reasonable and timely fashion, reasonable and prompt access to all facilities, equipment, records and personnel, employed, leased, used, owned or occupied by the Manager or its agents,

    b.    to return to the Company without undue delay, destroy with the Company's consent, deliver to a new manager, or follow any other reasonable instruction of the Company with respect to any and all materials belonging to the Company,

    c.    to immediately discontinue the dissemination or use of, or follow any other reasonable instruction of the Company with respect to, any materials, marketing or otherwise, bearing the Company's name or logo or intellectual property; and

    d.    to promptly return to Company, or follow any other reasonable instruction of the Company with respect to all original records and all electronic records relating to the Business and not to retain any copies or extracts thereof or of any part thereof.

17.    Article XV.C.3 is amended as follows:

Upon termination of this Agreement, the Company agrees, for a period of one (1) year from the date of termination, that following reasonable advance written notice to Company, Manager shall have the right to reasonable access, for bona fide business reasons relating to the run off or management of accounts or defense of claims, and shall have the right to review all records related to the Business generated by Manager.

- 7 -

18.  Article XVI.A is amended as follows:

   A. Use and control. The business relationships with all customers, use and control of, and all right, title and interest in, all expirations and business written under this Agreement, pertaining to Business written pursuant to this Agreement shall remain the Company's property and remain in the Company's undisputed possession

19.  Article XVI. B is omitted in its entirety

20.  Article XVI. C is amended as follows:

   C. Security Interest.        To secure all indebtedness or liabilities for which Manager and/or its affiliated entities as set forth in Endorsement A are now, or may become liable to the Company in any manner pursuant to this Agreement, the Manager and its affiliated entities specified in Endorsement A grant to the Company, and its present and future affiliates, a security interest in all inventory, chattel paper, accounts, equipment, general intangibles and fixtures, including, but not limited to, all records, commissions, and after acquired collateral relating to insurance policies written by Manager and/or its affiliated entities (per Endorsement A), and all products and proceeds from the foregoing, now owned or in which they have an interest and in any and all of the same hereafter acquired or created. The Manager, and/or its affiliated entities listed in Endorsement A will execute any document, including but not limited to a document giving Company Power of Attorney, the Company considers necessary to maintain and perfect this security interest or to comply with applicable law.

21.  Article XVI. D is omitted in its entirety.

22.  Article XIX.Q is amended as follows:

   Q. Delivery of Insurance and Guaranty of Manager.

      The failure of (i) Robert Wallach and/or William Wallach to execute the Personal Guaranty required in Article XI.D concurrently with the execution of this Agreement or (ii) Manager to provide by December 16, 2005 at 5:00 P.M., E.S.T certificates of insurance or other evidence satisfactory to the Company that Manager has continued its existing professional errors and omissions policy and has in force the general liability insurance and fidelity bond, all as required by Article XI A., B. and C., shall entitle the Company, at its sole discretion and in addition to any other remedies provided under this Agreement or at law, to treat this Agreement as void ab initio.

- 8 -

23.    Endorsement B, Article I.B is amended as follows:

B. Allowed Policy Coverages / Limits

1. Assigned Risk Business – coverages and limits as prescribed by the applicable state assigned risk plan rules.

2. Voluntary Business- coverages and limits as prescribed by the New York Private Passenger Auto (Voluntary Take Out) and Physical Damage Only programs

24.    Endorsement D, Article II.A is amended as follows:

A. Provisional Commission. Subject to Article III.J of the Agreement, the Company shall allow the Manager a provisional commission (the "Provisional Commission") retroactive to January 1, 2006, equal to 12.5% (subject to adjustment as provided in paragraph H., the "Provisional Commission Rate") on monthly Net Collected Premium, net of required deposits to the Escrow Account (as defined below), as an advance against Commissions (as defined below) payable as provided below. The Manager shall allow the Company return commission on return premiums during each month at the Provisional Commission Rate, which the Company shall deduct on a monthly basis from the Provisional Commission for such month. The Company shall pay the Manager the Provisional Commission, net of any deduction for deposit into the Escrow Account (as defined below) as set forth below, five (5) days following receipt by Company of the Manager's invoice therefore and monthly reconciliation supporting such Provisional Commission; except that, for the calendar year 2006, the Company agrees to pay Manager an estimated Provisional Commission for each month, net of any deduction for deposit into the Escrow Account (as defined below) as set forth below, within two (2) business days of the first day of the next following month during such year, so long as the Manager shall have provided Company a good faith estimate of such Provisional Commission with such supporting documentation as the Company may reasonably request. On a monthly basis with respect to 2006, the parties shall true up any overpayment or underpayment of the actual monthly 2006 Provisional Commission owed with the estimated 2006 Provisional Commission paid within five (5) business days following receipt by Company of Manager's monthly reconciliation. The Manager agrees to deliver such a monthly reconciliation with respect to each month to the Company not later than the 10th business day following the end of such month.

25.    Endorsement D, Article II.D is amended to add the following paragraph immediately following the title of the Section and prior to words "The Company shall establish..."

- 9 -                                              _235478_11/

The provisions of this Section D shall only apply prospectively at any time when (i) Manager is not performing in accordance with all obligations under this Agreement, or (ii) all sums now or hereafter owed by TRPC to the Company under the Credit Agreement and the loan documents referred to therein, which is being executed contemporaneously with this Amendment have been paid in full, or (iii) the Company is not the sole owner of all of the equity interests (however defined) of the RPC Insurance Agency, L.L.C.

26.    Endorsement D, Article II.E is amended as follows:

E.  Commission. The commission payable with respect to any period by the Company to the Manager (the "Commission") shall be a percentage of Net Collected Premiums for such period, not less than 40% of the Provisional Commission Rate nor more than 120% of the Provisional Commission Rate (the "Commission Rate") calculated as follows:

1.  If the Loss Ratio for such period is greater than, or equal to, 72.0%, the Commission Rate shall be 40% of the Provisional Commission Rate.

2.  If the Loss Ratio for such period is greater than, 67.0%, and less than 72.0% the Commission Rate shall be equal to 80% of the Provisional Commission Rate, less 100.0% of the difference between the Loss Ratio and 67.0%, but not less than 40% of the Provisional Commission Rate.

3.  If the Loss Ratio for such period is greater than 64.0% and less than, or equal to 67.0% the Commission Rate shall be 80% the Provisional Commission Rate.

4.  If the Loss Ratio for such period is greater than, or equal to, 54.0%, but less than, or equal to, 64.0%, the Commission Rate shall be 80% of the Provisional Commission Rate plus 50% of percentage by which the Loss Ratio is less than 64.0%, but not greater than 120% of the Provisional Commission Rate.

5.  If the Loss Ratio for such period is less than 54% the Commission Rate shall be 120% of the Provisional Commission Rate.

27.    Endorsement E, Managers Personal Guaranty, is amended by deleting the following paragraph:

This Guaranty shall be secured by an irrevocable, unconditional, evergreen Letter of Credit ("LOC") with a qualified financial institution acceptable to LGIC in a face amount of $5,000,000 on terms and conditions reasonably acceptable to LGIC or, by other collateral acceptable to LGIC as determined in the sole discretion. LGIC shall be entitled to draw upon such Letter of Credit in the event of a breach of this Guaranty or any breach by RPC or any of its affiliates of the Program Manager Agreement or any Endorsement thereto. For purposes of this Endorsement E, qualified financial institution shall mean an institution that:

- 10 -

~~(1) is organized or, in the case of a U.S. office of a foreign banking organization, licensed under the laws of the United States or any state thereof;~~

~~(2) is regulated, supervised, and examined by U.S. federal or state authorities having regulatory authority over banks and trust companies; and~~

~~(3) is not affiliated with Manager or Guarantors.~~

28.    Payment to RPCA. Manager shall pay to RPCA, no later than five (5) days following receipt of each installment of the Provisional Commission paid to Manager pursuant to Endorsement D, Article II.A, an amount equal to one half of one per cent (.5%) of monthly Net Collected Premium due, paid or payable to Manager commencing January 1, 2006. The amounts due to RPCA for the period January 1, 2006 through the date of this Amendment shall be paid by Manager to RPCA out of the first Provisional Commissions due and paid to Manager after the date of this Amendment. RPCA shall allow the Manager a credit on return commission on return premiums during each month at the same rate, which the Manager shall deduct on a monthly basis from the payment to be made pursuant to this paragraph to RPCA.

29.    Withdrawal of Termination Notice Dated June 9, 2006. As of the Effective Date of this Amendment, the Termination Notice dated June 9, 2006 is withdrawn and the Agreement, as amended hereby, is reinstated as of the Effective Date. Other than with respect to those changes to the Agreement by operation of Sections 8, 9, 22, 27, 38, 39 and 40 hereof, reinstatement is not a waiver of any defaults or events that could mature into a default with the giving of notice, lapse of time or both, nor is it intended to affect the reversion of the Expirations to Company, which shall remain effective.

30.    Reservation Of Rights. The reinstatement set forth herein shall be limited precisely as written and, except as expressly set forth herein, neither the reinstatement nor this Amendment shall, or shall be deemed or construed to, (i) be a consent to any forbearance, waiver, amendment or modification of any other provision or condition of the Agreement as amended hereby, or to any forbearance, waiver, amendment or modification in the future, (ii) affect, impair, operate as a waiver of, or prejudice any right, power or remedy which Company may now or hereafter have pursuant to the Agreement or any other document, agreement, security agreement or instrument executed by either party in connection with or related to the Agreement, as amended hereby, or at law or in equity or by statute including, without limitation, with regard to any existing or hereafter arising default (other than with respect to those specifically waived by operation of Sections 8, 9, 22, 27, 38, 39 and 40 hereof), or (iii) impose upon Company any obligation, express or implied, to consent to any amendment or further modification of the Agreement or to a change in any beneficial or record ownership of the Manager. Company hereby expressly reserves all rights, powers and remedies specifically given to it under the Agreement, as amended hereby, or any other agreement or instrument, or now or hereafter existing at law, in equity or by statute.

31.    Releases; Indemnities. (a)    In further consideration of Company's execution of this Agreement, Manager, individually and on behalf of its successors (including, without limitation, any trustees acting on behalf of Manager and any debtor-in-possession with respect to Manager), assigns, subsidiaries and Affiliates, hereby forever releases Company and its respective successors, assigns, parents, subsidiaries, Affiliates, officers, employees directors, agents and attorneys (collectively, the "Releasees") from any and all debts, claims, demands, liabilities, responsibilities, disputes, causes, damages, actions and causes of actions (whether at law or in equity) and obligations of every nature whatsoever, whether liquidated or unliquidated, whether known or unknown, matured or unmatured, fixed or contingent (collectively, "Claims") that Manager may have against the Releasees which arise from or relate to any actions which the Releasees may have taken or omitted to take prior to the date this Agreement was executed including without limitation with respect to the Obligations, any Collateral, the Agreement, any other Loan Document and any third parties liable in whole or in part for the Obligations. This provision shall survive and continue in full force and effect whether or not (I) Manager shall satisfy all other provisions of this Amendment, or the Agreement including payment in full of all obligations and servicing the Business, or (ii) the Agreement otherwise is terminated.

(b)    Manager hereby agrees that its obligation to indemnify and hold the Releasees harmless as set forth in Section 31(a) shall include an obligation to indemnify and hold the Releasees harmless with respect to any and all liabilities, obligations, losses, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever incurred by the Releasees, or any of them, whether direct, indirect or consequential, as a result of or arising from or relating to any proceeding by, or on behalf of any Person, including, without limitation, officers, directors, agents, trustees, creditors, partners or shareholders of Manager, whether threatened or initiated, asserting any claim for legal or equitable remedy under any statutes, regulation or common law principle arising from or in connection with the negotiation, preparation, execution, delivery, performance, administration and enforcement of the Agreement or this Amendment, or any other document executed in connection herewith. The foregoing indemnity shall survive termination of the Agreement, the execution of any agreement with RPCA and the execution of any other agreements between the parties.

32.    Amendments.    No amendment or modification of any provision of this Amendment or the Agreement as amended hereby shall be effective without the written agreement of Company and Manager, and no termination or waiver or any provision of this Amendment or of the Agreement, or consent to any departure by Manager therefrom, shall in any event be effective without the written concurrence of Company, in each instance. Any waiver or consent shall be effective only in the specific instance and for the specific purpose for which it was given. No notice to or demand upon Manager in any case shall entitle such party to any other or further notice or demand in similar or other circumstances. Oral waivers, oral modifications and oral termination shall be ineffective and void.

_235478_1 I/

33.    Successors And Assigns. This Agreement shall inure to the benefit of and shall be binding upon the Manager and Company and their respective successors and assigns, and no other Person shall have any right, benefit or interest under or because of the existence of this Agreement, the Agreement, the Loan Documents, or the Collateral.

34.    Limitation On Relationship Between Parties. The relationship of the parties shall be that of independent contracting parties. No joint venture or partnership exists or is implied.

35.    No Assignment. Neither this Amendment nor the Agreement shall may be assignable by Manager without the prior written consent of Company. Company may assign to one or more affiliates all or any part of Company's rights and benefits hereunder or under the Agreement.

36.    Section Titles. The Section titles contained in this Agreement are included for the sake of convenience only, shall be without substantive meaning or content of any kind whatsoever, and are not a part of the agreement among the parties.

37. .   Preparation and Negotiation of this Agreement. Manager's counsel reviewed and participated in the negotiation and drafting of this Amendment. Accordingly, no adverse inference shall be drawn as a result of the drafting, preparation, filing or negotiation of this Amendment as against either party.

38.    Manager has delivered the Financial Statements and by such delivery is deemed to have cured the Statement Default.

39.    Manager has advised the Company that a New York State Tax Lien has been filed and that the State has informally agreed to accept monthly payments of approximately $133,000 to liquidate such lien. So long as (i) the Manager makes all such payments when due and (ii) the State does not disavow the Agreement, or takes action by way of enforcement of the lien or otherwise to collect the amounts due, other than by acceptance of approximately $133,000 per month, such lien shall not be deemed to be a default under the Agreement.

40.    Provided that Amendment No. 2 to the Promissory Note dated March 22, 2006 made by the Manager to the order of GSSF Master Fund, LP ("Gryphon") in the original principal amount of US $2,000,000 (the "Gryphon Note") is duly executed and delivered by the Manager and paid in full concurrently with the execution hereof, thus terminating and releasing any rights of Gryphon to any ownership interest in the Manager, THEN the authorization by the Manager, the execution and the payment of the Gryphon Note and Amendments 1 and 2 thereto shall not be deemed to be a default under the Agreement.

41.    Article XV.A.3(e) is amended as follows:

(e) Change of Ownership or Control of Manager. Except as specifically permitted under the Restated and Amended Limited Liability Company Agreement of RPCA. with respect to Manager acquiring 60 Class B Units of RPCA,

- 13 -                                             _235478_11/

(i) there is one or more changes in the record or beneficial ownership or control of Manager or of RPCA that either is not or are not permitted under clause (iii) of this sub-section (e) or that Company does not consent to in writing, which consent may be granted or withheld by the Company in its sole discretion, or

(ii) Manager issues or sells any securities or rights to acquire any securities of Manager or of any of its Affiliates (other than Eagle Insurance Company or any of its direct and indirect subsidiaries (collectively, "Eagle")) to any party (other than in a recapitalization whereby there is no change in the beneficial ownership or percentages of ownership or voting control of any equity securities of Manager or its Affiliates (other than Eagle) held by the shareholders of Manager on June 9, 2006) from and after the date that Manager acquires 60 Class B Units of the Manager, or

(iii) there is a transfer, conversion, redemption (if permitted under applicable law) sale, pledge, hypothecation or other transaction (collectively for purposes of this sub-section (e), a "Transfer" or "Transfers", as the case may require), effected without the prior written consent of the Company whereby any person obtains any record or beneficial interest in the Manager or in Manager unless at all times William, Frances and Robert Wallach own beneficially and of record, on a continuous basis from the date hereof, and control not less than 92.5% of the combined voting power of all issued and outstanding equity securities of all classes issued by Manager, calculated on an as converted basis, with not fewer than 75% (on a fully diluted and fully converted basis) of the issued and outstanding equity securities of the Provider being pledged to LGIC under the terms of the Security Agreements executed concurrently with the Credit Agreement by such individuals; or

(iv) Manager defaults in any obligation to acquire Units of RPCA under Article XII of the Administration Services Agreement.

In the event Company so consents to a change in ownership of control, Manager agrees that the Company shall have the exclusive right to continue all Business set forth under this Agreement for a minimum of two (2) years from the effective date of change in ownership or control, and Manager may not exercise the 240 day termination provision contained in Section A.2. of this Article until the expiration of such two year period.

For purpose of this Article, control shall include, but shall not be limited to the common usage of the term under all insurance regulations and laws affecting LGIC, the Manager or the Manager, or under any securities laws, or the ability to affect the management or affairs of the Manager, by contract, instrument, agreement or otherwise. However, a change in ownership resulting from the death of either William Wallach or his wife, Frances Wallach shall not be deemed a change in ownership or control if all voting and dispositive control of all equity

_235478_11/

interests held by the deceased are transferred to or otherwise remain under the sole and control of the survivor of them or Robert Wallach. For this purpose, any trusts created under the will of such decedent for the exclusive benefit of his or her children or grandchildren shall not be deemed to be a change in ownership for purposes of this clause if, and only if Robert Wallach has the exclusive voting and dispositive control of the equity interests of Manager constituting the corpus of such trusts.

*THE BALANCE OF THIS PAGE IS INTENTIONALLY LEFT BLANK*
*THE SIGNATURE PAGE IMMEDIATELY FOLLOWS THIS PAGE*

_235478_11/

IN WITNESS WHEREOF, the parties, intending to be legally bound, have caused their authorized representatives to execute this Amendment No.1 to the Agreement below.

Manager:                                    Company:

THE ROBERT PLAN CORPORATION                 LINCOLN GENERAL INSURANCE
                                            COMPANY

By: _____                 By: _____

Title: Chairman + CEO                        Title: _____

Date: 6·21· 06                               Date: _____

WITNESS: _____            WITNESS: _____

By: _____                 By: _____

Title: Chief Operating Officer               Title: _____

Date: 6·21· 06                               Date: _____

WITNESS: _____            WITNESS: _____

IN WITNESS WHEREOF, the parties, intending to be legally bound, have caused their authorized representatives to execute this Amendment No. 1 to the Agreement below.

Manager:                                   Company:

THE ROBERT PLAN CORPORATION                LINCOLN GENERAL INSURANCE
                                           COMPANY

By: _____                By: _____

Title: Chairman + CEO                      Title: Pres. & CEO

Date: _____              Date: 6/21/06

WITNESS: _____                WITNESS: _____

By: _____                By: _____

Title: Philbert A. NezAmoodeen             Title: EVP/CFO
Sr. Exec. V.P. + Chief Operating Officer

Date: _____              Date: 06/21/06

WITNESS: _____                WITNESS: _____

**EXHIBIT C**

**Lincoln General Insurance Company**
**RPC Insurance Agency, L.L.C.**

**Transfer of Certain Assets of**
**The Robert Plan Corporation and its Affiliates**

**Closing Memorandum**

This Memorandum describes the transactions among the following parties that were intended to be completed as of December 31, 2006 (the "Closing Date"), and executed and delivered by a duly authorized representative of the parties on January 5, 2007 (the "Closing"). All transactions are deemed to be completed simultaneously on the Closing Date unless otherwise provided herein.

**Section 1.**    The parties to the transactions were:

Purchaser: Lincoln General Insurance Company

Agency: RPC Insurance Agency, L.L. C.

Sellers: The Robert Plan Corporation ("TRCP"), The Robert Plan of California Corporation, The Robert Plan of New York Corporation, Freedom General Agency, Inc., Freedom Premium Finance Co.

Principals: Robert Wallach, Frances Wallach, William Wallach, William Wallach Trust

**Section 2.**    Reference is made to the following existing documents:

Program Manager Agreement dated November 22, 2005, between Purchaser and TRPC, as amended (the "PMA").

Administration Services Agreement dated as of June 14, 2006, between the Agency and TRPC, as amended (the "ASA").

Credit Agreement dated as of June 20, 2006 between Purchaser as lender and The Robert Plan Corporation, the Robert Plan of New York Corporation, the Robert Plan of California Corporation as borrowers (the "Borrowers") and Freedom General Agency, Inc., Freedom Premium Finance Co. as guarantors, as amended (the "Credit Agreement").

**Section 3.**    Reference is also made to the following additional documents that were executed and delivered at the Closing (the "Closing Documents"):

Marketing and Option Agreement dated as of December 31, 2006, between the Purchaser, the Agency and TRPC (the "Marketing and Option Agreement"), a copy of which is attached hereto as Exhibit 1.

Assignment and Consent dated as of December 31, 2006 from the Sellers to the Purchaser (the "Assignment") transferring the assets, as described therein, from the Sellers to the Purchaser for the consideration described therein, and acknowledging the settlement of disputes, a copy of which is attached hereto as Exhibit 2.

Releases dated as of January 5, 2006, from each of the Sellers and each of the Principals and their affiliates (the "Releases"), copies of which are attached hereto as Exhibit 3

Non-Compete and Non-Solicitation Agreements dated as of January 5, 2006, from each of the Sellers and their affiliates (the "Non-Compete Agreements"), copies of which are attached hereto as Exhibit 4.

Amended and Restated Limited Liability Company Agreement of the Agency dated as of January 1, 2007, copies of which are attached hereto as Exhibit 5.

**Section 4.**    As of the Closing Date, the following occurred:

(a)    Certain assets of the Sellers were transferred to the Purchaser in accordance with the Assignment (the "Assets").    Sellers acknowledge receipt of the full consideration stated to be paid on the Closing Date.

(b)    Sellers waived any objection to the Purchaser or the Agency speaking to, making offers of employment to, or employing any of the current or former employees of any of the Sellers. The employment of any of the current or former employees of any of the Sellers by the Purchaser or the Agency is at the sole discretion of the Purchaser or the Agency.

(c)    The Credit Agreement was terminated effective as of the Closing Date. No further borrowings are permitted under the Credit Agreement. All amounts outstanding under the Credit Agreement, whether or not due or payable, were applied to the purchase price of the Assets and are no longer outstanding under the Credit Agreement or the Term Loan Note issued thereunder.

(d)    The Term Loan Note (as defined in the Credit Agreement) was returned to Sellers marked Cancelled.

(e)    The Guaranty (as defined in the Credit Agreement) of each Guarantor (as defined in the Credit Agreement) was returned to the Guarantors, marked Cancelled.

(f)    Each Stock Pledge Agreement (as defined in the Credit Agreement) was released and the shares of stock pledged thereunder were returned to the Sellers, as agent for the pledgors.

(g)    The PMA and the ASA were terminated.

(h)    The Sellers and their affiliates delivered the Releases to the Purchaser and the Agency.

(i)    The Sellers and their affiliates delivered the Non-Compete Agreements to the Purchaser and the Agency.

(j)    The Purchaser and the Agency were authorized to make offers of employment to certain of the current and former employees of the Sellers to commence employment with the Agency as of January 8, 2007 (the "Initial Agency Employees").

**Section 5.**    License and Sublease.    In addition to the foregoing, as part of the transaction, the Sellers agree to permit the Agency and its employees and representatives to occupy space in the premises of TRPC located at 999 Stewart Avenue, Bethpage, New York (the "Premises") formerly occupied by the Initial Agency Employees (the "License"). In addition, and as part of the License, the Agency, its employees and representatives shall have the right and license to use any and all office equipment, software, data bases, files, furniture fixtures and equipment, including, without limitation, any computers, routers, communications equipment, printers, HVAC equipment, desks, chairs, lighting, work stations, servers, etc. (collectively, "Equipment").    There shall be no charge for such License or use of the Premises or the Equipment during the term of the License. Within ten (10) Business Days from the Closing Date TRPC and the Agency will enter into a sublease and services agreement (the "Sublease") for the space occupied by such employees or other space in the premises of TRPC acceptable to the Agency in its sole discretion, which Sublease will provide for the payment of rent in an amount equal to the base rent (other than late fees, interest or other charges multiplied by a fraction, the numerator of which is the number of rentable square feet of the Premises occupied from time to time by Agency and the denominator of which shall be the total number of rentable square feet of the entire Premises. During the term of the License, Sellers shall use their best efforts to obtain the consent of the landlord to the sublease and to the license. No adjustment or additional charge shall be made for the use of the Equipment. The Sublease shall provide for the use of all Equipment currently being used by such employees. TRPC will maintain such Equipment and the Premises in its current condition, and will provide HVAC, sanitary and other services with respect to such space for cleaning and maintenance, receptionist services, access to the cafeteria, computer facilities and use of other central computer and other equipment now used by such employees in the operation of the Business. The cost of all such services shall be included in the rent under the Sublease, and no additional amount shall be charged except for a proportionate share of the direct out-of-pocket expenses incurred by TRPC in providing such services. The term of the Sublease shall be for two years through December 31, 2008, and may be terminated by Purchaser or the Agency upon 30 day's prior written notice effective and concurrently with the termination or expiration of the Marketing and Option Agreement. The Sublease will also provide that TRPC will keep and maintain its lease with its landlord in effect and will promptly seek all necessary consents from the landlord with respect to the Sublease and the occupancy by the Agency.    Until the Sublease is in effect, the Agency will be allowed to occupy such space on such terms. Any material breach by TRPC of this undertaking to permit occupancy and use of equipment and services, to enter into the Sublease and to perform its obligations thereunder shall authorize Company to suspend the payment of fees under the Marketing and Option Agreement. This authorization is not intended to limit the Company's rights or remedies arising upon a breach.

**Section 6.**    Information Technology and Related Services.

6.1    CGI.    CGI and the Agency will enter into a separate agreement to be effective in January 2007 that will provide certain information technology ("IT") services, central computer and other services to Agency and TRPC that will be paid by the Agency. Upon execution of this Memorandum, there will be a transition period in which the Agency will pay for shared services for both the Agency and TRPC expenses until such time that the parties can physically and contractually separate certain IT services, central computer and other services.    Such proportionate expenses paid by the Agency that are attributable to TRPC will be deducted from the monthly sub-lease payments or Marketing Fee due TRPC until paid in full. It is understood that both parties will use best efforts to "carve out" all certain IT services, central computer and

other services as soon as reasonably possible that are required to support all TRPC business. Both parties will be responsible for their own expenses resulting from and deemed necessary by the Agency to effectuate said transition, and services provided in this Memorandum that are paid separately by the Agency will not be included in the Sublease.

6.2     Other IT Services.  For certain IT services, central computer and other services not contemplated in the aforementioned agreement between CGI and Agency, it is understood that the Agency will directly enter into individual contracts and/or agreements with various IT vendors, suppliers and services providers necessary to support and operate Agency business. Until such time as the successor agreements are in place, Agency may continue to use TRPC's IT Services and third party providers under the License and Agency shall reimburse TRPC for a portion of the expenses it deems reasonable for those services actually used by Agency, but only during a transition period not to exceed sixty (60) days from the Closing Date. Both parties will use best efforts to "carve out" and transition all existing TRPC contracts and service agreements pertaining all certain IT services, central computer and other services as soon as reasonably possible that are deemed necessary by the Agency to support Agency business. Both parties will be responsible for their own expenses resulting from and deemed necessary by the Agency to effectuate said transitions. Services provided in these various agreements that are paid separately by the Agency will not be included the Sublease.

Section 7.     Representations ,Warranties and Covenants of Seller and Principals.

Sellers and each Principal represent and warrant, jointly and severally, to Purchaser and to Agency as follows:

7.1     Organization and Good Standing.  Each Seller is duly organized, validly existing and in good standing in its state of formation with full corporate power and authority to conduct its business as it is now being conducted, to own or use the properties and assets that it purports to own or use, and to perform all its obligations under the Closing Documents. Sellers are duly qualified to do business as a foreign corporations or limited liability companies, are in good standing under the laws of each state or other jurisdiction in which either the ownership or use of the properties owned or used by it, or the nature of the activities conducted by it, requires such qualification and hold all licenses that are required for them to perform their obligations under the Closing Documents.

7.2     Enforceability; Authority; No Conflict.  Each of this Memorandum and the Closing Documents constitutes the legal, valid and binding obligation of Sellers and Principals, enforceable against each of them in accordance with its terms.  Upon the execution and delivery by Seller and Principals of the Closing Documents and this Memorandum, each such document will constitute the legal, valid and binding obligation of each of Sellers and the Principals, enforceable against each of them in accordance with its terms. Sellers, each, has the absolute and unrestricted right, power and authority to execute and deliver this Memorandum and the Closing Documents to which it is a party and to perform its obligations under this Agreement and the Seller's Closing Documents, and such action has been duly authorized by all necessary action by Sellers' governing body and owners.  Neither the execution and delivery of this Agreement nor the consummation or performance of any of the transactions contemplated hereby or by the Closing Documents (the "Contemplated Transactions") will, directly or indirectly (with or without notice or lapse of time):

(a)    breach (A) any provision of any of the governing documents of any Seller or (B) any resolution adopted by the governing body of the Sellers or the owners of any Seller;

(b)    breach or give any governmental body or other person the right to challenge any of the Contemplated Transactions or to exercise any remedy or obtain any relief under any legal requirement or any order, judgment, award or ruling (collectively, an "Order") to which any Seller or Principal, or any of the Assets, may be subject;

(c)    contravene, conflict with or result in a violation or breach of any of the terms or requirements of, or give any governmental body the right to revoke, withdraw, suspend, cancel, terminate or modify, any governmental authorization that is held by any Seller or that otherwise relates to the Assets or to the business of Sellers; cause Purchaser to become subject to, or to become liable for the payment of, any tax;

(d)    breach any provision of, or give any Person the right to declare a default or exercise any remedy under, or to accelerate the maturity or performance of, or payment under, or to cancel, terminate or modify, any material contract of any Seller;

(e)    result in the imposition or creation of any encumbrance upon or with respect to any of the Assets; or

(f)    result in any equity owner of any Seller having the right to exercise dissenters' appraisal rights.

Except with respect to the Sublease, neither Sellers nor any Principal is required to give any notice to or obtain any consent or approval from any person in connection with the execution and delivery of this Memorandum or the consummation or performance of any of the Contemplated Transactions.

7.3    Description of Leased Real Property. Annexed hereto as Schedule 7(b) is a true copy of the overlease for the Premises. There are no amendments or supplements thereto and no provisions have been waived by any party. Sellers are in full compliance with the terms thereof.

7.4    Condition of Facilities The Premises are in good condition and repair and in full compliance with all governmental regulations and the certificate of occupancy. All improvements are in compliance with all applicable legal requirements, including those pertaining to zoning, building and the disabled, electrical, building and other codes, are in good repair and in good condition, ordinary wear and tear excepted, and are free from latent and patent defects. Each item of Equipment is in good repair and good operating condition, ordinary wear and tear excepted, is suitable for immediate use in the ordinary course of business and is free from latent and patent defects. No item of tangible personal property is in need of repair or replacement other than as part of routine maintenance in the ordinary course of business.

7.5    Employees and Employee Benefits. Schedule 8 sets forth a complete and correct list of all persons that were employees of the Sellers during the prior 90 days, setting forth their rates of pay/salaries, benefits, holidays, sick days, and other terms of employment. Sellers shall timely pay all wages, salaries and benefits to its employees for all work through January 7, 2007 and shall timely fulfill all funding and filing requirements with respect to all "employee benefit plans" as defined by Section 3(3) of ERISA, all specified fringe benefit plans as defined in Section 6039D of the Internal Revenue Code of 1986, as amended, and all other bonus,

incentive-compensation, deferred-compensation, profit-sharing, stock-option, stock-appreciation-right, stock-bonus, stock-purchase, employee-stock-ownership, savings, severance, change-in-control, supplemental-unemployment, layoff, salary-continuation, retirement, pension, health, life-insurance, disability, accident, group-insurance, vacation, holiday, sick-leave, fringe-benefit or welfare plan, and any other employee compensation or benefit plan, agreement, policy, practice, commitment, contract or understanding (whether qualified or nonqualified, currently effective or terminated, written or unwritten) and any trust, escrow or other agreement related thereto that (i) is maintained or contributed to by Seller or any other corporation or trade or business controlled by, controlling or under common control with Seller (within the meaning of Section 414 of the Code or Section 4001(a)(14) or 4001(b) of ERISA) ("ERISA Affiliate") or has been maintained or contributed to in the last six (6) years by Seller or any ERISA Affiliate, or with respect to which Seller or any ERISA Affiliate has or may have any liability, and (ii) provides benefits, or describes policies or procedures applicable to any current or former director, officer, employee or service provider of Seller or any ERISA Affiliate, or the dependents of any thereof, regardless of how (or whether) liabilities for the provision of benefits are accrued or assets are acquired or dedicated with respect to the funding thereof (collectively the "Employee Plans.

      (a)    Full payment has been made not later than one business day following the Closing Date, or, if Sellers established payroll practices dictate a later date, then by such date, of all amounts that are required to be paid to employees and withholding authorities for all work through January 7, 2007, and all sum due and to become due under the terms of each Employee Plan to be paid as contributions with respect to all periods prior to and including January 7, 2007.

      (b)    There is no material pending or threatened proceeding relating to any Employee Plan, nor is there any basis for any such proceeding.

      (c)    Except for the continuation coverage requirements of COBRA, Seller has no obligations or potential liability for benefits to employees, former employees or their respective dependents following termination of employment or retirement under any of the Employee Plans that are Employee Welfare Benefit Plans.

    7.6    Legal Proceedings; Orders.  There is no pending or, to the knowledge of Sellers or Principals, threatened proceeding by or against any Seller or that otherwise relates to or may affect the business of, or any of the assets owned or used by, Seller, or that challenges, or that may have the effect of preventing, delaying, making illegal or otherwise interfering with, any of the Contemplated Transactions.  No event has occurred or circumstance exists that is reasonably likely to give rise to or serve as a basis for the commencement of any such proceeding.  There is no Order to which any Seller, its business or any of the Assets is subject; and no officer, director, agent or employee of Seller is subject to any Order that prohibits such officer, director, agent or employee from engaging in or continuing any conduct, activity or practice relating to the Business.

    7.7    Brokers or Finders.  Neither Sellers nor any of the Principals have incurred any obligation or liability, contingent or otherwise, for brokerage or finders' fees or agents' commissions or other similar payments in connection with the sale of the Assets or the Contemplated Transactions.

**Section 8.**   Representations and Warranties of Purchaser

Purchaser represents and warrants to Seller and Principals as follows:

8.1   Organization and Good Standing. Purchaser is a corporation duly organized, validly existing and in good standing under the laws of the State of Pennsylvania, with full corporate power and authority to conduct its business as it is now conducted.

8.2   Authority; No Conflict. This Agreement constitutes the legal, valid and binding obligation of Purchaser, enforceable against Purchaser in accordance with its terms. Upon the execution and delivery by Purchaser of this Memorandum and the Closing Documents to which it is a party, each of such documents will constitute the legal, valid and binding obligation of Purchaser, enforceable against Purchaser in accordance with its respective terms. Purchaser has the absolute and unrestricted right, power and authority to execute and deliver this Memorandum and the Closing Documents to which it is a party and to perform its obligations under this Memorandum and such Closing Documents, and such action has been duly authorized by all necessary corporate action. Neither the execution and delivery of this Memorandum agreement by Purchaser nor the consummation or performance of any of the Contemplated Transactions by Purchaser will give any person the right to prevent, delay or otherwise interfere with any of the Contemplated Transactions.

8.3   Certain Proceedings. There is no pending proceeding that has been commenced against Purchaser and that challenges, or may have the effect of preventing, delaying, making illegal or otherwise interfering with, any of the Contemplated Transactions. To Purchaser's Knowledge, no such proceeding has been threatened.

8.4   Brokers or Finders. Neither Purchaser nor Agency have incurred any obligation or liability, contingent or otherwise, for brokerage or finders' fees or agents' commissions or other similar payment in connection with the Contemplated Transactions.

**Section 9.**   Covenants of Sellers and Principals Following Closing

9.1   Access and Investigation. Following the Closing, upon reasonable advance notice received from Purchaser or Agency or their representatives, Sellers shall (and Principals shall cause Sellers to) (a) afford Purchaser, Agency and their representatives (collectively, "Purchaser Group") full and free access, during regular business hours, to Seller's personnel, properties, books and records and other documents, systems and data, for the purposes of dealing in and with the Business and any customer matters or claims made under any of the policies, such rights of access to be exercised in a manner that does not unreasonably interfere with the operations of Sellers; (b) furnish Purchaser Group with copies of all contracts, governmental authorizations, books and records and other existing documents and data as Purchaser may reasonably request; (c) furnish Purchaser Group with such additional financial, operating and other relevant data and information as Purchaser may reasonably request for the foregoing purposes; and (d) otherwise cooperate and assist, to the extent reasonably requested by Purchaser, with Purchaser's or Agency's operation of the Business and the transition from Sellers.

9.2   Operation of the Business of Seller. Sellers shall (and Principals shall cause Sellers to):

        (a)     (a) comply with all legal requirements and contractual obligations applicable to the operations of Sellers businesses through January 5, 2007, and thereafter, and in connection with the fulfillment of the Sellers obligations from the Closing under the Marketing and Option Agreement;

        (b)     (b) upon request from time to time, execute and deliver all documents, make all truthful oaths, testify in any Proceedings and do all other acts that may be reasonably necessary or desirable in the opinion of Purchaser to consummate the Contemplated Transactions, all without further consideration; and

        (c)     (c) maintain all books and records of Seller relating to Sellers' businesses in the ordinary course of Business.

    **Section 10.**   Miscellaneous Provisions

    10.1   Notices. Any notice, demand, process or communication required or permitted to be given by any provision of this Memorandum shall be deemed to have been sufficiently given or served for all purposes if delivered personally to the party or to any executive officer of the party to whom the same is directed or, if sent by express, priority, registered or certified mail, postage and charges prepaid, addressed to The Robert Plan Corporation if intended for the Sellers or the Principals and to Lincoln General Insurance Company if to Purchaser or to the Agency, each at the addresses provided in the Closing Documents. Except as otherwise provided herein, any such notice shall be deemed to be given five (5) business days after the date on which the same was deposited in a regularly maintained receptacle for the deposit of United States mail, addressed and sent as aforesaid.

    10.2   Application of New York Law. This Memorandum and its application and interpretation shall be governed exclusively by its terms and by the laws of the State of York applicable to agreement executed and to be fully performed in such state. Choice of law rules that might cause the application of the laws of any other jurisdiction shall not apply.

    10.3   Jurisdiction. Any lawsuit, action or legal proceeding of any nature commenced under this Memorandum or under any of the Closing Documents by any party must be brought in the Courts of the Commonwealth of Pennsylvania, sitting in Harrisburg, the United States District Court for the Middle District of Pennsylvania (sitting in Harrisburg), and any applicable appellate courts. The United States District Court for the Eastern District of New York shall also be acceptable to both parties in the event federal jurisdiction is found. No party shall remove, seek to transfer or seek to dismiss for lack of jurisdiction or the convenience of a party or witness any action or proceeding brought in such courts. Legal process may be served in the manner provided herein for notices or as may be permitted by applicable law. For purposes of service of process related to disputes governed by this Agreement only, the parties agree to accept service of process by personal delivery, registered or certified U.S. mail or overnight courier/delivery service to the addresses specified above. The parties consent to the personal jurisdiction of the above courts and agree that they shall not seek to dismiss or transfer any case or proceeding brought in the designated courts on the basis of lack of personal jurisdiction or based on a claim the forum is not convenient for the parties or any witness.

10.4    Amendments. Neither this Memorandum nor any of the Closing Documents may be amended except by the written agreement of all of the signatories to the applicable agreement or instrument. Oral amendments, oral supplements and purported oral terminations shall be void.

10.5    Execution of Additional Instruments. Each party agrees to execute such other and further agreements, instruments, assignments and documents as may be necessary to consummate the Contemplated Transactions and to provide the benefits contemplated thereby to the parties.

10.6    Headings. The headings in this Memorandum are inserted for convenience only and are in no way intended to describe, interpret, define or limit the scope, extent or intent of this Memorandum or any provision hereof.

10.7    Waivers. The failure of any party to seek redress for violation of or to insist upon the strict performance of any covenant or condition of this Memorandum or in any of the Closing Documents shall not prevent a subsequent act, which would have originally constituted a violation, from having the effect of an original violation. Oral waivers are void.

10.8    Rights and Remedies Cumulative. The rights and remedies provided by this Memorandum and in the Closing Documents are cumulative and the use of any one right or remedy by any party shall not preclude or waive the right to use any or all other remedies. Said rights and remedies are given in addition to any other rights the parties may have by law, statute, ordinance or otherwise.

10.9    Severability. If any provision of this Memorandum or the application thereof to any person or circumstance shall be invalid, illegal or unenforceable to any extent, the remainder of this Memorandum and the application thereof shall not be affected and shall be enforceable to the fullest extent permitted by law.

10.10    Heirs, Successors and Assigns. Each and all of the covenants, terms, provisions and agreements herein contained shall be binding upon and inure to the benefit of the parties hereto and, to the extent permitted by this Memorandum, their respective heirs, legal representatives, successors and assigns.

10.11    Creditors/Third Party Beneficiaries. None of the provisions of this Memorandum shall be for the benefit of or enforceable by any third party, including, without limitation, creditors of any party. There are no intended third party beneficiaries of this Memorandum.

10.12    Counterparts. This Memorandum may be executed in counterparts and via facsimile with an original signature to follow promptly via U.S. Mail, each of which shall be deemed an original but all of which shall constitute one and the same instrument.

10.13    Entire Agreement. This Memorandum and the Closing Documents set forth the entire agreement among the parties with respect to the subject matters covered hereby and thereby.    This Memorandum and the Closing Documents supersede any prior or contemporaneous understanding or agreement with respect to the Contemplated Transactions.

10.14    Independent Contractor. Sellers and the Principals are not partners with, joint venturers with or agents or representatives for Purchaser or Agency and may not bind Purchaser

or Agency. Purchaser and Agency are not partners with, joint venturers with or agents or representatives for Sellers or Principals and may not bind Sellers or Principals.

10.15 Negotiated Agreement. The parties have negotiated this Memorandum and the Closing Documents and counsel for the parties has reviewed the prior drafts and the final version. The fact that the initial and final draft, shall have been prepared by one or the other of the parties shall not be used in any forum in the construction or interpretation of this Memorandum or any of the Closing Documents or any of their respective provisions.

*THE BALANCE OF THIS PAGE IS INTENTIONALLY LEFT BLANK.*
*THE SIGNATURE PAGE IMMEDIATELY FOLLOWS THIS PAGE*

10

### *Signature Page to Closing Memorandum*

The parties acknowledge and agree to the foregoing as of the Closing Date.

### LINCOLN GENERAL INSURANCE COMPANY

By: _____

    John T. Clark
    President and CEO


### RPC INSURANCE AGENCY, L.L.C.

By: _____

    Scott Butler
    President


### THE ROBERT PLAN CORPORATION

By: _____

    Robert M. Wallach
    Chairman, Chief Executive Officer and President

By: _____

    Name:
    Title:


### THE ROBERT PLAN OF NEW YORK CORPORATION

By: _____

    Robert M. Wallach
    President

By: _____

    Name:
    Title:

*Signature Page to Closing Memorandum*

The parties acknowledge and agree to the foregoing as of the Closing Date.

### LINCOLN GENERAL INSURANCE COMPANY

By: _____
    John T. Clark
    President and CEO

### RPC INSURANCE AGENCY, L.L.C.

By: _____
    Scott Butler
    President

### THE ROBERT PLAN CORPORATION

By: _____
    Robert M. Wallach
    Chairman, Chief Executive Officer and President

By: _____
    Name:
    Title:

### THE ROBERT PLAN OF NEW YORK CORPORATION

By: _____
    Robert M. Wallach
    President

By: _____
    Name:
    Title: Vice President

THE ROBERT PLAN OF CALIFORNIA CORPORATION

By: _____
Robert M. Wallach
President

By: _____
Name:
Title: Vice President

FREEDOM GENERAL AGENCY, INC.

By: _____
Robert M. Wallach
President

By: _____
Name:
Title: Vice President

FREEDOM PREMIUM FINANCE CO.

By: _____
Robert M. Wallach
President

By: _____
Name:
Title: Vice President

_____
Robert M. Wallach
Individually

_____
Frances Wallach
Individually

_____
William Wallach
Individually

[Others?]

*Signature Page to Closing Memorandum*

The parties acknowledge and agree to the foregoing as of the Closing Date.

William Wallach
Individually

### THE WILLIAM WALLACH IRREVOCABLE TRUST

By: _____
Frances Wallach, its Trustee

By: _____
Richard Wallach, its Trustee

NYC 234707.3